**Dated: December 20, 2024.**

CHRISTOPHER G. BRADLEY
**UNITED STATES BANKRUPTCY JUDGE**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 23-30242-cgb |
| **J.A.R. CONCRETE, INC.** | § | |
| **d/b/a J.A.R. Construction, Inc.,** | § | **Chapter 7** |
| | § | |
| Debtor. | § | |
| **CAMINO REAL REGIONAL** | § | |
| **MOBILITY AUTHORITY,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | |
| | § | **Adv. No. 24-03001-cgb** |
| **RONALD E. INGALLS, solely in** | § | |
| **his capacity as Chapter 7 Trustee** | § | |
| **for the estate of J.A.R.** | § | |
| **CONCRETE, INC., d/b/a J.A.R.** | § | |
| **Construction, Inc.,** | § | |
| | § | |
| **Defendant.** | § | |

## <u>OPINION ON FIRST STAGE OF TRIAL</u>

Camino Real Regional Mobility Authority (variously referred to as "<u>Camino Real</u>," "<u>Camino</u>," the "<u>Authority</u>," or "<u>CRRMA</u>") seeks declaratory relief from Ronald Ingalls (the "<u>Trustee</u>"), trustee of the Chapter 7 bankruptcy estate of J.A.R.

Concrete, Inc. ("<u>JAR</u>");[1] the Trustee has counterclaimed for monetary and declaratory relief.[2]

The Court has determined to hold a multi-part trial in this adversary proceeding. The first stage of trial (the "<u>First Stage</u>") was held in El Paso on November 13, 2024,[3] and closing arguments were heard by Zoom on December 5, 2024. Proposed findings of fact and conclusions of law were each submitted by Camino Real[4] and the Trustee.[5] In this opinion (the "<u>Opinion</u>"), the Court provides its findings and holdings on the matters at issue in the First Stage.

This Opinion is intended to be helpful to the parties in planning for the second stage of trial. It is not intended as a final order and provides only such explanation as the Court believes is necessary to guide the parties in their preparations. In a later, fuller opinion and final order, the Court will provide more background, analysis, and discussion to aid in the consideration of this matter by appellate courts and any other parties interested in this proceeding.

In short, the rulings on the three matters set for the First Stage[6] are as follows:

1)  <u>the identity of the Engineer that is to act as referee in the contract between Camino Real and JAR</u>

*Mr. Edgar Fino of Atkins North America, Inc. served as the Engineer under the Contract from its inception.*

2)  <u>the scope of the Engineer's authority as referee to decide the matters addressed in the August 16, 2023, decision by Edgar Fino of Atkins North America, Inc. and affirmative claims by JAR for additional time and/or damages</u>

*The Contract entrusts the Engineer with authority to determine numerous matters, including whether to issue a notice of intent to default and other matters related to default. Affirmative claims for*

---

[1]  *See* Compl. for Declaratory J., ECF No. 1 (the "<u>Compl.</u>").

[2]  *See* Trustee's Answer and Countercl., ECF No. 47 (the "<u>Counterclaim</u>").

[3]  *See* Hr'g Tr. (Nov. 13, 2024), ECF No. 125 (the "<u>1st Stage Hr'g Tr.</u>").

[4]  Pl.'s Proposed Findings and Conclusions, ECF No. 111 ("<u>Pl.'s Proposed Findings and Conclusions</u>").

[5]  Trustee's 2d Am. Proposed Findings and Conclusions, ECF No. 128 ("<u>Trustee's Proposed Findings and Conclusions</u>").

[6]  *See* Mem. Order, ECF No. 86.

*additional time and/or damages generally fall within this authority as well. Insofar as the Engineer has made a determination on matters within his authority, his decision is subject to review under the Gross Error Standard (as defined below).*

*The Engineer does not, however, also have the right to sit in judgment under the contractual Dispute or Claims Procedure to determine whether his own decision was gross error. That must be done according to state law, which in this case means by this Court applying the appropriate substantive standard.*

3)    the propriety of the process leading to the August 16, 2023, determination by Edgar Fino of Atkins North America, Inc.

*The Court believes that the contractual default process was substantially followed, as the Engineer was sufficiently involved throughout the default process. Accordingly, the Court will review the Trustee's claim for wrongful default under the Gross Error Standard.*

*Because the Engineer is not empowered by the Dispute or Claims Procedure to determine disputes or claims that have been "elevat[ed]," his August 16, 2023, decision is not entitled to any additional deference.*

## I.    Background[7]

Camino Real was created in 2007 as a political subdivision of the State of Texas. Raymond Telles, Camino Real's Executive Director, has been at the Authority since 2008.[8] He is one of its two employees.[9] Since 2008, Camino Real has been involved more than 60 different projects, expending over $1.4 billion.[10]

In 2019, Camino Real sought bids for the Pellicano Drive Widening Project, an improvement project to widen Pellicano Drive east of the TX-375 Loop in El Paso

---

[7]    These background facts are uncontested or uncontroverted unless otherwise noted.
[8]    1st Stage Hr'g Tr. 47:5–8.
[9]    1st Stage Hr'g Tr. 47:19–22.
[10]   1st Stage Hr'g Tr. 47:9–16.

(the "Project").[11] It awarded the Project to JAR in 2020, the parties entered into their contract in March 2020, and construction was to commence in April 2020.[12]

In particular, JAR and Camino Real entered into a contract (the "Contract"), which had several parts. One was a short document executed by both parties, dated March 28, 2020.[13] The Contract also incorporated various items, including a lengthy set of project specifications, in a form almost entirely dictated by the Texas Department of Transportation ("TxDOT").[14] These specifications ("the "Technical Specifications")[15] are a version of the specifications used by TxDOT in its own projects (the "Standard Specifications")[16] that are modified as appropriate to public construction projects undertaken under the auspices of a local public entities like Camino Real.[17]

Due to a number of factors, many of which are hotly contested, the Project remained unfinished through the end of 2022[18] (and apparently remains so today). Camino Real sent a notice of intent to default to JAR on December 7, 2022,[19] which listed corrective items for JAR to perform within a 10-day period. Deeming JAR's response to this notice to be insufficient, Camino Real defaulted JAR on December 22, 2022.[20] In response, JAR submitted a claim for wrongful default to Camino Real on January 9, 2023,[21] and Camino Real determined that its declaration of default was proper on January 30, 2023.[22] The record reflects that the parties have exchanged various emails and other correspondence since then, although they appear to have come no closer to resolving their disputes.

---

[11] Pl.'s Proposed Findings and Conclusions ¶ 1; Trustee's Proposed Findings and Conclusions ¶ 6.

[12] Trustee's Proposed Findings and Conclusions ¶ 6.

[13] Compl., Ex. 1, ECF No. 1; Ex. P-1; Ex. TR-1 (the "Contract").

[14] 1st Stage Hr'g Tr. 61:8–23.

[15] Compl., Ex. 3, ECF No. 1; Ex. P-2; Ex. TR-2 (the "Tech. Specs.").

[16] TxDOT Standard Specifications for Construction and Maintenance of Highways, Streets, and Bridges (adopted Nov. 1, 2014), *available at* https://ftp.txdot.gov/pub/txdot-info/des/spec-book-1114.pdf.

[17] Hr'g Tr. 61:8–62:16.

[18] Pl.'s Proposed Findings and Conclusions ¶ 6; Counterclaim 10, ¶ 34.

[19] Compl., Ex. 2, ECF No. 1; Ex. P-22; Ex. TR-31.

[20] Compl., Ex. 5, ECF No. 1; Ex. P-24; Ex. TR-45.

[21] Compl., Ex. 6, ECF No. 1; Ex. P-25; Ex. TR-48.

[22] Compl., Ex. 7, ECF No. 1; Ex. P-26; Ex. TR-49.

JAR filed for Chapter 11 bankruptcy relief on March 14, 2023, and its case was converted to Chapter 7 liquidation on September 12, 2023,[23] at which time the Trustee was appointed. The Trustee, on behalf on JAR, maintains that the default was wrongful and seeks damages relating to it (as well as asserting a number of other claims against Camino Real).[24]

The parties also disagree on the propriety of the default process itself. Camino Real maintains that it "substantially complied" with the contractual default process, and furthermore, that its project manager, an engineering firm called Atkins North America Inc. ("Atkins"), led by a licensed engineer named Edgar Fino ("Fino"), was empowered by the Contract, as "Engineer" thereunder, not just to supply the initial notice of intent to default but to make the later determination of whether the contractual default process (in which it was involved) was correct.[25] According to Camino Real, Mr. Fino made his final determination on this matter at a meeting/"hearing" on August 8, 2023, which JAR was invited to but did not attend,[26] and Mr. Fino's decision was memorialized in a letter dated August 16, 2023.[27]

The Trustee argues, by contrast, that Camino Real did not comply with the contractually ordained default process,[28] that Mr. Fino of Atkins is not the Engineer under the Contract,[29] and that even if it is, it is not empowered to make the determination of whether the default process was proper.[30] It also contends that the Engineer has no right to determine its affirmative claims for additional time and/or damages under the Contract.[31] It states that it filed such claims with Camino Real on December 6, 2023,[32] as contractually required, but that they were never considered and therefore must be considered by this Court.[33]

Further procedural background can be gathered from the docket in this case. Relevant to this Opinion is that as of the time of the First Stage, among other active matters, Camino Real had a Motion to Dismiss[34] and a Motion for Partial Summary

---

23   Order Converting Case to Chapter 7, Case No. 23-30242, ECF No. 382.
24   See generally Counterclaim 17–31.
25   Pl.'s Proposed Findings and Conclusions ¶ 34.
26   Pl.'s Proposed Findings and Conclusions ¶¶ 16–18.
27   Ex. P-40; Ex. TR-61.
28   Trustee's Proposed Findings and Conclusions ¶ 31.
29   Trustee's Proposed Findings and Conclusions ¶ 17.
30   Trustee's Proposed Findings and Conclusions ¶ 124.
31   Trustee's Proposed Findings and Conclusions ¶ 122.
32   Ex. TR-62.
33   Trustee's Proposed Findings and Conclusions ¶ 104.
34   ECF No. 75.

Judgment[35] pending. A few days ago, the Court entered its Order Denying Motion to Dismiss Counterclaims and Denying Motion for Partial Summary Judgment,[36] which order the present Opinion draws from significantly.

## II.   Rulings

### A.   Mr. Fino of Atkins served as the Engineer under the Contract.

A crucial question in the Contract is who serves or served as the "Engineer" under it. The Contract does not directly answer that question. The Contract definitions state only that: the Engineer is the "Professional Engineer licensed in Texas who represents the interests of the Owner";[37] Camino Real is the "Owner";[38] and a "Licensed Professional Engineer" is a "person who has been duly licensed by the Texas Board of Professional Engineers to engage in the practice of engineering in the State of Texas; also referred to as a Professional Engineer."[39]

The Contract nowhere *names* the Engineer, and Camino Real and the Trustee disagree about who in fact served in that role. Camino Real contends it is Mr. Fino and/or his employer, Atkins,[40] whereas the Trustee contends it was CEA Group ("CEA"), another engineering firm licensed in Texas.[41] At first glance, both have plausible claims: Mr. Fino of Atkins[42] was the primary project manager, whereas CEA was responsible for design work and its engineers' stamps appear on most of the project design materials.[43] Because the Contract fails to designate who this

---

[35]   ECF No. 38.
[36]   ECF No. 139.
[37]   Tech. Specs., Sec. 1L.3.53.
[38]   Contract at 1.
[39]   Tech. Specs., Sec. 1L.3.74.
[40]   Pl.'s Proposed Findings and Conclusions ¶¶ 20–23.
[41]   Trustee's Proposed Findings and Conclusions ¶¶ 115–20.
[42]   Although the Court believes the Contract is best understood as an individual (Fino) rather than the entity for whom he worked (Atkins), this distinction does not affect the outcome of this case in any way. The Court occasionally uses "Atkins" as shorthand for "Mr. Fino of Atkins." In any case, both parties have agreed that the Contract can be interpreted to allow an entity (such as Atkins or CEA) to serve as Engineer.
[43]   *See, e.g.*, Ex. TR-85; 1st Stage Hr'g Tr. 125:1–9.

important person is, the Engineer's identity must be reverse-engineered (so to speak).[44]

The Engineer is empowered to perform a large number of tasks under the Contract. The various responsibilities of the Engineer under the Contract include the following:

- Quality assurance, sampling, testing, and inspecting to determine payment and make acceptance decisions.[45]
- Approve any internal or external facilitators to lead and guide discussions between Owner and Contractor.[46]
- Coordinate meeting dates, times, locations, other needs and appurtenances.[47]
- Approve reimbursement or invoices to pay external facilitators.[48]
- Reimburse invoices for meeting facilities and appurtenances.[49]
- Approve changes in addition, reduction, or elimination of quantities or alternations needed to complete the Contract.[50]
- If any chances occur in the contract, the Engineer may adjust the compensation.[51]
- If an adjusted unit price cannot be agreed upon, the engineer can determine the unit price.[52]
- When differing site conditions are present, the Engineer will notify the Contractor, investigate the conditions, and determine whether differing site conditions actually exist. Further, the Engineer will make adjustments in accordance with the Contract.[53]

---

[44] Camino Real apparently contends that Atkins' own determination that it is the Engineer is entitled to deference, because it is the Engineer. But this is circular. If Atkins is not the Engineer under the Contract terms, then its decision to the contrary is entitled to no more deference than a person on the street's. One cannot assume that Atkins is the Engineer and thereby give Atkins the power to decide that it is the Engineer.

[45] Tech. Specs., Sec. 1L.3.108.

[46] Tech. Specs., Sec. 4L.3.2.

[47] Tech. Specs., Sec. 4L.3.3.

[48] Tech. Specs., Sec. 4L.3.4.

[49] Tech. Specs., Sec. 4L.3.4.

[50] Tech. Specs., Art. 4L.4.

[51] Tech. Specs., Art. 4L.4.

[52] Tech. Specs., Art. 4L.4.

[53] Tech. Specs., Art. 4L.5.

- Make adjustments if the differing site conditions caused an increase or decrease in the cost or number of working days specified for the performance of the Contract.[54]
- Review any additional compensations requests submitted by the Contractor.[55]
- Observe, test, inspect, approve, and accept the work on behalf of the Owner.[56]
- Act as a referee in all questions arising under the terms of the contract. The Engineer's decisions will be final and binding.[57]
- May approve alternative submission procedures for project plans and working drawings.[58]
- Sign, seal, and date the working drawings.[59]
- Approval of items spanning over live traffic or where safety of the traveling public is affected.[60]
- Approve any work beyond the lines and grades shown on the plans or any extra work.[61]
- Approve any deviations from the project plans or any extra work. The Engineer will document the basis of acceptance by a letter and may adjust the Contract price.[62]
- When work fails to meet the Contract requirements, the Engineer can correct, remove, and replace defective or unauthorized work.[63]
- Make any necessary corrections and interpretations of any omissions, errors, or discrepancies.[64]
- May suspend work without suspending working day charges if Superintendent is not available or does not meet the criteria.[65]
- May remove from the project any employee or representative of the Contract or a subcontractor who, in the opinion of the Engineer, does not perform work in a proper and skillful manner or who is disrespectful, intemperate, disorderly, uncooperative, or otherwise objectionable.[66]

---

[54] Tech. Specs., Art. 4L.5.
[55] Tech. Specs., Art. 4L.6.
[56] Tech. Specs., Art. 5L.1.
[57] Tech. Specs., Art. 5L.1.
[58] Tech. Specs., Art. 5L.2.
[59] Tech. Specs., Art. 5L.2.
[60] Tech. Specs., Art. 5L.3.
[61] Tech. Specs., Art. 5L.3.
[62] Tech. Specs., Sec. 5L.3.1.
[63] Tech. Specs., Sec. 5L.3.2.
[64] Tech. Specs., Art. 5L.4.
[65] Tech. Specs., Art. 5L.5.
[66] Tech. Specs., Art. 5L.5.

- Make necessary arrangements with the utility owner when utility adjustments are required.[67]
- After being notified of utility conflicts, decide whether to adjust utilities or adjust the work to eliminate or lessen the conflict.[68]
- Allow the Contractor to copy available earthwork cross-sections, computer printouts or data files, and other information necessary to establish and control work.[69]
- Reserves the right to make measurements and surveys to determine the accuracy of the work and determine pay quantities.[70]
- Set control point for establishing lines, slopes, grades, and centerlines and for providing both vertical and horizontal control for construction surveying.[71]
- Set adequate control points, stakes, and marks to establish lines, slopes, grades and centerlines.[72]
- Authorize project inspectors.[73]
- Perform a complete and detailed inspection of the work.[74]
- Give written final acceptance for the work locations in the Contract.[75]
- Perform a final inspection after all work is completed.[76]
- Notify the Contractor in writing of the final acceptance of the work. If the final inspection finds any work to be unsatisfactory, the Engineer will identify in writing all deficiencies in the work requiring correction.[77]
- Provide written notice of the final acceptance.[78]
- Approve the source of materials to be used in the project before their delivery.[79]
- Approve corrective actions on material not meeting Contract requirements.[80]
- Inspect, test, and accept project materials.[81]

---

[67] Tech. Specs., Art. 5L.6.
[68] Tech. Specs., Art. 5L.6.
[69] Tech. Specs., Art. 5L.9.
[70] Tech. Specs., Art. 5L.9.
[71] Tech. Specs., Sec. 5L.9.1-9.
[72] Tech. Specs., Sec. 5L.9.2.
[73] Tech. Specs., Art. 5L.10.
[74] Tech. Specs., Art. 5L.10.
[75] Tech. Specs., Sec. 5L.12.1.
[76] Tech. Specs., Sec. 5L.12.1.2.
[77] Tech. Specs., Sec. 5L.12.1.2.
[78] Tech. Specs., Sec. 5L.12.1.2.
[79] Tech. Specs., Art. 6L.1.
[80] Tech. Specs., Art. 6L.2.
[81] Tech. Specs., Art. 6L.4.

- Witness all testing performed on the project.[82]
- May, but is not obligated, to inspect materials at the acquisition or manufacturing source.[83]
- Test and remove or dispose hazardous materials not introduced by the Contractor on sites owned or controlled by the Owner.[84]
- Review invoices and other records obtained from the facility showing the received weight of the steel and the facility name of paint that contains hazardous materials.[85]
- Schedule and attend a safety preconstruction meeting with the Contractor, subcontractors, Owner, local law enforcement, and other personnel that plays an active role on the project.[86]
- Determine if any of the requirements of the Legal Relations and Responsibilities have not been met.[87]
- May authorize or direct in writing the removal or relocation of project limit advance warning signs.[88]
- Discuss any unexpected situations that arises that cause the Contractor to believe that the traffic control should be changed.[89]
- Give written approval for any project specific locations in the right of way not specifically addressed on the plans.[90]
- Review writings submitted by the Contractor that discuss any changes in the date of actual demolition, renovation, or removal is changes.[91]
- May give written permission authorizing to make an opening in the highway for utilities, drainage, or any other reason.[92]
- Direct the repair of all openings.[93]
- Has the ability to request copies of the yearly overweight tolerance permits.[94]

---

[82]  Tech. Specs., Art. 6L.4.
[83]  Tech. Specs., Art. 6L.5.
[84]  Tech. Specs., Art. 6L.10.
[85]  Tech. Specs., Sec. 6L.10.2.
[86]  Tech. Specs., Sec. 7L.1.2.
[87]  Tech. Specs., Sec. 7L.1.3.
[88]  Tech. Specs., Sec. 7L.1.5.
[89]  Tech. Specs., Sec. 7L.1.5.
[90]  Tech. Specs., Sec. 7L.6.6.
[91]  Tech. Specs., Art. 7L.12.
[92]  Tech. Specs., Art. 7L.1.
[93]  Tech. Specs., Art. 7L.13.
[94]  Tech. Specs., Art. 7L.16.

- May request temporary fill for hauling purposes for the protection of certain structures.[95]
- May allow equipment with oversized or non-divisible overweight loads to operate without a permit within the work locations.[96]
- Review structural analysis and supporting documentation to determine whether traffic crossing structures will cause no damage or overstresses in excess of those normally allowed for occasional overweight loads.[97]
- Grant permission to store or stockpile material on bridge structures if no damages or overstresses in excess of those normally allowed for occasional overweight load will result to structures that will remain in use after Contract completion.[98]
- May allow divisible overweight loads on pavement structures within the work locations not open to the traveling public.[99]
- May consider failures beyond the Contractor's control when determining reimbursement for repairs to detours constructed.[100]
- May relieve the Contractor from responsibility of maintenance when directed.[101]
- May accept other states' electrical licenses by reviewing documentation of the requirements for obtaining that license.[102]
- Approve beginning work or before beginning any new operation.[103]
- May grant permission if Contractor wants to sublet any portion of the construction contract.[104]
- Direct how any specialty items will be shown on the plans.[105]
- Review and inspect payment records including copies of cancelled checks by the 20th day of each month.[106]
- If requested, must provide the conceptual time determination schedule to the Contractor for informational purposes only.[107]

---

[95] Tech. Specs., Art. 7L.16.
[96] Tech. Specs., Sec. 7L.16.1.
[97] Tech. Specs., Sec. 7L.16.1.
[98] Tech. Specs., Sec. 7L.16.3.
[99] Tech. Specs., Sec. 7L.16.4.
[100] Tech. Specs., Sec. 7L.17.4.
[101] Tech. Specs., Sec. 7L.17.5-5.4.
[102] Tech. Specs., Sec. 7L.18.1.4.
[103] Tech. Specs., Art. 8L.1.
[104] Tech. Specs., Art. 8L.2.
[105] Tech. Specs., Sec. 8L.2.1.
[106] Tech. Specs., Sec. 8L.2.3.
[107] Tech. Specs., Art. 8L.3.

- May consider increasing the number of working days under extraordinary circumstances.[108]
- Determine if weather or other conditions permit performance of the principal unit of work underway, grant permission to Contract to schedule work on Saturdays.[109]
- Grant permission for nighttime work if required, when nighttime work is allowed or required and daytime work is not allowed.[110]
- Grant permission for nighttime work, if nighttime work is performed or required and daytime work is allowed.[111]
- May suspend the work, wholly or in part, and provide notice and reasons for the suspension in writing.[112]
- May suspend working day charges only when conditions not under the control of the Contractor prohibit the performance of critical activities.[113]
- Evaluate and examine any modifications of the project schedule. If not accepted, provide comments to the Contractor for incorporation.[114]
- Review the project schedule.[115]
- Evaluate the updated schedule within 5 calendar days of receipt and inform the Contractor if it has or has not been accepted. If the schedule is not accepted, the Engineer will provide comments to the contractor for incorporation. Provide a revised schedule based on the Engineer's comments, or reasons for not doing so within 5 calendar days.[116]
- Review statement submitted by Contractor that may impacted the schedule.[117]
- Review time impact analysis when project schedule changes.[118]
- May declare the Contractor to be in default of the Contract.[119]
- Give notice in writing to the Contractor and the Surety of the intent to declare the Contractor in default.[120]

---

[108] Tech. Specs., Art. 8L.3.
[109] Tech. Specs., Sec. 8L.3.1.4.
[110] Tech. Specs., Sec. 8L.3.3.2.1.
[111] Tech. Specs., Sec. 8L.3.3.2.2.
[112] Tech. Specs., Art. 8L.4.
[113] Tech. Specs., Art. 8L.4.
[114] Tech. Specs., Sec. 8L.5.5.2.2.1.
[115] Tech. Specs., Sec. 8L.5.5.2.3.
[116] Tech. Specs., Sec. 8L.5.5.2.3.
[117] Tech. Specs., Sec. 8L.5.5.2.3.
[118] Tech. Specs., Sec. 8L.5.5.4.
[119] Tech. Specs., Sec. 8L.7.1.
[120] Tech. Specs., Sec. 8L.7.1.

- Provide written notice to the Contractor of termination specifying the extent of the termination and the effective date.[121]
- Prepare a change order that reduces the affected quantities of work and adds acceptable costs of termination.[122]
- Measure all completed work using United States standard measures, unless otherwise specified.[123]
- May require verification of volume through weight measurement.[124]
- May reject loads and suspend hauling operations for overloading.[125]
- Grant permission to Contractor of hauling on routes not accessible to the traveling public.[126]
- May agree in writing to fix the final quantity as a plans quantity item, if the item is less than $250.[127]
- Prepare a monthly estimate of the amounts of work performed, including materials in place.[128]
- Grant approval of any repairs required after fabricated materials have been approved for storage. [129]
- May request records relating to MOH payment.[130]
- Verify daily records of extra work created by Contractor.[131]
- Establish a reasonably hourly rate for pieces of equipment that are not in the Rental Rate Blue book.[132]
- Prepare a final estimate for payment showing the total quantity of work completed and the money owed to the Contractor.[133]
- Reviewing and resubmit, if necessary, all necessary shop drawings, certificates, etc. for review and acceptance.[134]
- May accept any Class I materials.[135]

---

[121] Tech. Specs., Sec. 8L.8.1.
[122] Tech. Specs., Sec. 8L.8.2.
[123] Tech. Specs., Art. 9L.1.
[124] Tech. Specs., Sec. 9L1.2.
[125] Tech. Specs., Sec. 9L.1.3.
[126] Tech. Specs., Sec. 9L.1.3.
[127] Tech. Specs., Art. 9L.2.
[128] Tech. Specs., Art. 9L.5.
[129] Tech. Specs., Art. 9L.6.
[130] Tech. Specs., Art. 9L.6.
[131] Tech. Specs., Art. 9L.7.
[132] Tech. Specs., Sec. 9L.7.1.4.1.
[133] Tech. Specs., Art. 9L.10.
[134] Tech. Specs., Special Specification 7016, Sec. 3.2.1.2.
[135] Tech. Specs., Special Specification 7016, Sec. 3.2.1.9.2.

- Review and resubmit, if necessary, documentation on pipe products, fittings, and related materials.[136]
- Approve any concrete thrust blocks that will be used in the project.[137]
- Review and resubmit, if necessary, any test reports regarding concrete mix design and reinforcing steel as may be required by the plans or the Engineer.[138]
- May amend in writing the maximum length of open trench in public right of way.[139]
- In the event of conflict or discrepancy that affects the project design, formulate a solution with Contractor before proceeding with pipe installation.[140]
- May direct to test class I material, if tested, the material must be measures by ASTM-D-4254 by percent of relative density.[141]
- Review any soil density tests.[142]
- Review the conformity of the valve operation after installation.[143]
- Coordinate disposal of water with Contractor and El Paso Water Utilities Operation Division.[144]
- Notify El Paso Water Utilities, a minimum of 48 hours in advance of any scheduled inspection; and provide a staging area that is free and accessible for TV camera activities.[145]
- May request documentation on pipe products, fittings, and related materials.[146]
- Prior to service line installation, coordinate service line installation with El Paso Water Utilities to have EPWU personnel curb mark the locations of proposed service tees.[147]
- Approve the repairs of any leaks.[148]

---

[136] Tech. Specs., Special Specification 7016, Sec. 3.2.2.2.
[137] Tech. Specs., Special Specification 7016, Sec. 3.2.2.9.
[138] Tech. Specs., Special Specification 7016, Sec. 4.2.3.
[139] Tech. Specs., Special Specification 7016, Sec. 6.3.8.
[140] Tech. Specs., Special Specification 7016, Sec. 6.3.9.2.
[141] Tech. Specs., Special Specification 7016, Sec. 6.3.9.6.
[142] Tech. Specs., Special Specification 7016, Sec. 6.3.9.7.
[143] Tech. Specs., Special Specification 7016, Sect. 7.4.
[144] Tech. Specs., Special Specification 7016, Sect. 10.2.
[145] Tech. Specs., Special Specification 7016, Sec. 11.1.
[146] Tech. Specs., Special Specification 7016, Sec. 11.2.1.
[147] Tech. Specs., Special Specification 7016, Sec. 11.3.1.
[148] Tech. Specs., Special Specification 7016, Sec. 11.3.2.

- May inspect the manufacturing process at any time to make tests on materials used, and to have cores cut out of the completed manholes for compressive strength testing and placement of reinforcement.[149]
- Perform television inspection of sewer lines.[150]
- Supervise testing conducted by the Contractor to all testing apparatus including pumps, compressors, hoses, gauges, and fittings, and other equipment necessary to perform the required tests.[151]
- Direct individual joint testing of pipe larger than 24 inches in diameter in accordance with ASTM C-1103 for special conditions not covered by other test methods.[152]
- Supervise and approve the performance of the mandrel test to verify the roundness and the proper installation of the flexible pipeline.[153]
- Approve adjustment of mandrel gauge and review permanent record of all testing with locations where excessive pipeline deflection occur.[154]
- Grant written permission to shutdown bypassing systems between shifts, on holidays or weekends, or during work stoppages.[155]
- Coordinate with Contractor schedule for operations to remove sewer line or structure from service.[156]
- Decide whether or not proposed materials and procedure will meet the contract requirements.[157]
- In the event a conflict exists, formulate a solution with contractor before proceeding with casing installation.[158]
- Review emergency road repair procedure plan.[159]
- Approve any wage rate that is not listed in the "Texas Counties Identified by Wage Rate Zones."[160]

The overwhelming evidence supports Camino Real's contention that it was Mr. Fino of Atkins performing the job of the Engineer in nearly every respect for the

---

[149] Tech. Specs., Special Specification 7016, Sec. 11.3.2.2.
[150] Tech. Specs., Special Specification 7016, Sec. 11.3.3.1.
[151] Tech. Specs., Special Specification 7016, Sec. 11.3.3.2.
[152] Tech. Specs., Special Specification 7016, Sec. 11.3.3.2.3.
[153] Tech. Specs., Special Specification 7016, Sec. 11.3.3.3.
[154] Tech. Specs., Special Specification 7016, Sec. 11.3.3.3.
[155] Tech. Specs., Special Specification 7016, Sec. 11.4.3.
[156] Tech. Specs., Special Specification 7016, Sec. 11.4.3.
[157] Tech. Specs., Technical Specifications 7016, Sec. 12.2.1.
[158] Tech. Specs., Technical Specifications 7016, Sec. 12.3.2.
[159] Tech. Specs., Technical Specifications 7016, Sec. 12.3.2.
[160] Tech. Specs., Wage Rates.

entire duration of JAR's involvement with this Contract.[161] While CEA provided design-related engineering services, particularly at the beginning of the Project, there can be no reasonable doubt that Mr. Fino of Atkins was the primary Engineer managing the Project from its inception, including through supervision of CEA's design work. This was established most of all through the credible testimony of Mr. Telles of Camino Real and Mr. Fino of Atkins,[162] as well as numerous exhibits, all of which demonstrated that Mr. Fino of Atkins (and not CEA) was from the very beginning performing the duties of Engineer as specified at length in the Contract.[163]

Contrary to the Trustee's arguments, the evidence here shows that even when certain design work was delegated to CEA, CEA operated under Atkins' authority and supervision,[164] and thus Mr. Fino of Atkins remained the Engineer—the Owner's representative and binding decisionmaker—even as to those aspects of the Project. And Mr. Fino testified that the most or all of the acts undertaken by CEA independently (that is, not under Atkins supervision) were on certain projects in which CEA was contracted by El Paso Water to handle certain related, joint projects involving both Camino Real's roadway and El Paso Water's utilities. These minimal, independent activities, which Mr. Fino testified were 2–5% of the total activities of the "Engineer" under the Contract,[165] do nothing to unseat the weight of the rest of the testimony and evidence at trial identifying Mr. Fino of Atkins as Engineer.

Mr. Rosales of JAR testified that he believed CEA was the Engineer.[166] The Court believes that Mr. Rosales generally testified in a credible manner, and the Court casts no doubt on his statement of his subjective belief about the Engineer.

---

[161] *See* Contract; Ex. P-3 (Engineer Responsibilities Chart prepared by Atkins); Ex. P-45 (Pre-Construction Conference – Agenda, Mar. 26, 2020); Ex. TR-84 (Project Proposal); 1st Stage Hr'g Tr. 100:22–101:1, 102:1–8, 159:5–161:2, 161:11–171:12, 172:6–176:13, 177:4–183:15.

[162] Mr. Ruben Chavez of CEA also gave testimony supporting this conclusion, He provided his opinions concerning who was the Engineer on the project. *See* 1st Stage Hr'g Tr. 138:15-25, 139:1-20. He helpfully explained the difference between the concept of "engineer of record" and the Engineer for purposes of the Contract. *See* 1st Stage Hr'g Tr. 141:1-19. Much of the rest of his testimony was not based on his personal knowledge and did not reflect a detailed understanding of the Project's specifics, as compared with the other witnesses. Accordingly, the Court has not given that testimony less weight.

[163] *See* Ex. P-3 (Engineer Responsibilities Chart prepared by CRRMA) and the testimony and exhibits cited above.

[164] Extensive testimony was elicited on this point. *See*, e.g., 1st Stage Hr'g Tr. 159:8–25.

[165] 1st Stage Hr'g Tr. 175:16–21.

[166] 1st Stage Hr'g Tr. 217:9–218:18.

Nonetheless, his personal understanding cannot trump the record of the activities actually performed by Atkins and not CEA.[167] Thus the basis for Mr. Rosales' understanding is not compelling, while the Court does not question his honesty in providing it. It remains the Court's firm impression that a reasonable contracting party should have known that Mr. Fino of Atkins was the Engineer under the Contract from the inception of the Contract; indeed, even the requests for bids reflect Atkins' pervasive role in management of the project.[168]

What is more, even if the Engineer's identity had not been established at the time of entry into the Contract (as the Court finds it was), the Court is not convinced that it would change the outcome. The inception of the Contract is not the only time that matters; the parties could agree to this Contract even without the Engineer's precise identity being known. After all, because Engineer is a functional title (as reflected in the functional definition provided for it), it is conceivable that the individual playing that role might shift in the course of a project. Even a party named as Engineer in advance might not serve on that role through the entire project, perhaps as a result of the retirement, illness, or termination. From a contractor's point of view, this could perhaps be confusing or frustrating at times, but that is the deal it chooses to enter. The Contract does not appear in this respect to be unusual at all as compared with other public construction contracts, and there is nothing unconscionable or inequitable about the arrangement. The point is that there will be an expert Engineer managing the project, to whom a number of important responsibilities devolve; a contractor need not know the identity of that individual ex ante to be able to enter into the contract.

As a final point, the Technical Specifications also include the following statement, which is apparently a "bespoke" or non-standard term, unlike the rest of the Technical Specifications, which apparently took a form developed by TxDOT, as discussed in more detail later in this Opinion. The statement is included before the specifications actually begin, along with other introductory material (such as an outline and an explanation of how to navigate the very lengthy document). The

---

[167] To take a couple of examples, Mr. Rosales conceded that he dealt with inspectors representing Atkins, not CEA, an important fact given how central inspection is to the role of the Engineer. *See* 1st Stage Hr'g Tr. 230:22–25, 231:1–19. He also declined to directly controvert Mr. Fino's testimony, *see* 1st Stage Hr'g Tr. 170:2–5), that Mr. Fino identified himself as the area engineer and construction engineer at the preconstruction meeting, *see* 1st Stage Hr'g Tr. 227:24–228:2 ("Edgar might have said he was the area engineer. I don't remember what he said. He said something.").

[168] *See* Ex. P-49; 1st Stage Hr'g Tr. 161:3–167:5.

statement is obviously not punctuated correctly and is generally not very clear. It is reproduced, mistakes and all, here:

> In general, the Owner" or the "Engineer" references the CRRMA or their representatives (Consulting Engineers, etc.) Reference to "Department" or "Engineer" in the construction and maintenance specifications refers to the CRRMA except when it is referencing a TxDOT Application, manual, material specification, Material Producers List or test method.[169]

This carelessly drafted provision does not, in the Court's view, add much clarity, one way or the other, to the Contract's dispute resolution procedures or identification of the Engineer. The Court believes that in all relevant respects— including with respect to the Engineer's duties in the Contract, the "Authority of Engineer" provisions, and the "Dispute or Claims Procedure" discussed in detail below—the "Owner" is Camino Real, and the "Engineer" is Mr. Fino of Atkins and that despite this provision, those roles remain distinct. The Court believes that this added provision appears intended to identify Camino Real as the public entity entering into the Contract and not to dramatically rewrite the roles thereunder by collapsing definitions or roles that the Contract distinguishes and empowers in various ways.[170] Thus the Court's analysis of the identity of the Engineer has focused on the relatively clear contractual contours of that role rather than this cryptic provision added to the opening of the Technical Specifications.

---

[169] Tech. Specs. at 8.

[170] To read the Contract as collapsing these roles would require more clarity than this clause provides, particularly given the case law (surveyed in the following section) recognizing the authority commonly given to Engineers in such contracts and the importance of this role in resolving ground-level disputes under the Contract. In addition, by referencing the definitions and roles outlined in the Contract ("Consulting Engineers, etc."), the provision expressly appears to preserve and not supersede them.

**B.** **The authority of the Engineer under the Contract is broad and the deference to which he is entitled is considerable, as reflected in both the contractual language and the case law; but he does not have the authority to resolve disputes or claims that are "elevat[ed]" pursuant to the contractual Dispute or Claims Resolution Procedure.**

Item 5L of the Technical Specifications is titled "Control of Work."[171] Its first Article is titled "Authority of Engineer,"[172] and it grants significant authority to the "Engineer":

---

**1.     Authority of Engineer**

The Engineer has the authority to observe, test, inspect, approve, and accept the work on behalf of the Owner. The Engineer decides all questions about the quality and acceptability of materials, work performed, work progress, Contract interpretations, and acceptable Contract fulfillment. The Engineer has the authority to enforce and make effective these decisions.

The Engineer acts as a referee in all questions arising under the terms of the Contract. The Engineer's decisions will be final and binding.

---

This provision and provisions very similar to it are familiar in Texas public construction contracts, as reflected in more than eighty years of Texas case law (discussed later in this Opinion). The provision is intended to give substantial deference to professionals directing public projects. When project decisions are entrusted to an Engineer or other professional (such as an architect), and when that professional is empowered to make decisions on a "final and binding" basis, courts interpret this to mean that both the public authority and the contractor are bound by those decisions. Under these circumstances, the professional's judgment is entitled to substantial deference—it may only be overturned if "in making it he is guilty of fraud, misconduct, or such gross mistake as would imply bad faith or failure to exercise an honest judgment."[173] The Court will refer to this as the "Gross Error

---

[171] Tech. Specs., Item 5L.
[172] Tech. Specs., Art. 5L.1.
[173] *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 203 (Tex. App. 1992) (quoting *City of San Antonio v. McKenzie Constr. Co.*, 150 S.W.2d 989, 996 (Tex. 1941)).

Standard."[174] (Otherwise, if a matter is entrusted to the public authority itself, its decision is entitled to a more limited degree of deference; it is subjected to a review for reasonableness.[175])

The Engineer's decisions are entitled to this high degree of deference even though the Engineer is often an employee of the public authority or (as here) an agent expressly working in the interest of the public authority.[176] Courts have not been bothered by the potential for a conflict of interest in the arrangement, perhaps because they believe that reliance on professional norms will govern over parochial loyalty to the public agency,[177] or perhaps that in any case, contractors bidding on public construction contracts are able to take this risk into account and price it into their bids.

Texas case law accords significant deference to the engineer's decisions in a broad range of matters commonly arising under construction contracts. For example:

- deciding how long concrete forms were required to be left in place after pouring;[178]
- assessing the type of work performed by laborer on a construction site in order to determine appropriate rate of compensation;[179]
- determining whether actual site conditions were materially different from those in plans and the appropriate methods for handling caving or water intrusion in drill shafts for a highway construction project;[180]

---

[174] *Tex. Dep't of Transp. v. Jones Bros. Dirt & Paving Contractors, Inc.*, 92 S.W.3d 477, 483 (Tex. 2002).

[175] *See, e.g.*, *Harris Cnty. v. Pulice Constr., Inc.*, No. 14-23-00818-CV, 2024 WL 4052762, at *7 (Tex. App. 2024).

[176] Tech. Specs., Sec. 1L.3.53 ("**Engineer**. The Professional Engineer licensed in Texas *who represents the interests of the Owner*." (italics added)). *See also* Ex. P-4, Camino Real Regional Mobility Authority Agreement for General Consulting Civil Engineering Services (July 24, 2015), Sec. 1 ("To that end, [Atkins] shall represent, advance, and further the interests of [Camino Real] throughout all aspects and phases of [Camino Real's] activities . . . .").

[177] There was testimony at trial concerning the applicability of professional engineering standards to all service for Camino Real. *See*, e.g., 1st Stage Hr'g Tr. at 129:2–21.

[178] *McKenzie Const. Co.*, 150 S.W.2d at 996–98.

[179] *Austin Bridge Co. v. Teague*, 152 S.W.2d 1091, 1093 (Tex. 1941).

[180] *Granite Const. Co. v. Tex. Dept. of Transp.*, No. 03-11-00436-CV, 2012 WL 5974085, at *5–6 (Tex. App. 2012).

- evaluating whether equipment supplied by contractor meets the standard specified in the contract;[181]
- approving or denying requests by the contractor to go beyond the contract's agreed scope of work;[182]
- interpreting whether the contract provided for payment to the contractor for rock excavated outside of an agreed-upon portion of the project;[183]
- assessing the cause of persistent blistering of a roof;[184]
- deciding whether damage to concrete driveways and slabs was the result of factors for which contractor was responsible;[185]
- directing the methods and materials for constructing a roadbed embankment;[186]
- considering whether a contractor was entitled to additional payment either because it removed a greater quantity of dirt than the engineer estimated or as a result of changes made by the state's engineer in the project plans and specifications after the contract was executed;[187] and
- determining whether unexpected subsurface conditions requiring a change in construction methods and configuration merited additional compensation to the contractor.[188]

The Court recognizes that the relevant language granting authority to the Engineer is not necessarily the same in the contracts at issue in each of the cases cited above. And some opinions do not include the language at all, so it is difficult to assess what precisely is shared among the different contracts. Nonetheless, the contractual language in Texas public construction contracts seems to be substantially similar, and perhaps for this reason, Texas courts have not focused much attention on the precise language. Instead, they have treated prior cases as instructive in laying out principles applicable whenever there is broad language entrusting project decisions

---

[181] *Westech Eng'g*, 835 S.W.2d at 202–03.

[182] *Harris Cnty*, No. 14-23-00818-CV, 2024 WL 4052762, at *7–8.

[183] *Barnard Const. Co. v. City of Lubbock, Tex.*, No. CIV.A. 503CV269C, 2004 WL 2173403, at *15–17 (N.D. Tex. Sept. 28, 2004), aff'd sub nom. *Barnard Const. Co., Inc. v. City of Lubbock*, 457 F.3d 425 (5th Cir. 2006).

[184] *Plantation Foods, Inc. v. R.J. Reagan Co., Inc.*, 520 S.W.2d 432, 434 (Tex. Civ. App. 1975) (architect).

[185] *City of San Antonio v. Meader*, 3236 S.W.2d 557, 559–60 (Tex. App. 1959).

[186] *Austin Bridge Co. v. State*, 427 S.W.2d 925, 937 (Tex. App. 1968).

[187] *State v. Martin Bros.*, 160 S.W.2d 58, 60 (Tex. 1942).

[188] *Keith A. Nelson Co. v. R.L. Jones, Inc.*, 604 S.W.2d 351, 355–56 (Tex. App. 1980).

to an engineer (which is certainly the case here). These principles have become well-known in construction law and form an important part of the context of contracting practices of sophisticated parties (such as Camino Real and JAR) in the construction industry.

In this Contract, both the Trustee's claim for wrongful default and most or all of his affirmative claims for additional time and/or compensation seem clearly within the scope of matters entrusted to the Engineer. They depend on his understanding of the Project and the Contract and rely on his professional expertise in order to resolve issues. As long as he actually made the decisions on these matters, his decisions will be entitled to the very deferential review required by the Gross Error Standard. The Engineer's decision-making on default is addressed in the following section of this Opinion. The Engineer's decision-making on the affirmative claims has not yet been brought before the Court, so further comment on those claims will have to wait.

Camino Real, not content with the normal bounds of Engineer decision-making and deference (generous though they are) has proposed a more aggressive interpretation of the "Authority of Engineer" provisions. It claims that the "Authority of Engineer" clause outlined above means that the Engineer does not just make decisions, but if JAR challenges those decisions, the Engineer also gets to sit as an appellate court and apply the Gross Error Standard to his own opinions.

The ramifications of this appear to be that Camino wants to insulate its decision-making behind another layer of deference: even if the default was called as result of gross error or bad faith, no court could intervene, unless the Engineer's decision itself was *also* the result of gross error or bad faith[189] (or perhaps if it lacked "substantial evidence," a standard in the case law for when an independent arbiter such as an administrative law judge has made a determination).[190] In other words, Camino seems to believe that the Engineer was not only deeply involved in determining whether there was a default but also got to sit in judgment over his and Camino's determination, and unless this *second* judgment was in gross error or the

---

[189] *See, e.g.*, Mot. for Summ. J., ¶¶ 35–36, ECF No. 38 ("[T]he Engineer has two opportunities to resolve disputes under the Contract. . . . In this regard, 4L.7 plainly provides for both informal settlement with the Engineer as a preference, but that any claims must ultimately be submitted to the Owner, who by implication must involve the Engineer to act as referee under 5L.1 . . . . Texas law applies a gross error standard applies [sic] when the parties to a contract agree to be bound by the decision of a referee.").

[190] *Granite Const. Co*, No. 03-11-00436-CV, 2012 WL 5974085, at *4.

result of bad faith (or perhaps lacked substantial evidence),[191] then the Court cannot intervene even if the initial determination *was* in gross error or the result of bad faith.

But the Contract, read fairly and as a whole, does not support this additional level of deference, nor does the case law. To the contrary, the Contract contemplates a review conducted outside of the purview of the Engineer, and this is confirmed by an analysis of TxDOT's Standard Specifications for its own projects, which was used as a template for the Technical Specifications applicable here.

In addition, the Court has not located any cases in which such an extraordinary double-layer-deference was applied when the Engineer made both layers of determination; in the case law, rather, the Engineer's decision was considered, under the appropriately deferential standard, not by he himself but by courts or by appropriate administrative process. The outcome of such an administrative process may be entitled to additional deference under a "substantial evidence" or similar standard, but no case law appears to support Camino Real's extraordinary apparent effort to have this Court accord "substantial evidence" or similar deference to the Engineer's determination that he himself was not in "gross error" when he made his own prior determination.

Even more important than the lack of case law, however, is the contract itself. Just before Item 5L ("Control of Work"), which contains the Authority of Engineer section quoted above, is a separate Item 4L ("Scope of Work") in which Article 7 ("Dispute or Claims Procedure") reads, in its entirety, as follows:

---

[191] *See, e.g.*, Pl.'s Proposed Findings and Conclusions ¶¶ 28, 34 ("Here, since Edgar Fino has the authority to act as the referee under the Contract and the Trustee has not proved fraud, misconduct, or gross error to set aside the Engineer's decision. Edgar Fino's determinations that 'CRRMA substantially complied with the contractual default process' and that 'the CRRMA's default of JAR was proper and for cause' are final and binding on the parties.").

**7.      Dispute or Claims Procedure**

The dispute resolution policy promotes a cooperative attitude between the Engineer and Contractor. Emphasis is placed on resolving issues while they are still current, at the project office, and in an informal manner. Open sharing of information is encouraged by all parties involved so the information provided completely and accurately reflects the issues and facts. If information is not shared, decisions may be limited to relying on the documentation that is available for review.

The Owner's goal is to have a dispute settled by the Engineer before elevating it as a claim.

If a dispute cannot be resolved, initiate the Contract claim procedure by filing a Contract claim after the completion of the Contract or when required for orderly performance of the Contract. Submit the claim to the Owner in accordance with state law.

For a claim resulting from enforcement of a warranty period, file the claim no later than one year after expiration of the warranty period. For all other claims, file the claim no later than the date the Owner issues notice to the Contractor that they are in default, the date the Owner terminates the Contract, or one year after the date of final acceptance of the Contract. It is the Contractor's responsibility to submit requests in a timely manner.

In essence, Camino Real contends that Article 4L.7 ("Dispute or Claims Procedure") actually means that all matters are referred to and resolved by the Engineer because of Article 5L.1 ("Authority of Engineer"), even though the two Articles are nested within different Items of the Contract and neither references the other. Apparently, under Camino Real's view, the Contract's "Dispute or Claims Procedure," despite its name, actually has little importance in determining how disputes or claims are resolved under the Contract; the Contract's later grant of authority to the Engineer is *actually* the Contract's important dispute resolution provision.

The more compelling interpretation of the Contract is that Article 5L.1 ("Authority of Engineer"), located as it is within the Item 5L ("Control of Work"),

is focused on entrusting broad control of the day-to-day operations of the project to the qualified expert representing the public entity's interest in the project. And by contrast, Article 4L.7 ("Dispute or Claims Procedure"), in Item 4L ("Scope of Work"), is intended to provide a process for dealing with higher-level disputes.[192] This Article includes a role for the Engineer but also seems to contemplate a dispute resolution process *not* controlled by the Engineer to which a "claim" can be "elevat[ed]": "The Owner's goal is to have a dispute settled by the Engineer before elevating it as a claim."[193]

The Contract's meaning can further be elucidated by looking at what it shares and does not share with the Standard Specifications applicable in projects run by TxDOT itself. As noted, this Contract incorporates standard TxDOT specifications for local projects—that is, projects run not by TxDOT itself but by entities such as Camino Real. The local Technical Specifications in the Contract differ only in relatively minor respects from the TxDOT Standard Specifications,[194] and the differences are illuminating.[195]

The crucial point is that the TxDOT Standard Specifications contain exactly the same, broad grant of authority to the Engineer, yet that language plainly does *not* mean that the Engineer controls the entire claim or dispute resolution apparatus. In specific, the "Authority of Engineer" provisions (as reproduced above), which are contained in Article 5.1 of the TxDOT Standard Specifications and Article 5L.1 of these local Technical Specifications, are identical. Yet in the TxDOT Standard Specifications, the "Dispute or Claims Procedure" apparatus is spelled out in significant detail complete with references to the governing state regulations. Below is a "black-lined" version of the TxDOT Standard Specifications with the local

---

[192] "'[H]eadings and titles provide context and can inform the meaning of the sections they label,' and . . . '[g]enerally, courts should construe contractual provisions in a manner that is consistent with the labels the parties have given them.'" *James Constr. Grp., LLC v. Westlake Chem. Corp.*, 650 S.W.3d 392, 416 (Tex. 2022) (quoting *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 121 (Tex. 2015)). In addition, courts should seek the interpretation that best fits all the provisions of a contract. *Hoover Panel Sys. v. HAT Contract, Inc.*, 819 F. App'x 190, 195 (5th Cir. 2020).

[193] Tech. Specs., Art. 4L.7.

[194] The local "version" of the specifications shares the structure of the TxDOT Standard Specifications, but each major section number has an "L" after it and includes various changes, as illustrated by the examples in this Opinion.

[195] The Court takes judicial notice of the general TxDOT specifications; it gave notice of its intent to do so and neither party objected. *See* Order Prior to Closing Arguments, ECF No. 126.

Technical Specifications' deletions marked in ~~strike through text~~ and its additions in **underlined text**:

---

**Article 7. Dispute or Claims Procedure**

The dispute resolution policy promotes a cooperative attitude between the Engineer and Contractor. Emphasis is placed on resolving issues while they are still current, at the ~~area office or the district~~**project** office, and in an informal manner. Open sharing of information is encouraged by all parties involved so the information provided completely and accurately reflects the issues and facts. If information is not shared, decisions may be limited to relying on the documentation that is available for review.

**The Owner's goal is to have a dispute settled by the Engineer before elevating it as a claim.** ~~It is the Department's goal to have a dispute settled in the District before elevating it to the Contract Claim Committee (CCC) as a claim. The Construction Division can assist in the resolution of a dispute with a Contractor when requested by the District. The Contractor may request that a District ask for assistance of the Construction Division; however, the request for a recommendation prepared by the Construction Division to settle a dispute must come from the District.~~

If a dispute cannot be resolved, initiate the Contract claim procedure by ~~submitting a claim to the District Engineer, the Director of the Construction Division, or the CCC.~~

~~The Department's Contract claim procedure has been established in accordance with Title 43 of the Texas Administrative Code, Part 1, Chapter 9, Subchapter A, Rule §9.2, Contract Claim Procedure. Detailed instructions for submitting a claim and its components can be found on the Department's website.~~

~~If a claim has been submitted and the Contractor wishes to resume negotiations with the District, notify the CCC in writing of the intent to resume negotiations at the District level and request review of the claim be suspended by the CCC pending the outcome of the negotiations.~~

---

> ~~File~~ **filing** a **Contract** claim after **the** completion of the Contract or when required for orderly performance of the Contract. **Submit the claim to the Owner in accordance with state law.**
>
> For a claim resulting from enforcement of a warranty period, file the claim no later than one year after expiration of the warranty period. For all other claims, file the claim no later than the date the ~~Department~~**Owner** issues notice to the Contractor that they are in default, the date the ~~Department~~**Owner** terminates the Contract, or one year after the date of final acceptance of the Contract. It is the Contractor's responsibility to submit requests in a timely manner.

The TxDOT Standard Specifications are relevant to the interpretation of the Contract in several ways. First, they help establish the general understanding of participants in similar contracts; such background industry expectations are part of the context within which any contract terms should be understood, whether ambiguous or not.[196] Further, insofar as this Contract is arguably ambiguous with respect to the crucial dispute resolution provision, and thus the use of extrinsic evidence (such as closely related variants to that Contract) can be used to explain its meaning.

What the TxDOT Standard Specifications show is that in those specifications—beyond the shadow of a doubt—the "Authority of Engineer" provisions do *not* mean that he is the ultimate arbiter under the "Dispute or Claims Procedure"; instead, the Standard Specifications provide for dispute resolutions involving the District Engineer, the Director of the Construction Division, or the Contract Claim Committee. Yet Camino Real would have this Court find that the *identical* "Authority of Engineer" language in *its* Contract *does* have that meaning. This is strained at best. While the Contract's Dispute or Claims Procedure section is not as detailed as the TxDOT Standard Specifications, *nothing* in it reflects the intent of the parties to *give the exact same, well-known language from the TxDOT Standard Specifications a radically different and expanded meaning*. Accordingly, the Court holds that it does not do so.

To the contrary, the Contract's added language in the "Dispute or Claims Procedure" appears to be an attempt to substitute general principles of "applicable state law" for the more detailed review established by regulation for general

---

[196] *See, e.g.*, *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 764–65, 767–68 (Tex. 2018); *EOG Res., Inc. v. Wagner & Brown, Ltd.*, 202 S.W.3d 338, 344 (Tex. App. 2006).

(non-local) TxDOT contracts. As noted below, applicable state law recognizes the substantial authority granted to Engineers under many public construction contracts. But there is no reason here to think that the "Authority of Engineer" includes control over a Dispute or Claims Procedure that (1) does not reference the Engineer in that capacity, and in fact implies that the Dispute or Claims Procedure is what is invoked when a claim is "elevated" from his purview; (2) undoubtedly has a different meaning in the closely related TxDOT Standard Specifications; and (3) references not other provisions of the Contract but "in accordance with state law" as providing the appropriate dispute resolution framework.

While the substantive criteria of "in accordance with state law" by which claims should be decided are fairly clear (and deferential to the Engineer within the scope of its authority), the procedural aspects of it are not so clear. For similar contracts with TxDOT directly (rather than a regional authority like Camino Real), there appear to be extensive contractual and regulatory regimes in place to ensure a fair review of claims such as those now urged by the Trustee.[197] Those particular regulations may not apply here, yet the contractual language seems to contemplate some legal process aside from the mere discretion of either Camino Real (as Owner) or the Engineer. The Court also notes that it seems likely that contractors used to dealing with TxDOT would expect such a process to control in the event of a serious dispute and to depart from this industry norm and commercial expectation would likely require clearer language than this Contract provides. These factors all weigh against Camino Real's proposed interpretation.

In the end, the Court is persuaded by the Trustee's counsel's suggestion that the "in accordance with state law" provision essentially means to follow whatever procedures *do* exist to resolve claims in a similar manner to how such claims are resolved under standard TxDOT contracts. Absent such procedures being established (as in this case), the claim must simply be resolved by the courts. This seems the best reading of the contractual provisions to this Court—certainly more persuasive than Camino's interpretation that this clause means "the Owner or its Engineer simply decide the claims themselves." Camino Real's interpretation would significantly reshape the relationship of Contractors and Owners under local

---

[197] *See, e.g.*, 43 Tex. Admin. Code § 9.1.

construction contracts. Given its lack of textual support in the Contract, the Court finds it entirely unpersuasive that such a structure was intended.[198]

The upshot of the analysis above is that the Court finds that neither the wrongful default claim nor the affirmative claims litigation are ultimately entrusted to the Engineer once they are elevated pursuant to the Dispute or Claims Procedure. Rather these issues must be decided according to state law. In the absence of an administrative apparatus to decide such claims, the claims must be brought to a court of competent jurisdiction, such as this one. As a substantive matter, state law, in turn, instructs courts (including this one) to review matters properly entrusted to the Engineer by the contract under the highly deferential Gross Error Standard.

The Trustee's wrongful default claim is discussed in the following section of this Opinion. As for the Trustee's affirmative claims: although these are not yet ripe, they will eventually have to pass through two layers of consideration. In the first, the Court must determine whether the decision(s) underlying the claim were within the Engineer's authority (an element the Court believes will likely be met as to most or all of them) and whether he in fact made or approved the decisions. If so, the Court will review them under the Gross Error Standard. If they were not within the scope of his authority, the Court will review them under the general standards of applicable contract law, including, as appropriate, the "reasonableness" standard that applies to contractual decisions entrusted to the Owner itself and not the Engineer.[199] The Court is unsure at this point what would happen with decisions that were within the

---

[198] The Court has avoided relying on canons such as *contra proferentem* in interpreting the Contract, because despite the difficulty of interpreting the Contract, the Court ultimately believes the evidence in favor of its interpretation is decisive, and "contra proferentem is a device of last resort." *Evergreen Nat. Indem. Co. v. Tan It All, Inc.*, 111 S.W.3d 669, 676 (Tex. App. 2003). If applied, *contra proferentem* would likely favor the Trustee. Even though Camino Real may not have actually drafted all of the Technical Specifications, it was the party offering them, apparently on a take-it-or-leave-it basis, to its contracting partners and was thus the party best situated to eliminate ambiguities ex ante. *See, e.g.*, *Lifemark Hosps., Inc. v. Liljeberg Enters., Inc. (In re Liljeberg Enters., Inc.)*, 304 F.3d 410 (5th Cir. 2002). And Camino Real does appear to have engaged in at least some customization, in the somewhat puzzling paragraph quoted in Section II.A above. Moreover, the Court also believes that this significant a change to a crucial part of a well-known and customary contractual scheme—essentially replacing a separate review structure with a "hearing" before the very parties who made the initial decisions—should be more clearly expressed in order to be enforceable.

[199] "The second review standard—whether the decision was 'reasonable'—applies when the party to the contract has the ultimate authority to determine whether a satisfaction clause has been satisfied." *Harris Cnty.*, No. 14-23-00818-CV, 2024 WL 4052762, at *7.

scope of the Engineer's authority but that he did not in fact make or approve;[200] if there are such decisions, the Court will address them in due course.

**C.** **Camino Real substantially complied with the contractual default procedure, but the Engineer's decision on default will be subject to review by this Court pursuant to the Gross Error Standard, because the Engineer did not have the contractual authority to hold a hearing and decide that his own determination was proper.**

The procedures for declaring a contractor to be in default, and then for the contractor to make a claim that default was wrongful, are contained in yet another Item in the Contract. Within Item 8L ("Prosecution and Progress") is Article 7 ("Default of the Contract"), which contains the grounds on which a contractor can be declared in default and the procedures for calling a default. Section 8L.7.1 ("Declaration of Default") provides as follows, in relevant part:

> **7.1.** **Declaration of Default**. The Engineer may declare the Contractor to be in default of the Contract if the Contractor:
>
> - fails to begin the work within the number of days specified,
> - fails to prosecute the work to assure completion within the number of days specified,
> - is uncooperative, disruptive or threatening,
> - fails to perform the work in accordance with the Contract requirements,
> - neglects or refuses to remove and replace rejected materials or unacceptable work,
> - discontinues the prosecution of the work without the Engineer's approval,
> - makes an unauthorized assignment,
> - fails to resume work that has been discontinued within a reasonable number of days after notice to do so,
> - fails to conduct the work in an acceptable manner, or
> - commits fraud or other unfixable conduct as determined by the Owner.

---

[200] The Court notes that the case law does not demand a high level of formality in terms of what constitutes the Engineer making a decision. *See, e.g.*, *Austin Bridge Co. v. State*, 427 S.W.2d 925, 934 (Tex. App. 1968).

> If any of these conditions occur, the Engineer will give notice in writing to the Contractor and the Surety of the intent to declare the Contractor in default. If the Contractor does not proceed as directed within 10 days after the notice, the Owner will provide written notice to the Contractor and the Surety to declare the Contractor to be in default of the Contract. . . .

The Section then provides for various other matters mostly involving post-default billing and financial questions. Section 8L.7.2 ("Wrongful Default") provides, in full (but with italics added):

> **7.2.   Wrongful Default**. Submit a written request to the Owner within 14 calendar days of receipt of the notice of default for consideration of wrongful default.
>
> The Owner will determine if the Contractor has been wrongfully defaulted, and will proceed with the following:
>
> ▪ If the Owner determines the default is proper, the default will remain. *If the Contractor is in disagreement, the Contractor may file a claim in accordance with Article 4.7., "Dispute or Claims Procedure."*
>
> ▪ If the Owner determines it was a wrongful default, the Owner will terminate the Contract for convenience, in accordance with Article 8.8., "Termination of the Contract."

Notably, these sections contain *no reference* to Article 5L.1 ("Authority of Engineer"), though there *is* a direct reference to Article 4L.7 ("Dispute or Claims Procedure"), which as already stated also lacks a reference to Article 5L.1.

These sections grant the Engineer substantial authority to determine if conditions of default exist and to issue the notice of intent to default to which the Contractor must respond "as directed within 10 days" lest it be defaulted. All of these activities appear to the Court to be plainly within the scope of the Engineer's authority and to be entitled to substantial deference under the Gross Error Standard.

But, according to Camino Real, that is not enough: the Engineer is *also* given power to conduct the later determination of whether the default was wrongful—by

virtue of the non-cross-referenced Article 5L.1. This appears to be another version of Camino Real's effort to erect an even higher barrier for the Trustee than the Gross Error Standard.

Again, for the reasons explored at length in the previous section, the Court does not find Camino Real's interpretation of these provisions to be persuasive. In the Court's view, the most reasonable reading of the Contract is that the Engineer's authority does not extend to conducting the Dispute or Claims Procedure himself.

Applying the contractual framework to this case, the relevant facts of default can be summarized as follows: On December 7, 2022, Camino Real (not the Engineer) sent a notice of intent to default to JAR, listing items to be completed within ten days.[201] The notice was apparently received by JAR on December 9. After that, there was some back-and-forth involving Camino Real, Atkins, and JAR concerning some details of the traffic control steps required in the notice of intent to default.[202] On December 19, JAR responded, providing its account of the reasons for the project delays and reporting progress on (though not the completion of) the items in the notice of intent to declare default.[203] On December 22, Camino Real declared that the default notice was final.[204] On January 9, 2023, JAR filed a claim for wrongful default with Camino Real.[205] After various further correspondence and saber-rattling from both sides,[206] Camino Real purported to hold a "hearing" on August 8, before Edgar Fino as the Engineer.[207] JAR refused to participate, including on grounds that it did not think Mr. Fino of Atkins was the Engineer and that Camino Real was not following the contractual dispute resolution process.[208] On August 16, on Atkins letterhead, Mr. Fino issued his "Atkins Engineer Final Determination," finding that Mr. Fino of Atkins was the Engineer under the Contract, that Camino Real "substantially complied with the contract default process," and that the default was "proper and for cause."[209] Ultimately, Camino Real sought declaratory judgment in its favor on the issue of wrongful default, while the Trustee has sought

---

[201]  Ex. TR-31 (CRRMA Letter to JAR re: Notice of Intent to Default).
[202]  *See* Ex. TR-35 (E-mail from A. Ordonez re TCP Items to be Addressed).
[203]  Ex. TR-37 (JAR Letter to CRRMA re: Response to NOI to Default).
[204]  Ex. TR-45 (CRRMA Letter to JAR re: Notice of Default).
[205]  Ex. TR-48 (Griffith Davidson Letter to CRRMA re: Notice of Claim for Wrongful Default).
[206]  *See* Exs. TR-49, TR-50, TR-52–TR-58.
[207]  *See* Ex. TR-59 (Locke Lord Response to Griffith Davidson Letter).
[208]  Ex. Tr-60 (Griffith Davidson Response to Locke Lord Letter).
[209]  Ex. TR-61 (Atkins Letter to CRRMA re: Final Determination).

nearly $25 million in damages, much of which appears to stem from the allegedly wrongful default.[210]

Inarguably, Camino Real did not strictly follow the contractual process for declaring a contractor to be in default. Camino Real has sought to minimize the problem, arguing that it does not matter what "letterhead" the notice of intent to default is placed on or that the provision merely means that the Engineer was supposed to deliver the letter, in which case it is hardly harmful for it to be sent by e-mail from Camino Real itself instead. But the Court disagrees. Under the Contract, the Engineer's role in the default process is significant and should not be put aside. The Contract requires the Engineer to analyze the stated reasons for which "the Engineer may declare the Contractor to be in default."[211] The Contractor is supposed to proceed "as directed" by the notice of intent to default, which is itself supposed to come from the Engineer.[212] In other words, the process is largely to be directed by the Engineer, reliant on the Engineer's expertise and authority under the Contract.

Contrary to the contractual framework, here, at least on the surface, Camino Real was in the driver's seat. It was Camino Real's principal, Mr. Telles, who took the laboring oar in drafting the notice of intent to default, coordinating feedback from both the Engineer and from TxDOT.[213] The Engineer was not even copied on the correspondence, although other interested parties (including the surety and various El Paso area officials) were.[214]

Nonetheless, and despite surface appearances, the extensive and credible testimony at trial showed that the important decisions regarding default were indeed made by or approved of by the Engineer. The Court will not reproduce this testimony here but refers the reader to the numerous parts of the transcript that are relevant and that support Camino Real in this respect.[215]

The Court does not lightly "bless" a departure from the strict observance of the contractually ordained procedures for an important matter such as default. But several factors support Camino Real's argument that it substantially complied with the provision. One is that Camino Real is a thinly staffed organization whose

---

[210] Counterclaim 31.

[211] Tech. Specs., Sec. 8L.7.1.

[212] Tech. Specs., Sec. 8L.7.1.

[213] Exs. TR-22, -23, -24, -27, -29, -30.

[214] Ex. TR-31.

[215] *See, e.g.*, 1st Stage Hr'g Tr. 79:5–82:9, 84:18–87:15, 88:16–23, 93:22–94:6, 116:5–9; 183:19–184:25.

principal is deeply involved in day-to-day matters and thus it would not be unusual for him to be paying keen attention to delicate matters such as a default determination (indeed, Mr. Telles testified that this is the only time that Camino has declared a contractor to be in default in one of its construction contracts[216]). His involvement does not indicate a domination over the Engineer but rather comports with the everyday practice of his being in close contact with the Engineer as they work collaboratively on the Project. The mere fact of this close involvement does not, in the Court's view, diminish the Engineer's authority under the Contract to make decisions in its professional role that are entitled to the substantial deference granted in the case law. The Court carefully considered, and found credible, Mr. Fino's testimony that, at every step of the default process, he exercised his professional judgment—in other words, that it was he and not Mr. Telles who made the default-related decisions entrusted to the Engineer, including the steps to cure and whether those steps had been accomplished. Accordingly, his decision on default is entitled to the deference due to an Engineer's decisions under the Contract.

As noted, the Court believes that Camino Real's reading of the "Dispute or Claims Procedure" provision of the Contract, which is then referenced in the "Wrongful Default" section of the Contract, is incorrect. While the Engineer's decisions on default as on other matters entrusted to him are entitled to substantial deference, once a claim (including a claim of wrongful default) is "elevat[ed]," as this one now is, it leaves his hands and he does not sit as an appellate court over his own actions. Accordingly, this Court will be reviewing the default determination under the Gross Error Standard but without giving any additional weight to the Engineer's purported determination after the August 2023 "hearing" that the default was proper.

Thus, Camino Real is not yet out of the woods on the issue of wrongful default. The Court restricted the parties, at the First Stage, from putting on their evidence with respect to whether the default determination met the Gross Error Standard. That evidence will be considered in future proceedings as appropriate.

## Conclusion

For the reasons stated above, the Court holds as follows concerning the questions presented in this trial's First Stage:

---

[216] 1st Stage Hr'g Tr. 49:23–50:4.

1)   the identity of the Engineer that is to act as referee in the contract between Camino Real and JAR

*Mr. Edgar Fino of Atkins North America, Inc. served as the Engineer under the Contract from its inception.*

2)   the scope of the Engineer's authority as referee to decide the matters addressed in the August 16, 2023, decision by Edgar Fino of Atkins North America, Inc. and affirmative claims by JAR for additional time and/or damages

*The Contract entrusts the Engineer with authority to determine numerous matters, including whether to issue a notice of intent to default and other matters related to default. Affirmative claims for additional time and/or damages generally fall within this authority as well. Insofar as the Engineer has made a determination on matters within his authority, his decision can only be overturned if "in making it he is guilty of fraud, misconduct, or such gross mistake as would imply bad faith or failure to exercise an honest judgment" (the "Gross Error Standard").*

*The Engineer does not, however, also have the right (as Camino Real asserts) to sit in judgment under the contractual Dispute or Claims Procedure to determine whether his own decision was gross error. That must be done according to state law, which in this case means by this Court applying the appropriate substantive standard—which as noted, for all or nearly all of the relevant determinations, will likely be the Gross Error Standard.*

3)   the propriety of the process leading to the August 16, 2023, determination by Edgar Fino of Atkins North America, Inc.

*Although the notice of intent to default did not come from the Engineer as it was supposed to, the Engineer was in fact sufficiently involved throughout the default process that the Court believes that the contractual default process was substantially followed. Accordingly, the Court will review the Trustee's claim for wrongful default under the Gross Error Standard.*

*Because the Engineer is not empowered by the Dispute or Claims Procedure to determine disputes or claims that have been "elevat[ed]"*

*(as the Contract puts it), the "appeal" from the default determination should not have been to the Engineer and thus his August 16, 2023, decision is not entitled to any additional deference.*

# # #