**Dated: April 28, 2025.**

_Christopher G. Bradley_
_____
**CHRISTOPHER G. BRADLEY**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| **J.A.R. CONCRETE, INC.** | § | **Case No. 23-30242-cgb** |
| **d/b/a J.A.R. Construction, Inc.,** | § | |
| | § | **Chapter 7** |
| Debtor. | § | |
| **CAMINO REAL REGIONAL** | § | |
| **MOBILITY AUTHORITY,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | **Adv. No. 24-03001-cgb** |
| **RONALD E. INGALLS, solely in** | § | |
| **his capacity as Chapter 7 Trustee** | § | |
| **for the estate of J.A.R.** | § | |
| **CONCRETE, INC. d/b/a J.A.R.** | § | |
| **Construction, Inc.,** | § | |
| | § | |
| Defendant. | § | |

## OPINION ON FIRST TWO STAGES OF TRIAL

## Introduction

In this construction dispute, a contractor argues that it was wrongfully defaulted under its contract with a public works authority. Through its trustee in bankruptcy, the contractor raises a number of different arguments in support of its position, but after careful consideration, the trustee's arguments lack merit. After a lengthy, two-part trial, the evidence is clear that the contractor failed to perform under the contract. The public authority followed the contractual default process in all material respects, and its defaulting of the contractor was not wrongful. This conclusion is confirmed both by extensive documentary evidence as well as the testimony of the engineer and supporting personnel on the project.

## Procedural Background

Camino Real Regional Mobility Authority (variously referred to as "Camino Real," "Camino," the "Authority," or "CRRMA") seeks declaratory relief from Ronald Ingalls (the "Trustee"), trustee of the Chapter 7 bankruptcy estate of J.A.R. Concrete, Inc. ("JAR");[1] the Trustee has counterclaimed for monetary and declaratory relief.[2] Both parties have consented to this Court's resolution of this dispute, which is "related to" JAR's bankruptcy proceeding for jurisdictional purposes.[3]

To allow for more orderly resolution of the many complex disputed issues between the parties, the Court determined to hold a multi-part trial in this adversary proceeding. The first stage of trial (the "First Stage") was held in El Paso on November 13, 2024,[4] and closing arguments were heard by Zoom on December 5, 2024. Proposed findings of fact and conclusions of law were each submitted by

---

[1]  *See* Compl. for Declaratory J., ECF No. 1 (the "Compl.").

[2]  *See* Trustee's Answer and Countercl., ECF No. 47 (the "Counterclaim").

[3]  *See* ECF Nos. 17, 48 (Statements of Consent); *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 674 (2015) ("[L]itigants may validly consent to adjudication by bankruptcy courts."); 28 U.S.C. § 157(c)(1), (2) ("A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11" and may "hear and determine" such proceedings and "enter appropriate orders and judgments" only "with the consent of all the parties to the proceeding.").

[4]  *See* Hr'g Tr. (Nov. 13, 2024), ECF No. 125 (the "1st Stage Hr'g Tr.").

Camino Real[5] and the Trustee.[6] The Court issued an opinion on December 20, 2024 (the "Opinion").[7]

The second stage of trial (the "Second Stage") was held in El Paso on January 13, 14, and 15, 2025.[8] The parties also submitted proposed findings, various briefs, and other related filings.[9]

In this opinion (the "Opinion"), the Court provides its findings and holdings on the matters at issue in the Second Stage as well as integrating, and occasionally refining or clarifying, its findings and holdings from the First Stage, for the convenience of the parties and any other readers, including any higher courts considering this matter on appeal. In effect, this Opinion supersedes the First Stage Opinion (although they do not conflict with one another in any material way).

A third stage of trial concerning the Trustee's "affirmative claims" still remains to be held. But this Opinion resolves all questions related to the allegedly wrongful defaulting of JAR by Camino Real under the Contract.

## Factual and Legal Background[10]

Camino Real was created in 2007 as a political subdivision of the State of Texas. Raymond Telles, Camino Real's Executive Director, has been at the

---

[5] Pl.'s Proposed Findings and Conclusions, ECF No. 111 ("Pl.'s 1st Stage Proposed Findings and Conclusions").

[6] Trustee's 2d Am. Proposed Findings and Conclusions, ECF No. 128 ("Tr.'s 1st Stage Proposed Findings and Conclusions").

[7] ECF No. 141. After receiving a "motion for reconsideration and/or clarification" from the Trustee, ECF No. 144 ("Tr.'s Mot. for Reconsideration"), the Court issued a short order clarifying that opinion, ECF No. 148, and held a hearing on January 3, 2025. The Court addresses some of the arguments further below. As of the time of the First Stage, among other active matters, Camino Real had a Motion to Dismiss, ECF No. 75, and a Motion for Partial Summary Judgment, ECF No. 38, pending. The Court entered its Order Denying Motion to Dismiss Counterclaims and Denying Motion for Partial Summary Judgment at ECF No. 139, and much of that opinion is restated and incorporated here.

[8] *See* Hr'g Trs. (Jan. 13–15, 2025), ECF Nos. 161, 162, 163 (the "2nd Stage Hr'g Tr.").

[9] Trustee's Prehearing Brief, ECF No. 154; Pl.'s Response to Trustee's Prehearing Brief, ECF No. 160; Trustee's Reply in Support of Its Prehearing Brief, ECF No. 169 ("Tr.'s Reply"); Trustee's Proposed Findings and Conclusions for Second Stage, ECF No. 171 ("Trustee's 2nd Stage Proposed Findings and Conclusions"); Pl.'s Proposed Findings and Conclusions for Second Stage, ECF No. 173.

[10] These background facts are uncontested or uncontroverted unless otherwise noted.

Authority since 2008.[11] He is one of its two employees.[12] Since 2008, Camino Real has been involved more than 60 different projects, expending over $1.4 billion.[13] Camino Real has never defaulted a contractor in any of its prior projects.[14]

In 2019, Camino Real sought bids for the Pellicano Drive Widening Project, an improvement project to widen Pellicano Drive east of the TX-375 Loop in El Paso (the "Project").[15] It awarded the Project to JAR in 2020, the parties entered into their contract in March 2020, and construction was to commence in April 2020.[16]

In particular, JAR and Camino Real entered into a multi-part contract (the "Contract"), including a short document executed by both parties, dated March 28, 2020,[17] and incorporating various items, including a lengthy set of project specifications ("the "Technical Specifications"),[18] in a form almost entirely dictated by the Texas Department of Transportation ("TxDOT").[19] The Technical Specifications are a version of the specifications used by TxDOT in its own projects (the "Standard Specifications")[20] that are modified as appropriate to public construction projects undertaken under the auspices of a local public entities like Camino Real.[21]

The Technical Specifications are presumably used in hundreds if not thousands of projects throughout Texas. Yet they do not form a particularly clear or well-drafted contract. They require more effort to understand, and include more uncertainty, than one would expect in standardized documents governing high-dollar contracts across this great and fast-developing state. Even relatively simple procedural matters, clearly contemplated under the Contract—such as procedures for default—require considerable analytical effort to render in a coherent way, as

---

[11]  1st Stage Hr'g Tr. 47:5–8.

[12]  1st Stage Hr'g Tr. 47:19–22.

[13]  1st Stage Hr'g Tr. 47:9–16.

[14]  1st Stage Hr'g Tr. 49:23–50:4. JAR's principal, Mr. Rosales, testified that he too had never been defaulted on a contract. 1st Stage Hr'g Tr. 211:19–21.

[15]  Pl.'s 1st Stage Proposed Findings and Conclusions ¶ 1; Tr.'s 1st Stage Proposed Findings and Conclusions ¶ 6.

[16]  Tr.'s 1st Stage Proposed Findings and Conclusions ¶ 6.

[17]  Compl., Ex. 1; Ex. P-1; Ex. TR-1 (the "Contract").

[18]  Compl., Ex. 3; Ex. P-2; Ex. TR-2 (the "Tech. Specs.").

[19]  1st Stage Hr'g Tr. 61:8–23.

[20]  TxDOT Standard Specifications for Construction and Maintenance of Highways, Streets, and Bridges (adopted Nov. 1, 2014), *available at* https://ftp.txdot.gov/pub/txdot-info/des/spec-book-1114.pdf.

[21]  1st Stage Hr'g Tr. 61:8–62:16.

will be explored below. This Court is happy to expend that analytical effort, but it recognizes that obtuse contract language raises litigation costs and uncertainties. The parties have each forcefully urged their interpretations of various knotty parts of the Contract, and the Court has been forced to blaze a trail through the numerous difficult contractual provisions implicated in this dispute. This lengthy and expensive litigation could surely have been shortened and simplified to the benefit of all parties if the Technical Specifications had been clearer.

But the mere fact that contractual language is complicated or at times difficult does not necessarily mean it is ambiguous as a matter of law. Under Texas law, "our primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument."[22] "We . . . 'presume parties intend what the words of their contract say' and interpret contract language according to its 'plain, ordinary, and generally accepted meaning' unless the instrument directs otherwise."[23] Contractual clauses and terms are not interpreted in isolation. "While interpreting a contract, courts must consider the entire writing and 'give effect to all the provisions of the contract so that none will be rendered meaningless.'"[24] This Contract is lengthy and complex, incorporating a large number of technical and procedural specifications. Accordingly, its interpretation requires considerable attention to the ways in which these disparate parts of the Contract work together.

In addition, "words must be construed in the context in which they are used."[25] The interpretation of this Contract is properly guided by the specialized commercial context of the Project. The Court has considered, for example, the Standard Specifications that, while not forming part of this Contract, clearly provide some objective evidence of the context for its terms.[26] The Court has not considered any evidence of the subjective intention of the parties in entering the Contract. Little or no such evidence was offered, in any case; after all, the uncontroverted evidence shows that the Contract is almost entirely composed of form terms apparently set

---

[22] *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018).

[23] *Id.* at 764 (quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010) and *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)).

[24] *In re Carmona*, 580 B.R. 690, 715 (Bankr. S.D. Tex. 2018) (quoting *Coker v. Coker*, 650 S.W.2d 393, 393 (Tex. 1983)).

[25] *URI, Inc.*, 543 S.W.3d at 764.

[26] "What 'facts and circumstances' may be consulted will naturally vary from case to case, but reasonably well-defined contours can be mined from our jurisprudence. Because objective intent controls the inquiry, only circumstantial evidence that is objective in nature may be consulted." *Id.* at 767–68 (citations omitted).

5

and required by authorities such as TxDOT, so the intention of the particular parties here could not provide much illumination of its meaning.

The Court believes that the Contract is ultimately unambiguous in all relevant respects. "If a written contract is so worded that it can be given a definite or certain legal meaning when so considered and as applied to the matter in dispute, then it is not ambiguous. But if contract language is susceptible to more than one reasonable interpretation when so viewed, an ambiguity exists."[27] After proper analysis as prescribed by Texas contract law, the Court believes that its interpretation as laid out below is the only reasonable interpretation of the contested terms of the Contract. Alternatively, however, if any terms are considered ambiguous, or if the Court's consideration of contextual or circumstantial evidence is deemed to cross over into consideration of the sort of extrinsic evidence allowed only with respect to ambiguous contracts, then the Court's holdings below should be considered its findings regarding the meaning of any ambiguous terms. In either case, the Court believes that while some work is required, the interpretation of all relevant provisions becomes clear once the work of proper contract analysis is performed.

Due to a number of factors, many of which are hotly contested, the Project remained unfinished through the end of 2022[28] (and apparently remains so today). Camino Real sent a notice of intent to default to JAR on December 7, 2022 (the "Notice of Intent to Default"),[29] which listed corrective items for JAR to perform within a 10-day period. Deeming JAR's response to this notice to be insufficient, Camino Real sent a notice of default to JAR on December 22, 2022,[30] which JAR received on December 27.[31] In response, JAR submitted a claim for wrongful default to Camino Real on January 9, 2023,[32] and Camino Real determined that its declaration of default was proper on January 30, 2023.[33] The record reflects that the parties have exchanged various e-mails and other correspondence since then, although they appear to have come no closer to resolving their disputes.

---

[27] *Id.* at 765 (citations omitted).

[28] Pl.'s 1st Stage Proposed Findings and Conclusions ¶ 6; Counterclaim at 10, ¶ 34.

[29] Compl., Ex. 2; Ex. P-22; Ex. TR-31. The Notice of Intent to Default was apparently received on December 9, 2022. *See* 2nd Stage Hr'g Tr. 400:23–401:1.

[30] Compl., Ex. 5, ECF No. 1; Ex. P-24; Ex. TR-45 (notice of default).

[31] *See* 2nd Stage Hr'g Tr. 457:11–18.

[32] Compl., Ex. 6; Ex. P-25; Ex. TR-48.

[33] Compl., Ex. 7; Ex. P-26; Ex. TR-49.

JAR filed for Chapter 11 bankruptcy relief on March 14, 2023, and its case was converted to Chapter 7 liquidation on September 12, 2023,[34] at which time the Trustee was appointed. The Trustee, on behalf on JAR, maintains that the default was wrongful and seeks damages relating to it (as well as asserting a number of other claims against Camino Real).[35]

At issue in the first two stages of trial is whether the default was wrongful. Part of the dispute is over the propriety of the default process itself. Camino Real maintains that it "substantially complied" with the contractual default process, and furthermore, that its project manager, an engineering firm called Atkins North America Inc. ("Atkins"), led by a licensed engineer named Edgar Fino ("Fino"), was empowered by the Contract, as "Engineer" thereunder, to not just supply the initial notice of intent to default but to also make the later determination of whether the contractual default process (in which he was deeply involved) was correct.[36] According to Camino Real, Mr. Fino made his final "determination" on this matter at a meeting/"hearing" on August 8, 2023, which JAR was invited to but did not attend,[37] and Mr. Fino's "decision" was memorialized in a letter dated August 16, 2023.[38]

The Trustee argues, by contrast, that Camino Real did not comply with the contractually ordained default process,[39] that Mr. Fino of Atkins is not the Engineer under the Contract,[40] and that even if he is, he is not empowered to make the determination of whether the default process was proper.[41] The Trustee also contends that the Engineer has no right to determine his affirmative claims for additional time and/or damages under the Contract.[42] He states that he filed such claims with Camino Real on December 6, 2023,[43] as contractually required, but that they were never considered by Camino Real and therefore must be considered by this Court.[44]

---

[34]  Order Converting Case to Chapter 7, Case No. 23-30242, ECF No. 382.
[35]  *See generally* Counterclaim 17–31.
[36]  Pl.'s 1st Stage Proposed Findings and Conclusions ¶ 34.
[37]  Pl.'s 1st Stage Proposed Findings and Conclusions ¶¶ 16–18.
[38]  Ex. P-40; Ex. TR-61.
[39]  Tr.'s 1st Stage Proposed Findings and Conclusions ¶ 31.
[40]  Tr.'s 1st Stage Proposed Findings and Conclusions ¶ 17.
[41]  Tr.'s 1st Stage Proposed Findings and Conclusions ¶ 124.
[42]  Tr.'s 1st Stage Proposed Findings and Conclusions ¶ 122.
[43]  Ex. TR-62.
[44]  Tr.'s 1st Stage Proposed Findings and Conclusions ¶ 104.

Most of the issues above were tried in the First Stage. Generally speaking, because the Court found that Camino Real substantially complied with the contractual default *process*, the Court proceeded in the Second Stage to try the *substance* of the default decision.

In the Second Stage, the Trustee has asserted that Camino Real waived the right to default JAR for late performance, that Camino Real bears the burden of showing that the default was valid, that there was no support for the stated grounds for default in the Notice of Intent to Default, that the cure period and standard for weighing compliance with the corrective items in the Notice of Intent to Default were improper in various ways, that the default was based on "immaterial items," and that JAR provided adequate assurance that it would complete the Project. It also complains about Camino Real's alleged failure to obtain all the requisite rights of way, as well as alleged design defects, which it claims played a significant role in its failure to perform under the Contract.

Camino Real has denied all of the above. It argues that Mr. Fino made the relevant decisions and that his decisions are entitled to deference, that the reasons for default are well supported by the record, that the cure items were properly selected and the cure procedure properly followed, and that JAR failed to perform according to the Notice of Intent to Default and was properly defaulted.

The upshot of the Findings and Conclusions below is the default was not wrongful. The Trustee's case lacks sufficient support in nearly every respect, whereas Camino Real's is well supported by the facts and the governing law. The Court holds that the appropriate standard for nearly every issue in this case is the highly deferential Gross Error Standard, under which the Trustee bears a heavy burden, but it also holds that the outcome would not differ even if Camino bore the burden of proving that the default was not wrongful by a preponderance of the evidence.

## Findings of Fact and Conclusions of Law[45]

The role of the "Engineer" in many public construction projects is crucial. Typically, under public construction contracts (including the Contract governing this Project), the Engineer has supervisory authority over a very wide variety of aspects

---

[45]   Any finding of fact that should be more appropriately characterized as a conclusion of law should be regarded as such, and vice versa.

of the project. The Engineer's decisions, within the scope of this sweeping authority, are entitled to considerable deference under the governing legal standard.

Much of the energy in this Opinion will be spent understanding the various aspects and activities of the Engineer under this Contract and based on the facts of this project. Below, the Court addresses, who the Engineer was (Section A), the scope of his authority (Section B), whether he was properly involved in the relevant decision-making (Section C), and whether his decisions were defensible substantively under the deferential governing legal standard (Section D). The Court also makes an alternative finding that, even under a much less deferential preponderance of the evidence standard, Camino Real would still prevail (Section E). Finally, the Opinion explains why the Trustee's remaining arguments are also meritless (Section F).

**A.  Mr. Fino served as the Engineer under the Contract from its inception, and (even if this were not clear from the inception) he served in that role at all relevant time periods and has the rights and responsibilities according to that role.**

One crucial question in the Contract is who serves or served as the "Engineer" under it. The Contract definitions state only that: the Engineer is the "Professional Engineer licensed in Texas who represents the interests of the Owner";[46] Camino Real is the "Owner";[47] and a "Licensed Professional Engineer" is a "person who has been duly licensed by the Texas Board of Professional Engineers to engage in the practice of engineering in the State of Texas; also referred to as a Professional Engineer."[48]

The Contract nowhere *names* the Engineer, and Camino Real and the Trustee disagree about who in fact served in that role. Camino Real contends it is Mr. Fino and/or his employer, Atkins,[49] whereas the Trustee contends it was CEA Group ("CEA"), another engineering firm licensed in Texas.[50] At first glance, both have

---

[46]  Tech. Specs., Sec. 1L.3.53.
[47]  Contract at 1.
[48]  Tech. Specs., Sec. 1L.3.74.
[49]  Pl.'s 1st Stage Proposed Findings and Conclusions ¶¶ 20–23.
[50]  Tr.'s 1st Stage Proposed Findings and Conclusions ¶¶ 115–20.

plausible claims: Mr. Fino of Atkins[51] was the primary project manager, whereas CEA was responsible for design work and its engineers' stamps appear on most of the project design materials.[52]

Because the Contract fails to designate who this important person is, the Engineer's identity must be reverse-engineered (so to speak) based on who actually performed the duties of Engineer as specified in considerable detail in the Contract.[53] In other words, "the Engineer is as the Engineer does," under this Contract.

The Court engages in that inquiry below, with the very clear result that Camino Real is correct that Mr. Fino was the Engineer *from the inception of the Contract*.

But the Court also notes from the outset (and will explain further below) that it rejects the Trustee's strained position that the relevant consideration should be who a reasonable contractor at the inception of the Contract would have thought was the Engineer.[54] There is no support for the notion that the identity of the Engineer was a term that needed to be known in advance at the time of contracting. The fact that, in such a lengthy and detailed Contract, the identity is left vague seems quite purposeful—and sensible. Indeed, there is no reason that the Engineer could not have changed at any point throughout the lengthy contract period. So even if the Trustee were correct (which he is not) that CEA served as the Engineer at some point, he would still lose because clearly Mr. Fino served as the Engineer for all relevant time periods in this dispute.

---

[51] Although the Court believes the Contract is best understood as an individual (Fino) rather than the entity for whom he worked (Atkins), this distinction does not affect the outcome of this case in any way. The Court occasionally uses "Atkins" as shorthand for "Mr. Fino of Atkins." In any case, both parties have agreed that the Contract can be interpreted to allow an entity (such as Atkins or CEA) to serve as Engineer.

[52] *See, e.g.*, Ex. TR-85; 1st Stage Hr'g Tr. 125:1–9.

[53] Camino Real apparently contends that Mr. Fino's own determination that he is the Engineer is entitled to deference, because he is the Engineer. *See* Pl.'s 1st Stage Proposed Findings and Conclusions ¶ 27 ("The Contract defines who the Engineer is. Therefore, it is Edgar Fino's role, as Engineer of the Contract, to interpret who the Engineer is."). But this is circular. If Mr. Fino is not the Engineer under the Contract terms, then his decision to the contrary is entitled to no more deference than a person on the street's. One cannot *assume* that Mr. Fino is the Engineer and thereby give him the power to decide that he *is* the Engineer.

[54] *See* Tr.'s Mot. for Reconsideration at 1–2.

The Engineer is empowered to perform a large number of tasks under the Contract. The various responsibilities of the Engineer under the Contract include the following[55]:

- Quality assurance, sampling, testing, and inspecting to determine payment and make acceptance decisions.[56]
- Approve any internal or external facilitators to lead and guide discussions between Owner and Contractor.[57]
- Coordinate meeting dates, times, locations, other needs and appurtenances.[58]
- Approve reimbursement or invoices to pay external facilitators.[59]
- Reimburse invoices for meeting facilities and appurtenances.[60]
- Approve changes in addition, reduction, or elimination of quantities or alternations needed to complete the Contract.[61]
- If any changes occur in the contract, the Engineer may adjust the compensation.[62]
- If an adjusted unit price cannot be agreed upon, the engineer can determine the unit price.[63]
- When differing site conditions are present, notify the Contractor, investigate the conditions, and determine whether differing site conditions actually exist. Further, make adjustments in accordance with the Contract.[64]
- Make adjustments if the differing site conditions caused an increase or decrease in the cost or number of working days specified for the performance of the Contract.[65]
- Review any additional compensations requests submitted by the Contractor.[66]
- Observe, test, inspect, approve, and accept the work on behalf of the Owner.[67]

---

[55] A number of these responsibilities are stated conditionally in the Contract, in that the Engineer *may* but is not necessarily *required* to perform them.
[56] Tech. Specs., Sec. 1L.3.108.
[57] Tech. Specs., Sec. 4L.3.2.
[58] Tech. Specs., Sec. 4L.3.3.
[59] Tech. Specs., Sec. 4L.3.4.
[60] Tech. Specs., Sec. 4L.3.4.
[61] Tech. Specs., Art. 4L.4.
[62] Tech. Specs., Art. 4L.4.
[63] Tech. Specs., Art. 4L.4.
[64] Tech. Specs., Art. 4L.5.
[65] Tech. Specs., Art. 4L.5.
[66] Tech. Specs., Art. 4L.6.
[67] Tech. Specs., Art. 5L.1.

- Act as a referee in all questions arising under the terms of the contract.[68]
- Approve alternative submission procedures for project plans and working drawings.[69]
- Sign, seal, and date the working drawings.[70]
- Approval of items spanning over live traffic or where safety of the traveling public is affected.[71]
- Approve any work beyond the lines and grades shown on the plans or any extra work.[72]
- Approve any deviations from the project plans or any extra work. Document the basis of acceptance by a letter and may adjust the Contract price.[73]
- When work fails to meet the Contract requirements, the Engineer can correct, remove, and replace defective or unauthorized work.[74]
- Make any necessary corrections and interpretations of any omissions, errors, or discrepancies.[75]
- Suspend work without suspending working day charges if Superintendent is not available or does not meet the criteria.[76]
- Remove from the project any employee or representative of the Contract or a subcontractor who, in the opinion of the Engineer, does not perform work in a proper and skillful manner or who is disrespectful, intemperate, disorderly, uncooperative, or otherwise objectionable.[77]
- Make necessary arrangements with the utility owner when utility adjustments are required.[78]
- After being notified of utility conflicts, decide whether to adjust utilities or adjust the work to eliminate or lessen the conflict.[79]
- Allow the Contractor to copy available earthwork cross-sections, computer printouts or data files, and other information necessary to establish and control work.[80]

---

[68] Tech. Specs., Art. 5L.1.
[69] Tech. Specs., Art. 5L.2.
[70] Tech. Specs., Art. 5L.2.
[71] Tech. Specs., Art. 5L.3.
[72] Tech. Specs., Art. 5L.3.
[73] Tech. Specs., Sec. 5L.3.1.
[74] Tech. Specs., Sec. 5L.3.2.
[75] Tech. Specs., Art. 5L.4.
[76] Tech. Specs., Art. 5L.5.
[77] Tech. Specs., Art. 5L.5.
[78] Tech. Specs., Art. 5L.6.
[79] Tech. Specs., Art. 5L.6.
[80] Tech. Specs., Art. 5L.9.

- Make measurements and surveys to determine the accuracy of the work and determine pay quantities.[81]
- Set control point for establishing lines, slopes, grades, and centerlines and for providing both vertical and horizontal control for construction surveying.[82]
- Set adequate control points, stakes, and marks to establish lines, slopes, grades and centerlines.[83]
- Authorize project inspectors.[84]
- Perform a complete and detailed inspection of the work.[85]
- Give written final acceptance for the work locations in the Contract.[86]
- Perform a final inspection after all work is completed.[87]
- Notify the Contractor in writing of the final acceptance of the work. If the final inspection finds any work to be unsatisfactory, identify in writing all deficiencies in the work requiring correction.[88]
- Provide written notice of the final acceptance.[89]
- Approve the source of materials to be used in the project before their delivery.[90]
- Approve corrective actions on material not meeting Contract requirements.[91]
- Inspect, test, and accept project materials.[92]
- Witness all testing performed on the project.[93]
- Inspect materials at the acquisition or manufacturing source.[94]
- Test and remove or dispose hazardous materials not introduced by the Contractor on sites owned or controlled by the Owner.[95]

---

[81] Tech. Specs., Art. 5L.9.
[82] Tech. Specs., Sec. 5L.9.1-9.
[83] Tech. Specs., Sec. 5L.9.2.
[84] Tech. Specs., Art. 5L.10.
[85] Tech. Specs., Art. 5L.10.
[86] Tech. Specs., Sec. 5L.12.1.
[87] Tech. Specs., Sec. 5L.12.1.2.
[88] Tech. Specs., Sec. 5L.12.1.2.
[89] Tech. Specs., Sec. 5L.12.1.2.
[90] Tech. Specs., Art. 6L.1.
[91] Tech. Specs., Art. 6L.2.
[92] Tech. Specs., Art. 6L.4.
[93] Tech. Specs., Art. 6L.4.
[94] Tech. Specs., Art. 6L.5.
[95] Tech. Specs., Art. 6L.10.

- Review invoices and other records obtained from the facility showing the received weight of the steel and the facility name of paint that contains hazardous materials.[96]
- Schedule and attend a safety preconstruction meeting with the Contractor, subcontractors, Owner, local law enforcement, and other personnel that plays an active role on the project.[97]
- Determine if any of the requirements of the Legal Relations and Responsibilities have not been met.[98]
- Authorize or direct in writing the removal or relocation of project limit advance warning signs.[99]
- Discuss any unexpected situations that arises that cause the Contractor to believe that the traffic control should be changed.[100]
- Give written approval for any project specific locations in the right of way not specifically addressed on the plans.[101]
- Review writings submitted by the Contractor that discuss any changes in the date of actual demolition, renovation, or removal is changes.[102]
- Give written permission authorizing to make an opening in the highway for utilities, drainage, or any other reason.[103]
- Direct the repair of all openings.[104]
- Request copies of the yearly overweight tolerance permits.[105]
- Request temporary fill for hauling purposes for the protection of certain structures.[106]
- Allow equipment with oversized or non-divisible overweight loads to operate without a permit within the work locations.[107]
- Review structural analysis and supporting documentation to determine whether traffic crossing structures will cause no damage or overstresses in excess of those normally allowed for occasional overweight loads.[108]

---

[96]  Tech. Specs., Sec. 6L.10.2.
[97]  Tech. Specs., Sec. 7L.1.2.
[98]  Tech. Specs., Sec. 7L.1.3.
[99]  Tech. Specs., Sec. 7L.1.5.
[100]  Tech. Specs., Sec. 7L.1.5.
[101]  Tech. Specs., Sec. 7L.6.6.
[102]  Tech. Specs., Art. 7L.12.
[103]  Tech. Specs., Art. 7L.1.
[104]  Tech. Specs., Art. 7L.13.
[105]  Tech. Specs., Art. 7L.16.
[106]  Tech. Specs., Art. 7L.16.
[107]  Tech. Specs., Sec. 7L.16.1.
[108]  Tech. Specs., Sec. 7L.16.1.

- Grant permission to store or stockpile material on bridge structures if no damages or overstresses in excess of those normally allowed for occasional overweight load will result to structures that will remain in use after Contract completion.[109]
- Allow divisible overweight loads on pavement structures within the work locations not open to the traveling public.[110]
- Consider failures beyond the Contractor's control when determining reimbursement for repairs to detours constructed.[111]
- Relieve the Contractor from responsibility of maintenance when directed.[112]
- Accept other states' electrical licenses by reviewing documentation of the requirements for obtaining that license.[113]
- Approve beginning work or before beginning any new operation.[114]
- Grant permission if Contractor wants to sublet any portion of the construction contract.[115]
- Direct how any specialty items will be shown on the plans.[116]
- Review and inspect payment records including copies of cancelled checks by the 20th day of each month.[117]
- If requested, provide the conceptual time determination schedule to the Contractor for informational purposes only.[118]
- Consider increasing the number of working days under extraordinary circumstances.[119]
- Determine if weather or other conditions permit performance of the principal unit of work underway, grant permission to Contract to schedule work on Saturdays.[120]
- Grant permission for nighttime work if required, when nighttime work is allowed or required and daytime work is not allowed.[121]

---

[109] Tech. Specs., Sec. 7L.16.3.
[110] Tech. Specs., Sec. 7L.16.4.
[111] Tech. Specs., Sec. 7L.17.4.
[112] Tech. Specs., Sec. 7L.17.5-5.4.
[113] Tech. Specs., Sec. 7L.18.1.4.
[114] Tech. Specs., Art. 8L.1.
[115] Tech. Specs., Art. 8L.2.
[116] Tech. Specs., Sec. 8L.2.1.
[117] Tech. Specs., Sec. 8L.2.3.
[118] Tech. Specs., Art. 8L.3.
[119] Tech. Specs., Art. 8L.3.
[120] Tech. Specs., Sec. 8L.3.1.4.
[121] Tech. Specs., Sec. 8L.3.3.2.1.

- Grant permission for nighttime work, if nighttime work is performed or required and daytime work is allowed.[122]
- Suspend the work, wholly or in part, and provide notice and reasons for the suspension in writing.[123]
- Suspend working day charges only when conditions not under the control of the Contractor prohibit the performance of critical activities.[124]
- Evaluate and examine any modifications of the project schedule. If not accepted, provide comments to the Contractor for incorporation.[125]
- Review the project schedule.[126]
- Evaluate the updated schedule within 5 calendar days of receipt and inform the Contractor if it has or has not been accepted. If the schedule is not accepted, provide comments to the contractor for incorporation. Provide a revised schedule based on the Engineer's comments, or reasons for not doing so within 5 calendar days.[127]
- Review statement submitted by Contractor that may impacted the schedule.[128]
- Review time impact analysis when project schedule changes.[129]
- Declare the Contractor to be in default of the Contract.[130]
- Give notice in writing to the Contractor and the Surety of the intent to declare the Contractor in default.[131]
- Provide written notice to the Contractor of termination specifying the extent of the termination and the effective date.[132]
- Prepare a change order that reduces the affected quantities of work and add acceptable costs of termination.[133]
- Measure all completed work using United States standard measures, unless otherwise specified.[134]
- Require verification of volume through weight measurement.[135]

---

[122] Tech. Specs., Sec. 8L.3.3.2.2.
[123] Tech. Specs., Art. 8L.4.
[124] Tech. Specs., Art. 8L.4.
[125] Tech. Specs., Sec. 8L.5.5.2.2.1.
[126] Tech. Specs., Sec. 8L.5.5.2.3.
[127] Tech. Specs., Sec. 8L.5.5.2.3.
[128] Tech. Specs., Sec. 8L.5.5.2.3.
[129] Tech. Specs., Sec. 8L.5.5.4.
[130] Tech. Specs., Sec. 8L.7.1.
[131] Tech. Specs., Sec. 8L.7.1.
[132] Tech. Specs., Sec. 8L.8.1.
[133] Tech. Specs., Sec. 8L.8.2.
[134] Tech. Specs., Art. 9L.1.
[135] Tech. Specs., Sec. 9L1.2.

- Reject loads and suspend hauling operations for overloading.[136]
- Grant permission to Contractor of hauling on routes not accessible to the traveling public.[137]
- Agree in writing to fix the final quantity as a plans quantity item, if the item is less than $250.[138]
- Prepare a monthly estimate of the amounts of work performed, including materials in place.[139]
- Grant approval of any repairs required after fabricated materials have been approved for storage. [140]
- Request records relating to MOH payment.[141]
- Verify daily records of extra work created by Contractor.[142]
- Establish a reasonably hourly rate for pieces of equipment that are not in the Rental Rate Blue book.[143]
- Prepare a final estimate for payment showing the total quantity of work completed and the money owed to the Contractor.[144]
- Reviewing and resubmit, if necessary, all necessary shop drawings, certificates, etc. for review and acceptance.[145]
- Accept any Class I materials.[146]
- Review and resubmit, if necessary, documentation on pipe products, fittings, and related materials.[147]
- Approve any concrete thrust blocks that will be used in the project.[148]
- Review and resubmit, if necessary, any test reports regarding concrete mix design and reinforcing steel as may be required by the plans or the Engineer.[149]
- Amend in writing the maximum length of open trench in public right of way.[150]

---

[136] Tech. Specs., Sec. 9L.1.3.
[137] Tech. Specs., Sec. 9L.1.3.
[138] Tech. Specs., Art. 9L.2.
[139] Tech. Specs., Art. 9L.5.
[140] Tech. Specs., Art. 9L.6.
[141] Tech. Specs., Art. 9L.6.
[142] Tech. Specs., Art. 9L.7.
[143] Tech. Specs., Sec. 9L.7.1.4.1.
[144] Tech. Specs., Art. 9L.10.
[145] Tech. Specs., Special Specification 7016, Sec. 3.2.1.2.
[146] Tech. Specs., Special Specification 7016, Sec. 3.2.1.9.2.
[147] Tech. Specs., Special Specification 7016, Sec. 3.2.2.2.
[148] Tech. Specs., Special Specification 7016, Sec. 3.2.2.9.
[149] Tech. Specs., Special Specification 7016, Sec. 4.2.3.
[150] Tech. Specs., Special Specification 7016, Sec. 6.3.8.

- In the event of conflict or discrepancy that affects the project design, formulate a solution with Contractor before proceeding with pipe installation.[151]
- Direct to test class I material, if tested, the material must be measures by ASTM-D-4254 by percent of relative density.[152]
- Review any soil density tests.[153]
- Review the conformity of the valve operation after installation.[154]
- Coordinate disposal of water with Contractor and El Paso Water Utilities Operation Division.[155]
- Notify El Paso Water Utilities, a minimum of 48 hours in advance of any scheduled inspection; and provide a staging area that is free and accessible for TV camera activities.[156]
- Request documentation on pipe products, fittings, and related materials.[157]
- Prior to service line installation, coordinate service line installation with El Paso Water Utilities to have EPWU personnel curb mark the locations of proposed service tees.[158]
- Approve the repairs of any leaks.[159]
- Inspect the manufacturing process at any time to make tests on materials used, and to have cores cut out of the completed manholes for compressive strength testing and placement of reinforcement.[160]
- Perform television inspection of sewer lines.[161]
- Supervise testing conducted by the Contractor to all testing apparatus including pumps, compressors, hoses, gauges, and fittings, and other equipment necessary to perform the required tests.[162]
- Direct individual joint testing of pipe larger than 24 inches in diameter in accordance with ASTM C-1103 for special conditions not covered by other test methods.[163]

---

[151] Tech. Specs., Special Specification 7016, Sec. 6.3.9.2.
[152] Tech. Specs., Special Specification 7016, Sec. 6.3.9.6.
[153] Tech. Specs., Special Specification 7016, Sec. 6.3.9.7.
[154] Tech. Specs., Special Specification 7016, Sect. 7.4.
[155] Tech. Specs., Special Specification 7016, Sect. 10.2.
[156] Tech. Specs., Special Specification 7016, Sec. 11.1.
[157] Tech. Specs., Special Specification 7016, Sec. 11.2.1.
[158] Tech. Specs., Special Specification 7016, Sec. 11.3.1.
[159] Tech. Specs., Special Specification 7016, Sec. 11.3.2.
[160] Tech. Specs., Special Specification 7016, Sec. 11.3.2.2.
[161] Tech. Specs., Special Specification 7016, Sec. 11.3.3.1.
[162] Tech. Specs., Special Specification 7016, Sec. 11.3.3.2.
[163] Tech. Specs., Special Specification 7016, Sec. 11.3.3.2.3.

- Supervise and approve the performance of the mandrel test to verify the roundness and the proper installation of the flexible pipeline.[164]
- Approve adjustment of mandrel gauge and review permanent record of all testing with locations where excessive pipeline deflection occur.[165]
- Grant written permission to shutdown bypassing systems between shifts, on holidays or weekends, or during work stoppages.[166]
- Coordinate with Contractor schedule for operations to remove sewer line or structure from service.[167]
- Decide whether or not proposed materials and procedure will meet the contract requirements.[168]
- In the event a conflict exists, formulate a solution with contractor before proceeding with casing installation.[169]
- Review emergency road repair procedure plan.[170]
- Approve any wage rate that is not listed in the "Texas Counties Identified by Wage Rate Zones."[171]

*The overwhelming evidence supports Camino Real's contention that it was Mr. Fino of Atkins performing the job of the Engineer in nearly every respect for the entire duration of JAR's involvement with this Contract.*[172] While CEA provided design-related engineering services, particularly at the beginning of the Project, there can be no reasonable doubt that Mr. Fino of Atkins was the primary Engineer managing the Project from its inception, including through supervision of CEA's design work. This was established through the credible testimony of Mr. Telles of Camino Real and Mr. Fino of Atkins,[173] as well as numerous exhibits, all of which

---

[164] Tech. Specs., Special Specification 7016, Sec. 11.3.3.3.

[165] Tech. Specs., Special Specification 7016, Sec. 11.3.3.3.

[166] Tech. Specs., Special Specification 7016, Sec. 11.4.3.

[167] Tech. Specs., Special Specification 7016, Sec. 11.4.3.

[168] Tech. Specs., Special Specification 7016, Sec. 12.2.1.

[169] Tech. Specs., Technical Specifications 7016, Sec. 12.3.2.

[170] Tech. Specs., Technical Specifications 7016, Sec. 12.3.2.

[171] Tech. Specs., Wage Rates.

[172] *See* Contract; Ex. P-3 (Engineer Responsibilities Chart prepared by Atkins); Ex. P-45 (Pre-Construction Conference – Agenda, Mar. 26, 2020); Ex. TR-84 (Project Proposal); 1st Stage Hr'g Tr. 100:22–101:1, 102:1–8, 159:5–161:2, 161:11–171:12, 172:6–176:13, 177:4–183:15.

[173] Mr. Ruben Chavez of CEA also gave testimony supporting this conclusion by providing his opinions concerning who was the Engineer on the project. *See* 1st Stage Hr'g Tr. 138:15–25, 139:1–20. He helpfully explained the difference between the concept of "engineer of record" and the Engineer for purposes of the Contract. *See* 1st Stage Hr'g Tr. 141:1–19. Much of the

demonstrated that Mr. Fino of Atkins (and not CEA) was from the very beginning performing the duties of Engineer as specified at length in the Contract.[174]

Contrary to the Trustee's arguments, the evidence here shows that even when certain design work was delegated to CEA, CEA operated under Atkins' authority and supervision,[175] and thus Mr. Fino of Atkins remained the Engineer—the Owner's representative and binding decisionmaker—even as to those aspects of the Project. And Mr. Fino testified that most or all of the acts undertaken by CEA independently (that is, not under Atkins supervision) were on projects in which CEA was contracted by El Paso Water to handle certain related, joint projects involving both Camino Real's roadway and El Paso Water's utilities. These minimal, independent activities, which Mr. Fino testified were 2–5% of the total activities of the "Engineer" under the Contract,[176] do nothing to unseat the very great weight of the rest of the testimony and evidence at trial identifying Mr. Fino of Atkins as Engineer.

On the other hand, Mr. Rosales of JAR testified that he believed CEA was the Engineer.[177] Mr. Rosales generally testified in a credible manner, and the Court casts no doubt on his statement of his subjective belief about the Engineer. Nonetheless, his personal understanding cannot trump the extensive and clear record of the activities actually performed by Atkins and not CEA.[178] The basis for Mr. Rosales' understanding is simply not compelling, while the Court does not question his honesty in providing it. There is no doubt that a reasonable contracting party should and would have known that Mr. Fino of Atkins was the Engineer under the Contract from its inception; indeed, even the requests for bids at the very beginning of the

---

rest of his testimony was not based on his personal knowledge and did not reflect a detailed understanding of the Project's specifics, as compared with the other witnesses. Accordingly, the Court has given that testimony less weight.

[174] *See* Ex. P-3 (Engineer Responsibilities Chart prepared by CRRMA) and the testimony and exhibits cited above.

[175] Extensive testimony was elicited on this point. *See*, e.g., 1st Stage Hr'g Tr. 159:8–25.

[176] 1st Stage Hr'g Tr. 175:16–21.

[177] 1st Stage Hr'g Tr. 217:9–218:18.

[178] To take a couple of examples, Mr. Rosales conceded that he dealt with inspectors representing Atkins, not CEA, an important fact given how central inspection is to the role of the Engineer. *See* 1st Stage Hr'g Tr. 230:22–25, 231:1–19. He also declined to directly controvert Mr. Fino's testimony, *see* 1st Stage Hr'g Tr. 170:2–5), that Mr. Fino identified himself as the area engineer and construction engineer at the pre-construction meeting, *see* 1st Stage Hr'g Tr. 227:24–228:2 ("Edgar might have said he was the area engineer. I don't remember what he said. He said something.").

relationship between JAR and this Project reflect Atkins' pervasive role in management of the project.[179]

What is more, even if the Engineer's identity had not been established at the time of entry into the Contract (as the Court finds it was), the Court is not convinced that it would change the outcome. The inception of the Contract is not the only time that matters; the parties could agree to this Contract even without the Engineer's precise identity being known. After all, because Engineer is a functional title (as reflected in the functional definition provided for it), it is conceivable that the individual playing that role might shift in the course of a project. Even a party named as Engineer in advance might not serve in that role through the entire lengthy project, perhaps as a result of retirement, illness, or termination. From a contractor's point of view, this could perhaps be confusing or frustrating at times, but that is the deal it chooses to enter. The Contract does not appear in this respect to be unusual at all as compared with other public construction contracts, and there is nothing unconscionable or inequitable about the arrangement. The point is that there will be an expert Engineer managing the project, to whom a number of important responsibilities devolve; a contractor need not know the identity of that individual ex ante to be able to enter into the contract.

As a final point, the Technical Specifications also include the following statement, which is apparently a "bespoke" or non-standard term, unlike the rest of the Technical Specifications. The statement is included before the specifications actually begin, along with other introductory material (such as an outline and an explanation of how to navigate the very lengthy document). The statement is obviously not punctuated correctly and is generally not very clear. It is reproduced, mistakes and all, here:

> In general, the Owner" or the "Engineer" references the CRRMA or their representatives (Consulting Engineers, etc.) Reference to "Department" or "Engineer" in the construction and maintenance specifications refers to the CRRMA except when it is referencing a

---

[179] *See* Ex. P-49; 1st Stage Hr'g Tr. 161:3–167:5. Mr. Rosales' attempt to suggest that Mr. Fino and Atkins were merely the "construction manager" and not the Engineer flies in the face of the actual duties of the Engineer as specified above, which were clearly performed by Mr. Fino and his team and which involve many things that one could describe as part of construction management.

TxDOT Application, manual, material specification, Material Producers List or test method.[180]

This carelessly drafted provision does not, in the Court's view, add much clarity, one way or the other, to the Contract's dispute resolution procedures or identification of the Engineer. The Court believes that in all relevant respects—including with respect to the Engineer's duties in the Contract, the "Authority of Engineer" provisions, and the "Dispute or Claims Procedure" discussed in detail below—the "Owner" is Camino Real, and the "Engineer" is Mr. Fino of Atkins and that despite this provision, those roles remain distinct. The Court believes that this added provision appears intended to identify Camino Real as the public entity entering into the Contract and not to dramatically rewrite the roles thereunder by collapsing definitions or roles that the Contract distinguishes and empowers in various ways.[181] Thus the Court's analysis of the identity of the Engineer has focused on the relatively clear contractual contours of that role rather than this cryptic provision added to the opening of the Technical Specifications.

In sum, the Court finds that the evidence could not reasonably be clearer that Mr. Fino of Atkins was the Engineer under this Contract. He performed nearly every one of the vast number of duties assigned to the Engineer. Although the Trustee's argument that CEA was the Engineer had a superficial plausibility to it, when it was tested against the actual evidence, the argument fell apart.

## B.    The Engineer's Authority

This Section addresses the scope of the Engineer's authority and the deference to which his decisions are entitled (Subsection 1), outlines the specific authority he has over default determinations as well as "affirmative claims" for time or money (Subsection 2), and explains why that authority does not extend to control of the "Dispute or Claims Resolution Procedure" (Subsection 3).

---

[180] Tech. Specs. at 8.

[181] To read the Contract as collapsing these roles would require more clarity than this clause provides, particularly given the case law (surveyed in the following section) recognizing the authority commonly given to Engineers in such contracts and the importance of this role in resolving ground-level disputes under the Contract. In addition, by referencing the definitions and roles outlined in the Contract ("Consulting Engineers, etc."), the provision expressly appears to preserve and not supersede and collapse them.

1. **The authority of the Engineer under the Contract is very broad and the deference to which he is entitled is considerable, as reflected in both the contractual language and the case law.**

Item 5L of the Technical Specifications is titled "Control of Work."[182] Its first Article is titled "Authority of Engineer,"[183] and it grants significant authority to the "Engineer":

> 1. **Authority of Engineer**
>
> The Engineer has the authority to observe, test, inspect, approve, and accept the work on behalf of the Owner. The Engineer decides all questions about the quality and acceptability of materials, work performed, work progress, Contract interpretations, and acceptable Contract fulfillment. The Engineer has the authority to enforce and make effective these decisions.
>
> The Engineer acts as a referee in all questions arising under the terms of the Contract. The Engineer's decisions will be final and binding.

This provision and provisions very similar to it are familiar in Texas public construction contracts, as reflected in more than eighty years of Texas case law (discussed later in this Opinion). The provision is intended to, and does, give substantial deference to professionals directing public projects. When project decisions are entrusted to an Engineer or other professional (such as an architect), and when that professional is empowered to make decisions on a "final and binding" basis, courts interpret this to mean that both the public authority and the contractor are bound by those decisions. Under these circumstances, the professional's judgment is entitled to substantial deference—it may only be overturned if "in making it he is guilty of fraud, misconduct, or such gross mistake as would imply bad faith or failure to exercise an honest judgment."[184] The Court will refer to this as the "Gross Error Standard."[185] (Otherwise, if a matter is entrusted to the public

---

[182] Tech. Specs., Item 5L.

[183] Tech. Specs., Art. 5L.1.

[184] *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 203 (Tex. App. 1992) (quoting *City of San Antonio v. McKenzie Constr. Co.*, 150 S.W.2d 989, 996 (Tex. 1941)).

[185] *Tex. Dep't of Transp. v. Jones Bros. Dirt & Paving Contractors, Inc.*, 92 S.W.3d 477, 483 (Tex. 2002).

authority itself, its decision is entitled to a more limited degree of deference; it is subjected to a review for reasonableness.[186])

The Engineer's decisions are entitled to this high degree of deference even though the Engineer is often an employee of the public authority or (as here) an agent expressly working in the interest of the public authority—*as the Contract explicitly contemplates and allows*.[187] Courts have not been bothered by the potential for a conflict of interest in the arrangement, perhaps because they believe that reliance on professional norms will govern over parochial loyalty to the public agency,[188] or perhaps that in any case, contractors bidding on public construction contracts are able to take this risk into account and price it into their bids.

Texas case law reflects the significant deference to the engineer's decisions in a broad range of matters commonly arising under construction contracts. For example, that authority has been held to extend to:

- deciding how long concrete forms were required to be left in place after pouring;[189]
- assessing the type of work performed by laborer on a construction site in order to determine appropriate rate of compensation;[190]
- determining whether actual site conditions were materially different from those in plans and the appropriate methods for handling caving or water intrusion in drill shafts for a highway construction project;[191]
- evaluating whether equipment supplied by contractor meets the standard specified in the contract;[192]

---

[186] *See, e.g.*, *Harris Cnty. v. Pulice Constr., Inc.*, No. 14-23-00818-CV, 2024 WL 4052762, at *7 (Tex. App. 2024).

[187] Tech. Specs., Sec. 1L.3.53 ("**Engineer**. The Professional Engineer licensed in Texas *who represents the interests of the Owner*.") (italics added). *See also* Ex. P-4, Camino Real Regional Mobility Authority Agreement for General Consulting Civil Engineering Services (July 24, 2015), Sec. 1 ("To that end, [Atkins] shall represent, advance, and further the interests of [Camino Real] throughout all aspects and phases of [Camino Real's] activities . . . .").

[188] There was testimony at trial concerning the applicability of professional engineering standards to all service for Camino Real. *See, e.g.*, 1st Stage Hr'g Tr. at 129:2–21.

[189] *McKenzie Const. Co.*, 150 S.W.2d at 996–98.

[190] *Austin Bridge Co. v. Teague*, 152 S.W.2d 1091, 1093 (Tex. 1941).

[191] *Granite Const. Co. v. Tex. Dept. of Transp.*, No. 03-11-00436-CV, 2012 WL 5974085, at *5–6 (Tex. App. Nov. 20, 2012).

[192] *Westech Eng'g*, 835 S.W.2d at 202–03.

- approving or denying requests by the contractor to go beyond the contract's agreed scope of work;[193]
- interpreting whether the contract provided for payment to the contractor for rock excavated outside of an agreed-upon portion of the project;[194]
- deciding whether damage to concrete driveways and slabs was the result of factors for which contractor was responsible;[195]
- directing the methods and materials for constructing a roadbed embankment;[196]
- considering whether a contractor was entitled to additional payment either because it removed a greater quantity of dirt than the engineer estimated or as a result of changes made by the state's engineer in the project plans and specifications after the contract was executed;[197] and
- determining whether unexpected subsurface conditions requiring a change in construction methods and configuration merited additional compensation to the contractor.[198]

The relevant language granting authority to the Engineer is not necessarily the same in the contracts at issue in each of the cases cited above. And some opinions do not include the contractual language at all, so it is difficult to assess what precisely is shared among the different contracts. Nonetheless, the deferential contractual language in Texas public construction contracts seems to be substantially similar and, perhaps for this reason, Texas courts have not focused much attention on the precise language. Instead, they have treated prior cases as instructive in laying out principles applicable whenever there is broad language entrusting project decisions to an engineer (which is most certainly the case here). These principles have become well known in construction law and form an important part of the context of contracting practices of sophisticated parties (such as Camino Real and JAR) in the construction industry.

---

[193] *Harris Cnty*, No. 14-23-00818-CV, 2024 WL 4052762, at *7–8.

[194] *Barnard Const. Co. v. City of Lubbock, Tex.*, No. CIV.A. 503CV269C, 2004 WL 2173403, at *15–17 (N.D. Tex. Sept. 28, 2004), *aff'd sub nom. Barnard Const. Co., Inc. v. City of Lubbock*, 457 F.3d 425 (5th Cir. 2006).

[195] *City of San Antonio v. Meader*, 3236 S.W.2d 557, 559–60 (Tex. App. 1959).

[196] *Austin Bridge Co. v. State*, 427 S.W.2d 925, 937 (Tex. App. 1968).

[197] *State v. Martin Bros.*, 160 S.W.2d 58, 60 (Tex. 1942).

[198] *Keith A. Nelson Co. v. R.L. Jones, Inc.*, 604 S.W. 2d 351, 355–56 (Tex. App. 1980).

The Trustee seeks to minimize the deference to which the Engineer's decisions are entitled, but his attempts fly in the face of the governing law. Within the very broad scope of his authority, the Engineer's decisions are entitled to very substantial deference. This could not be clearer in the case law—or in the very contractual language to which JAR agreed.

**2. The Engineer has the authority to determine whether a counterparty has met the standards in order to call a default, as well as to determine appropriate steps to be taken in response to a notice of intent to default, and then to evaluate whether those steps have been taken, as well as over most "affirmative claims" related to additional time or compensation to be awarded under the Project.**

In this Contract, both the Trustee's claim for wrongful default and most or all of his affirmative claims for additional time and/or compensation seem clearly within the scope of matters entrusted to the Engineer. This is because they depend on his understanding of the Project and the Contract and rely on his professional expertise in order to resolve issues related to the Project.[199]

The Court will begin by analyzing the default process as laid out in the Contract. The procedures for declaring a contractor to be in default, and then for the contractor to make a claim that default was wrongful, are contained in Item 8L ("Prosecution and Progress"), Article 7 ("Default of the Contract"), of the Contract. This Article contains the grounds on which a contractor can be declared in default and the procedures for calling a default. Section 8L.7.1 ("Declaration of Default") provides as follows, in relevant part:

---

[199] As a reminder, the "Authority of Engineer" section provides:

> The Engineer has the authority to observe, test, inspect, approve, and accept the work on behalf of the Owner. The Engineer decides all questions about the quality and acceptability of materials, work performed, work progress, Contract interpretations, and acceptable Contract fulfillment. The Engineer has the authority to enforce and make effective these decisions.

> The Engineer acts as a referee in all questions arising under the terms of the Contract. The Engineer's decisions will be final and binding.

Tech. Specs., Art. 5L.1 The Court will not continue repeating this language, but it should be kept in mind throughout this Opinion.

**7.1**.  **Declaration of Default**. The Engineer may declare the Contractor to be in default of the Contract if the Contractor:

- fails to begin the work within the number of days specified,
- fails to prosecute the work to assure completion within the number of days specified,
- is uncooperative, disruptive or threatening,
- fails to perform the work in accordance with the Contract requirements,
- neglects or refuses to remove and replace rejected materials or unacceptable work,
- discontinues the prosecution of the work without the Engineer's approval,
- makes an unauthorized assignment,
- fails to resume work that has been discontinued within a reasonable number of days after notice to do so,
- fails to conduct the work in an acceptable manner, or
- commits fraud or other unfixable conduct as determined by the Owner.

If any of these conditions occur, the Engineer will give notice in writing to the Contractor and the Surety of the intent to declare the Contractor in default. If the Contractor does not proceed as directed within 10 days after the notice, the Owner will provide written notice to the Contractor and the Surety to declare the Contractor to be in default of the Contract. . . .

The Section then provides for various other matters mostly involving post-default billing and financial questions. Section 8L.7.2 ("Wrongful Default") provides, in full (but with italics added):

**7.2**.  **Wrongful Default**. Submit a written request to the Owner within 14 calendar days of receipt of the notice of default for consideration of wrongful default.

The Owner will determine if the Contractor has been wrongfully defaulted, and will proceed with the following:

> ▪ If the Owner determines the default is proper, the default will remain. *If the Contractor is in disagreement, the Contractor may file a claim in accordance with Article 4.7., "Dispute or Claims Procedure."*
>
> ▪ If the Owner determines it was a wrongful default, the Owner will terminate the Contract for convenience, in accordance with Article 8.8., "Termination of the Contract."

The role of the Engineer in the various default-related decisions is substantial. First, the Contract requires the Engineer to determine the stated reasons for which "the Engineer may declare the Contractor to be in default."[200] The Contractor is supposed to proceed "as directed" by the notice of intent to default, which is itself supposed to come from the Engineer.[201] In other words, *at least the first part of the default process*—that leading up to and including the issuance of notice of intent to default—is largely to be directed by the Engineer, reliant on the Engineer's expertise and authority under the Contract.

In fact, *the second part of the default process*—the actual declaration of default based on a failure to implement the corrective steps outlined in the notice of intent to default—is *also* a process that requires significant Engineer involvement. As a reminder, the relevant sentence states: "If the Contractor does not proceed as directed within 10 days after the notice, the Owner will provide written notice to the Contractor and the Surety to declare the Contractor to be in default of the Contract." This obviously gives the Owner the right and responsibility of actually providing the "written notice" of default. But such a notice can only be given "[i]f the Contractor does not proceed as directed within 10 days after the notice." As the duties laid out in the Contract make clear, *compliance with that clause must be assessed by the Engineer*. After all, a determination of whether his technical instructions were complied with is well within the scope of his contractual competence and authority.[202]

The "wrongful default" process in Article 7.2—which could be considered the *third part of the of default process*—provides further support for the Engineer's involvement in the second part of the process. Article 7.2 entrusts a *review* of the default determination to the Owner; if this determination had already been entrusted

---

[200] Tech. Specs., Sec. 8L.7.1.
[201] Tech. Specs., Sec. 8L.7.1.
[202] As always, see Tech. Specs., Art. 5L.1 ("Authority of Engineer").

*entirely* to the Owner, such a review would not make much sense. Thus, this Article 7.2 "review" process affirms the importance of the Engineer to the earlier default decision. (As to the Contractor's further appellate rights if the Owner determines (as it did here) that default was *not* wrongful, the Court will discuss that issue in the following subsection.)

Thus, the second part of the default process is predicated on the Engineer's instructing the Owner that the Contractor has failed to "proceed as directed" in the Notice of Intent to Default, because such technical matters are entrusted to the Engineer for his professional judgment (and accorded deference by reviewing courts). After the Engineer has made such a determination, the Contract turns to the Owner to determine whether it considers the failure to be such that it *wishes* to default the Contractor.[203]

This joint decision-making structure on default makes a lot of sense. Once the Engineer has exercised his professional judgment concerning compliance with contractual requirements, what arises is what could be termed the "policy" question of whether actually taking the momentous step of calling the default is in the best interest of the Owner. That policy question is appropriately left to the Owner.

That is the basic default framework in the Contract as the Court understands it. Again, as with other contractual interpretation issues, the Court believes the Contract is unambiguous (though difficult at times) on all relevant points. But the Court has also taken account of all extrinsic evidence in the record of this case, and that evidence confirms this interpretation; should the Contract itself be held to be ambiguous, the Court finds that this is its correct interpretation in light of all evidence.

As for the Trustee's affirmative claims: although these are not yet ripe, they will eventually have to pass through two layers of consideration, based on consideration of the substance of the claims and the authority of the Engineer under the Contract. In the first step, the Court will determine whether the decision(s) underlying the claim were within the Engineer's broad authority (an element the Court believes will likely be met as to most or all of them) and whether he in fact made the decisions. If so, the Court will review them under the Gross Error Standard.

---

[203] The Engineer appears to share this understanding of his role in determining whether the default standard is met before the Owner decides whether to go through with it or not. 2nd Stage Hr'g Tr. 69:17–21.

The Trustee in his motion to reconsider objected to the standard as initially explained by the Court—particularly the suggestion that the Engineer could merely "approve" a decision.[204] So the Court here removes that word. But the Court emphasizes, as it has said before, that no high degree of formality appears to be required in the Engineer's decision making, and within the scope of his authority, not just the Engineer's conclusions but also his professional judgment as to the appropriate means of reaching those conclusions are entitled to deference.

Again, close consideration of the Contract affirms this. For instance, as it explains about Inspectors:

> Inspectors are authorized representatives of the Engineer. Inspectors are authorized to examine all work performed and materials furnished, including preparation, fabrication, and material manufacture. Inspectors inform the Contractor of failures to meet Contract requirements. Inspectors may reject work or materials and may suspend work until any issues can be referred to and decided by the Engineer.[205]

The Engineer remains the ultimate decisionmaker, but as this language indicates, he is allowed and expected to rely on representatives on the ground for many day-to-day matters, including for gathering data about the Project to be used as the basis for his decisions. Again, the Trustee's consistent but poorly supported efforts to evade the Contract and law on deference to the Engineer are not going to be successful.

If the decisions were not within the scope of the Engineer's authority, the Court will review them under the general standards of applicable contract law, including, as appropriate, the "reasonableness" standard that applies to contractual decisions entrusted to the Owner itself and not the Engineer.[206] The Court is unsure at this point what would happen with decisions that were within the scope of the Engineer's authority but that he did not in fact make; if there are such decisions, the Court will address them in due course.

To sum up, as long as the Engineer actually made the decisions contractually entrusted to him, his decisions will be entitled to the very deferential review required by the Gross Error Standard. The Engineer's actual involvement in the default

---

[204] Tr.'s Mot. for Reconsideration at 3.
[205] Tech. Specs., Art. 5L, section 10.
[206] "The second review standard—whether the decision was 'reasonable'—applies when the party to the contract has the ultimate authority to determine whether a satisfaction clause has been satisfied." *Harris Cnty.*, No. 14-23-00818-CV, 2024 WL 4052762, at *7.

process is addressed below in section C below. The Engineer's decision-making on the affirmative claims has not yet been brought before the Court.

### 3. The Engineer does not have the authority to resolve disputes or claims that are "elevat[ed]" pursuant to the contractual Dispute or Claims Resolution Procedure.

The prior subsection did not fully analyze what happens if a Contractor thinks it has been wrongfully defaulted. As a reminder, Item 7.4 says such a Contractor must file a timely written request for a review of the default determination. If the Owner affirms the default as not wrongful, then "the Contractor may file a claim in accordance with Article 4.7., 'Dispute or Claims Procedure.'" With respect to this determination, Camino Real has proposed an aggressive interpretation of this clause in light of the "Authority of Engineer" provisions. It claims that the "Authority of Engineer" clause outlined means that if JAR challenges the default decisions, the Engineer gets to sit as an appellate court and apply the Gross Error Standard to opinions developed by him and the Owner.[207] In other words, a Contractor invoking the "Dispute or Claims Procedure" has to argue its case to the Engineer largely responsible for its substance in the first place under the contractual framework.

The ramifications of this interpretation would be to insulate the Engineer's decision making behind another layer of deference: even if the default was called as result of gross error or bad faith, no court could intervene, unless the Engineer's "appellate" decision itself was *also* the result of gross error or bad faith[208] (or perhaps if it lacked "substantial evidence," a similarly deferential standard in the case law

---

[207] In a hearing on this matter, Camino Real suggested that this was a mischaracterization of its views, but the Court respectfully disagrees, at least in terms of how those views have been articulated in certain of its filings. *See, e.g.*, Pl.'s 1st Stage Proposed Findings and Conclusions ¶¶ 28, 34 ("Here, since Edgar Fino has the authority to act as the referee under the Contract and the Trustee has not proved fraud, misconduct, or gross error to set aside the Engineer's decision. Edgar Fino's determinations that 'CRRMA substantially complied with the contractual default process' and that 'the CRRMA's default of JAR was proper and for cause' are final and binding on the parties."). As is explained below, and Camino's evidence plainly showed, Mr. Fino's involvement in the default process was thoroughgoing, and thus his August 2023 "determination" most certainly involved him sitting in "judgment" over some of his own acts and decisions.

[208] *See, e.g.*, Mot. for Summ. J. ¶¶ 35–36, ECF No. 38 ("[T]he Engineer has two opportunities to resolve disputes under the Contract. . . . In this regard, 4L.7 plainly provides for both informal settlement with the Engineer as a preference, but that any claims must ultimately be submitted to the Owner, who by implication must involve the Engineer to act as referee under 5L.1 . . . . Texas law applies a gross error standard applies [sic] when the parties to a contract agree to be bound by the decision of a referee.").

for when an independent arbiter such as an administrative law judge has made a determination).[209]

The Contract, read fairly and as a whole, does not support this additional level of deference, nor does the case law. To the contrary, the Contract contemplates a review conducted outside of the purview of the Engineer, and this is confirmed by an analysis of TxDOT's Standard Specifications for its own projects, which was used as a template for the Technical Specifications applicable here.

In addition, the Court has not located any cases in which such an extraordinary deference was applied; in the case law, rather, the Engineer's decision is evaluated—under the appropriately deferential standard—not by he himself but by courts or by appropriate administrative process. The outcome of such an administrative process may be entitled to additional deference under a "substantial evidence" or similar standard, but no case law appears to support Camino Real's effort to have this Court accord "substantial evidence" or similar deference to the Engineer's determination that he himself was not in "gross error" when he made (or at least was deeply involved in) the prior determinations concerning default, cure items, etc.

Even more important than the lack of case law, however, is the contract itself. Just before Item 5L ("Control of Work"), which contains the Authority of Engineer section quoted above, is a separate Item 4L ("Scope of Work") in which Article 7 ("Dispute or Claims Procedure") reads, in its entirety, as follows:

---

**7.  Dispute or Claims Procedure**

The dispute resolution policy promotes a cooperative attitude between the Engineer and Contractor. Emphasis is placed on resolving issues while they are still current, at the project office, and in an informal manner. Open sharing of information is encouraged by all parties involved so the information provided completely and accurately reflects the issues and facts. If information is not shared, decisions may be limited to relying on the documentation that is available for review.

The Owner's goal is to have a dispute settled by the Engineer before elevating it as a claim.

---

[209] *Granite Const. Co*, No. 03-11-00436-CV, 2012 WL 5974085, at *4.

> If a dispute cannot be resolved, initiate the Contract claim procedure by filing a Contract claim after the completion of the Contract or when required for orderly performance of the Contract. Submit the claim to the Owner in accordance with state law.
>
> For a claim resulting from enforcement of a warranty period, file the claim no later than one year after expiration of the warranty period. For all other claims, file the claim no later than the date the Owner issues notice to the Contractor that they are in default, the date the Owner terminates the Contract, or one year after the date of final acceptance of the Contract. It is the Contractor's responsibility to submit requests in a timely manner.

In essence, Camino Real contends that Article 4L.7 ("Dispute or Claims Procedure") actually means that all matters are referred to and resolved by the Engineer because of Article 5L.1 ("Authority of Engineer"), even though the two Articles are nested within different Items of the Contract and neither references the other. Apparently, under Camino Real's view, the Contract's "Dispute or Claims Procedure," despite its name, has little importance in determining how disputes or claims are resolved under the Contract, and the Contract's later grant of authority to the Engineer is *actually* the Contract's important dispute resolution provision.

The more compelling interpretation of the Contract, which is this Court's interpretation, is that Article 5L.1 ("Authority of Engineer"), located as it is within the Item 5L ("Control of Work"), is focused on entrusting broad control of the day-to-day operations of the project to the qualified expert representing the public entity's interest in the project. By contrast, Article 4L.7 ("Dispute or Claims Procedure"), in Item 4L ("Scope of Work"), is intended to provide a process for dealing with higher-level disputes.[210] This Article includes a role for the Engineer but also seems to contemplate a dispute resolution process *not* controlled by the

---

[210] Under Texas law, "'headings and titles provide context and can inform the meaning of the sections they label,' and . . . '[g]enerally, courts should construe contractual provisions in a manner that is consistent with the labels the parties have given them.'" *James Constr. Grp., LLC v. Westlake Chem. Corp.*, 650 S.W.3d 392, 416 (Tex. 2022) (quoting *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 121 (Tex. 2015)). In addition, courts should seek the interpretation that best fits all the provisions of a contract. *Hoover Panel Sys. v. HAT Contract, Inc.*, 819 F. App'x 190, 195 (5th Cir. 2020).

Engineer to which a "claim" can be "elevat[ed]": "The Owner's goal is to have a dispute settled by the Engineer before elevating it as a claim."[211]

The Contract's meaning can further be elucidated by looking at what it shares and does not share with the Standard Specifications applicable in projects run by TxDOT itself. As noted, this Contract incorporates standard TxDOT specifications for local projects—that is, projects run not by TxDOT itself but by entities such as Camino Real. The local Technical Specifications in the Contract differ only in relatively minor respects from the TxDOT Standard Specifications,[212] and the differences are illuminating.[213]

The crucial point is that the TxDOT Standard Specifications contain exactly the same, broad grant of authority to the Engineer, yet that language plainly does *not* mean that the Engineer controls the entire claim or dispute resolution apparatus. In specific, the "Authority of Engineer" provisions (as reproduced above), which are contained in Article 5.1 of the TxDOT Standard Specifications and Article 5L.1 of these local Technical Specifications, are identical. Yet in the TxDOT Standard Specifications, the "Dispute or Claims Procedure" apparatus is spelled out in significant detail complete with references to the governing state regulations. Below is a "black-lined" version of the TxDOT Standard Specifications with the local Technical Specifications' deletions marked in ~~strike-through text~~ and its additions in **_bold and underlined text_**:

---

**Article 7. Dispute or Claims Procedure**

The dispute resolution policy promotes a cooperative attitude between the Engineer and Contractor. Emphasis is placed on resolving issues while they are still current, at the ~~area office or the district~~**project** office, and in an informal manner. Open sharing of information is encouraged by all parties involved so the information provided completely and accurately reflects the issues and facts. If information is not shared, decisions may be limited to relying on the documentation that is available for review.

---

[211] Tech. Specs., Art. 4L.7.

[212] The local "version" of the specifications shares the structure of the TxDOT Standard Specifications, but each major section number has an "L" after it and includes various changes, as illustrated by the examples in this Opinion.

[213] The Court takes judicial notice of the general TxDOT specifications; it gave notice of its intent to do so and neither party objected. *See* Order Prior to Closing Arguments, ECF No. 126.

**The Owner's goal is to have a dispute settled by the Engineer before elevating it as a claim.** ~~It is the Department's goal to have a dispute settled in the District before elevating it to the Contract Claim Committee (CCC) as a claim. The Construction Division can assist in the resolution of a dispute with a Contractor when requested by the District. The Contractor may request that a District ask for assistance of the Construction Division; however, the request for a recommendation prepared by the Construction Division to settle a dispute must come from the District.~~

If a dispute cannot be resolved, initiate the Contract claim procedure by ~~submitting a claim to the District Engineer, the Director of the Construction Division, or the CCC.~~

~~The Department's Contract claim procedure has been established in accordance with Title 43 of the Texas Administrative Code, Part 1, Chapter 9, Subchapter A, Rule §9.2, Contract Claim Procedure. Detailed instructions for submitting a claim and its components can be found on the Department's website.~~

~~If a claim has been submitted and the Contractor wishes to resume negotiations with the District, notify the CCC in writing of the intent to resume negotiations at the District level and request review of the claim be suspended by the CCC pending the outcome of the negotiations.~~

~~File~~ **filing** a **Contract** claim after **the** completion of the Contract or when required for orderly performance of the Contract. **Submit the claim to the Owner in accordance with state law.**

For a claim resulting from enforcement of a warranty period, file the claim no later than one year after expiration of the warranty period. For all other claims, file the claim no later than the date the ~~Department~~**Owner** issues notice to the Contractor that they are in default, the date the ~~Department~~**Owner** terminates the Contract, or one year after the date of final acceptance of the Contract. It is the Contractor's responsibility to submit requests in a timely manner.

The TxDOT Standard Specifications are relevant to the interpretation of the Contract in several ways. First, they help establish the general understanding of

participants in similar contracts; such background industry expectations are part of the context within which any contract terms should be understood, whether ambiguous or not.[214] Further, although the Court ultimately believes it is not ambiguous, insofar as this Contract may be arguably ambiguous with respect to the crucial dispute resolution provision, then the use of extrinsic evidence (such as other sources on which the Contract draws) can be used to explain its meaning.[215]

What the TxDOT Standard Specifications show is that in those specifications—beyond the shadow of a doubt—the "Authority of Engineer" provisions do *not* mean that he is the ultimate arbiter under the "Dispute or Claims Procedure"; instead, the Standard Specifications provide for dispute resolutions involving the District Engineer, the Director of the Construction Division, or the Contract Claim Committee. Yet Camino Real would have this Court find that the *identical* "Authority of Engineer" language in *its* Contract *does* mean that the Engineer is ultimate arbiter under the "Dispute or Claims Procedure." This is strained and implausible. While the Contract's Dispute or Claims Procedure section is not as detailed as the TxDOT Standard Specifications, *nothing* in it reflects the intent of the parties to *give the exact same, well-known language from the TxDOT Standard Specifications a significantly different and expanded meaning.* Accordingly, the Court holds that it does not do so.

To the contrary, the Contract's added language in the "Dispute or Claims Procedure" appears to be an attempt to substitute general principles of "applicable state law" for the more detailed review established by regulation for general (non-local) TxDOT contracts. As noted already, applicable state law recognizes the substantial authority granted to Engineers under many public construction contracts. But there is no reason here to think that the "Authority of Engineer" includes control over a Dispute or Claims Procedure that (1) does not reference the Engineer in that capacity, and in fact implies that the Dispute or Claims Procedure is what is invoked when a claim is "elevated" from his purview; (2) undoubtedly has a different meaning in the closely related TxDOT Standard Specifications; and (3) references no other provisions of the Contract but "in accordance with state law" as providing the appropriate dispute resolution framework.

While the substantive criteria of "in accordance with state law" by which claims should be decided are fairly clear (and deferential to the Engineer within the scope of his authority), the procedural aspects of it are not so clear. For similar

---

[214] *See, e.g.*, *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d at 764–65, 767–68; *EOG Res., Inc. v. Wagner & Brown, Ltd.*, 202 S.W.3d 338, 344 (Tex. App. 2006).

[215] *URI, Inc.*, 543 S.W.3d at 764–68.

contracts with TxDOT directly (rather than a regional authority like Camino Real), there appear to be extensive contractual and regulatory regimes in place to ensure a review of claims such as those now urged by the Trustee.[216] Those particular regulations may not apply here, yet the contractual language seems to contemplate some legal process aside from the mere discretion of either Camino Real (as Owner) or the Engineer. The Court also notes that it seems likely that contractors used to dealing with TxDOT would expect such a process to control in the event of a serious dispute and to depart from this industry norm and commercial expectation would likely require clearer language than this Contract provides. These factors all weigh against Camino Real's proposed interpretation.

In the end, the Court is persuaded by the Trustee's counsel's suggestion that the "in accordance with state law" provision essentially means to follow whatever procedures *do* exist to resolve claims in a similar manner to how such claims are resolved under standard TxDOT contracts. Absent such procedures being established (as in this case), the claim must simply be resolved by the courts. This seems the best reading of the contractual provisions to this Court—certainly more persuasive than Camino's interpretation that this clause means "the Owner or its Engineer simply decide the claims themselves." Camino Real's interpretation would significantly reshape the relationship of Contractors and Owners under local construction contracts. Given its lack of textual support in the Contract, the Court finds it entirely unpersuasive that such a structure was intended.[217]

The upshot of the analysis above is that the Court finds that neither the wrongful default claim nor the affirmative claims litigation are ultimately entrusted to the Engineer *once they are elevated pursuant to the Dispute or Claims Procedure*.

---

[216] *See, e.g.*, 43 Tex. Admin. Code § 9.1.

[217] The Court has not relied on *contra proferentem* in interpreting the Contract, because the Court ultimately believes the Contract is unambiguous and/or that if it's considered ambiguous, the evidence in favor of its interpretation is decisive, and "contra proferentem is a device of last resort." *Evergreen Nat. Indem. Co. v. Tan It All, Inc.*, 111 S.W.3d 669, 676 (Tex. App. 2003). If applied, *contra proferentem* would likely favor the Trustee. Even though Camino Real may not have actually drafted all of the Technical Specifications, it was the party offering them, apparently on a take-it-or-leave-it basis, to its contracting partners and was thus the party best situated to eliminate ambiguities ex ante. *See, e.g.*, *Lifemark Hosps., Inc. v. Liljeberg Enters., Inc. (In re Liljeberg Enters., Inc.)*, 304 F.3d 410 (5th Cir. 2002). And Camino Real does appear to have engaged in at least some customization, in the somewhat puzzling paragraph quoted in Section A above. Moreover, the Court also believes that this significant a change to a crucial part of a well-known and customary contractual scheme—essentially replacing a separate review structure with a "hearing" before the very parties who made the initial decisions—should be more clearly expressed in order to be enforceable.

Rather these issues must be decided according to state law. In the absence of an administrative apparatus to decide such claims, the claims must be brought to a court of competent jurisdiction, as they have been brought before this one. As a substantive matter, state law, in turn, instructs courts to review matters properly entrusted to the Engineer by the contract under the Gross Error Standard.

**C. The Engineer made the relevant decisions concerning default, and his decisions are therefore entitled to be reviewed under the highly deferential Gross Error Standard.**

As we have seen, the Contract grants the Engineer substantial authority to determine if conditions of default exist, to issue the notice of intent to default with directions which the Contractor must follow "as directed within 10 days," and to determine whether the Contractor has in fact complied with the directions. All of these activities appear to the Court to be plainly within the scope of the Engineer's authority and to be entitled to substantial deference under the Gross Error Standard. (As noted in the preceding section, the Contract then takes the matter out of the Engineer's scope of authority if the Contractor decides to proceed further and request a determination of whether default was wrongful under section 7.2; but that determination is not relevant here, because it is effectively an appeal from that determination, a claim filed under the Article 4.7 Dispute or Claims Procedure, which is what is now before this Court.)

Applying the contractual framework to this case, the relevant facts of default can be summarized as follows: On December 7, 2022, Camino Real (not the Engineer) sent a notice of intent to default to JAR, listing items to be completed within ten days.[218] The notice was received by JAR on December 9. After that, there was some back-and-forth involving Camino Real, Atkins, and JAR concerning some details of the traffic control steps required in the notice of intent to default.[219] On December 19, JAR responded, providing its account of the reasons for the project delays and reporting progress on (though not the completion of) the items in the notice of intent to declare default.[220] By letter dated December 22, but not received until December 27, Camino Real declared that the default notice was final.[221] On January 9, 2023, JAR filed a claim for wrongful default with Camino Real.[222]

---

[218]  Ex. TR-31 (CRRMA Letter to JAR re: Notice of Intent to Default).
[219]  *See* Ex. TR-35 (E-mail from A. Ordonez re TCP Items to be Addressed).
[220]  Ex. TR-37 (JAR Letter to CRRMA re: Response to NOI to Default).
[221]  Ex. TR-45 (CRRMA Letter to JAR re: Notice of Default), Ex. P-64 (Telles Email to Madrid).
[222]  Ex. TR-48 (Griffith Davidson Letter to CRRMA re: Notice of Claim for Wrongful Default).

After various further correspondence and saber-rattling from both sides,[223] Camino Real purported to hold a "hearing" on August 8, before Edgar Fino as the Engineer.[224] JAR refused to participate, including on grounds that it did not think Mr. Fino of Atkins was the Engineer and that Camino Real was not following the contractual dispute resolution process.[225] On August 16, on Atkins letterhead, Mr. Fino issued his "Atkins Engineer Final Determination," finding that Mr. Fino of Atkins was the Engineer under the Contract, that Camino Real "substantially complied with the contract default process," and that the default was "proper and for cause."[226] Ultimately, Camino Real sought declaratory judgment in its favor on the issue of wrongful default, while the Trustee has sought nearly $25 million in damages, much of which appears to stem from the allegedly wrongful default.[227]

Camino Real did not strictly follow the contractual process for declaring a contractor to be in default. Section 8L.7.1 states that the "the Engineer will give notice in writing to the Contractor and the Surety of the intent to declare the Contractor in default," whereas here, Camino itself gave that notice. Camino Real has sought to minimize the problem, arguing that it does not matter what "letterhead" the notice of intent to default is placed on or that the provision merely means that the Engineer was supposed to deliver the letter, in which case it is hardly harmful for it to be sent by e-mail from Camino Real itself instead. But the Court disagrees. As already explained at length, under the Contract, the Engineer's role in both parts of the default process is significant and should not be put aside. In any case, contrary to the contractual framework, here, *at least on the surface*, Camino Real was in the driver's seat at the Notice of Intent to Default stage. It was Camino Real's principal, Mr. Telles, who took the laboring oar in drafting the notice of intent to default, coordinating feedback from both the Engineer and from TxDOT.[228] The Engineer was not copied on the correspondence, although other interested parties (including the surety and various El Paso area officials) were.[229]

Nonetheless, and despite initial surface appearances (and the Court's own initial skepticism), the extensive and highly credible testimony at both stages of trial, together with significant documentary evidence, showed that *the important*

---

[223] *See* Exs. TR-49, TR-50, TR-52–TR-58.
[224] *See* Ex. TR-59 (Locke Lord Response to Griffith Davidson Letter).
[225] Ex. TR-60 (Griffith Davidson Response to Locke Lord Letter).
[226] Ex. TR-61 (Atkins Letter to CRRMA re: Final Determination).
[227] Counterclaim 31.
[228] Exs. TR-22, TR-23, TR-24, TR-27, TR-29, TR-30.
[229] Ex. TR-31.

*decisions regarding default were indeed made by the Engineer.*[230] *This includes both the decisions with respect to the Notice of Intent to Default and the Notice of Default itself. In other words, the Engineer considered and made a determination that JAR was in breach of its obligations under the Contract, that the corrective items were appropriate and could be performed within the relevant time frame, and that they were not sufficiently performed by the end of the 10-day period.* The Court will not reproduce this testimony here but refers the reader to a few of the numerous exhibits and parts of the transcript that are relevant and that ultimately, considered as a whole, strongly support Camino Real in this respect.[231]

The Court does not lightly "bless" any departure from the contractually ordained procedures for an important matter such as default. But several factors support Camino Real's argument that it substantially complied with the default provisions. One is that Camino Real is a thinly staffed organization whose principal is deeply involved in day-to-day matters and thus it would not be unusual for him to be paying keen attention to delicate matters such as a default determination; indeed, Mr. Telles testified that this is the only time that Camino has declared a contractor to be in default in one of its construction contracts.[232] At the same time, he would have to rely on his Engineer because he has no independent staff who could make technical determinations. For these reasons, Mr. Telles' involvement does not indicate a domination over the Engineer but rather comports with the everyday practice of his being in close contact with the Engineer as they work collaboratively on the Project. The mere fact of this close involvement does not, in the Court's view, diminish the Engineer's authority under the Contract to make decisions in its professional role that are entitled to the substantial deference granted in the case law. The Court has carefully considered, and found thoroughly credible, Mr. Fino's testimony that, at every step of the default process, he exercised his professional judgment—in other words, that it was he who made the default-related decisions entrusted to the Engineer, including the steps to cure and whether those steps had been accomplished. The Trustee's attempts to undermine this holding were not successful. Certainly, Mr. Telles was deeply involved in the process, because he was in a sense shepherding the process as a procedural matter; but Mr. Telles is not an engineer, is not (and does not pretend to be) proficient in the relevant technical matters, and looked to Mr. Fino and his staff to analyze progress and make determinations. *Mr. Fino's expertise was central, it was pervasive, and it was*

---

[230] Camino Real, of course, agreed with them and had a role in the process, but none of this diminishes that the Engineer made his determinations as instructed by the Contract.

[231] *See, e.g.*, 1st Stage Hr'g Tr. 79:5–82:9, 84:18–87:15, 88:16–23, 93:22–94:6, 116:5–9; 183:19–184:25; 2nd Stage Hr'g Tr. 72:1–14; Exs. P-39, P-56, P-57, P-60, P-62.

[232] 1st Stage Hr'g Tr. 49:23–50:4.

*decisive*. Accordingly, Mr. Fino's decisions on default are entitled to the deference due to an Engineer's decisions under the Contract. Again, to be clear, this includes his determination that JAR was in fact in breach of the Contract, that the corrective items were appropriately chosen and assessed, and that they were not complied with.

All of that said, as noted already, the Court believes that Camino Real's reading of the "Dispute or Claims Procedure" provision of the Contract, which is then referenced in the "Wrongful Default" section of the Contract, is incorrect. While the Engineer's decisions on default as on other matters entrusted to him are entitled to substantial deference, once a claim (including a claim of wrongful default) is "elevat[ed]," as this one now is, it leaves his hands and he does not sit as an appellate court over his own actions. Accordingly, this Court will review the default determination under the Gross Error Standard but without giving any additional weight to the Engineer's purported determination after the August 2023 "hearing" that the default was proper.

A couple of further observations regarding various arguments raised by the Trustee. The Court does not at all credit the notion that because the Engineer's decisions were not "reflected in any writing prepared or stamped by Mr. Fino, which is required as a Registered Professional Engineers," that they should somehow not be entitled to deference.[233] The Trustee characterizes this fact as "[c]ritical[]"[234] but raises it only in his reply prehearing brief in a more or less offhand way and without real explanation of its import. (Similarly, the Court finds it nothing short of absurd to suggest as the Trustee does in his initial prehearing brief before the Second Stage that "[t]he only decision that Mr. Fino made in this case was his August 2023 decision."[235] This is completely untethered from the record in this case.)

The duties of the Engineer are wide-ranging, as the Contract plainly shows, as recounted at great length earlier in this Opinion. While it is possible that some of the Engineer's duties might require "written or stamped" documents, many of them plainly do not. The decisions relevant to this dispute over wrongful default do not require such documentation. The Engineer decided, with substantial basis, that JAR had defaulted under the Contract and that its activity under the Notice of Intent was insufficient to preserve it from default. Contrary to the Trustee's assertion, these plainly *are* "decisions," and there is no reason under this contractual framework that

---

[233] Tr.'s Reply at 2.
[234] *Id*.
[235] Trustee's Prehearing Brief, ECF No. 154 at 12.

its lack of being "reflected in any writing prepared or stamped by Mr. Fino" would change that fact.

As with other issues, the case law provides absolutely no support for the Trustee's position. The Court has uncovered no decisions turning on or even mentioning the particular degree of formality by which the Engineer made a decision. To the contrary, the cases reflect that no high level of formality is required in terms of what constitutes the Engineer making any of the many, many decisions required by sophisticated public works contracts.[236] This is not a game of "gotcha." Engineers may make decisions in the field or in their offices, they may make them in writing or orally, and they may even communicate them through inspectors or in other intermediated ways. As long as the Engineer has exercised professional judgment and the results of that judgment do not violate the Gross Error Standard, that decision will not be second-guessed by courts. The Court is bound by this law and will follow it.

### D. All decisions related to default easily clear the Gross Error Standard.

This Section explains the Court's holding that the default was not wrongful under the Gross Error Standard. First it explains that the Trustee bore the burden of showing the default decisions were wrongful under the Gross Error Standard (subsection 1); it finds that there were ample grounds for default for late performance (subsection 2) as well as for performing the work in accordance with contractual requirements (subsection 3); and it finds that the so-called cure items were properly chosen and a proper standard to assess compliance was applied (subsection 4).

Before going into any greater detail, however, the Court must make some observations about how this case has unfolded. In broad strokes, the case for the Trustee's position is extremely weak and relies on a nearly wholly one-sided view of the situation. The Trustee nitpicks mostly minor, alleged errors in Camino Real's conduct in the default process while at the same time ignoring or dramatically understating JAR's significant and pervasive performance difficulties throughout the term of the Contract. In anything like an objective view, the truth is that neither the facts nor the law favor the Trustee's position.

None of this is intended as a personal reflection on the Trustee, his counsel, or his primary witness and the moving force of JAR, Mr. Rosales. Mr. Rosales is clearly a knowledgeable and hard-working contractor and manager, and the Court has deep respect for him and his family's historic El Paso business, JAR. But the

---

[236] *See, e.g.*, *Austin Bridge Co.*, 427 S.W.2d at 934.

Court must follow the evidence, which beyond a shadow of a doubt shows that JAR was simply not able to complete its contractual duties. The cause for this is not before the Court. But the conclusion is inescapable and was plain even from Mr. Rosales' own testimony, as well as the credible testimony of Mr. Fino and Mr. Ordonez.

1. **The burden of showing Gross Error in the default determination is on the Trustee, and the burden in light of the Contract and the case law is a heavy one.**

   a. **The burden of showing Gross Error in the default determination is on the Trustee.**

   Under clear Texas law, the burden of meeting the Gross Error Standard must be borne by the party challenging the Engineer's decisions—the Trustee.[237] The Trustee's citations to cases where the party calling the default must meet an exacting burden are not pertinent here where the contractual language is entrusts broad discretion to the Engineer.[238]

   b. **The burden of showing Gross Error is a heavy one.**

   The Gross Error Standard is highly deferential to the designated decisionmaker under a contract. It provides that a decision may only be overturned if "in making it he is guilty of fraud, misconduct, or such gross mistake as would imply bad faith or failure to exercise an honest judgment."[239]

   The Trustee has cited to a couple of cases in which this high standard was met. One such case is *State v. Buckner Construction*, a 1985 case from the Texas appellate courts.[240] *Buckner* appears to have been an egregious situation in which the state did

---

[237] *See, e.g.*, *McKenzie Constr. Co.*, 150 S.W.2d at 999; *Granite Const. Co.*, No. D-1-GN-10-2178, 2012 WL 5974085, at *6.

[238] Tech. Specs., Art. 5L.1.

[239] *Westech Eng'g*, 835 S.W.2d at 203 (quoting *McKenzie Constr. Co.*, 150 S.W.2d at 996). The Trustee insisted that, as some of the case law provides, "partiality" is also part of the standard: "the decision will not be deemed to violate the contract unless the decision is based on partiality, fraud, misconduct, or gross error." *Granite Const. Co.*, No. 03-11-00436-CV, 2012 WL 5974085, at *5; *see* Tr.'s Mot. for Reconsideration at 2–3. This restatement of the test is unobjectionable but makes no difference in the outcome of this case; indeed, the Trustee seems to recognize this himself, as the Court has been unable to find any mention of it in the Trustee's proposed findings or briefing on the Second Stage of trial. In any case, there is no evidence of "partiality" anywhere near sufficient in this case to trip the Gross Error Standard. The evidence is that Mr. Fino followed appropriate professional standards in making all determinations.

[240] 704 S.W.2d 837, 842 (Tex. App. 1985).

not very actively put on its own case. The evidence appears to have been overwhelming that the engineer, who lacked experience in the disputed area of work, and the numerous inspectors whom he cycled through, who also lacked experience in the work, did not behave reasonably through the process.

By contrast, the Engineer on this project is highly experienced in projects like this. In addition, considering the trial testimony and the written exhibits, the Court finds that he and his inspectors if anything went out of their way to accommodate JAR's performance even when it did not meet the strict technical specifications, for instance by giving very lengthy timeframes for the concrete to reach the required strength (as discussed below). And unlike *Buckner*, here it was the contractor JAR (and not the public authority) that apparently had numerous staff members cycling on the job, making it difficult for the Engineer to communicate and perhaps impeding JAR's ability to fulfill its contractual requirements.

Another Texas appellate case in which the Gross Error Standard was met is *Plantation Foods, Inc. v. R. J. Reagan Co., Inc.*[241] *Plantation Foods* also appears to represent egregious circumstances. It involved blisters on a roof caused by moisture either from the turkey processing operations below—in which case they were the result of a design error—or from installation errors both in the initial roof and in the roof as rebuilt. The architect (whose decisions were entitled to Gross Error deference) found it was an installation error, but the jury disagreed. The appellate court cited some very strong reasons to doubt the architect's credibility, both in terms of inconsistencies in trial testimony as well as in self-interest (because if it were not an installation error it was a design error *by the architect*). Moreover, the very circumstances and sequence of events strongly suggested that his stated view was simply wrong. Accordingly, the reviewing court held enough evidence to support a jury finding of gross error. The egregious circumstances of *Plantation Foods* bear little resemblance to the present case, where the Engineer and his staff testified credibly and where the evidence concerning the circumstances of construction does not favor the Trustee's view.

Finally, there is the case of *Travis-Williamson County Water Control and Improvement District No. 1 v. Page*.[242] Although the opinion is lengthy and complex, the facts related to the Gross Error Standard are somewhat minimally discussed in this case, which makes it hard to apply as precedent. But the core of the determination was to find that the "refusal of the engineer to issue the certificate of

---

[241] 520 S.W.2d 432, 434–35 (Tex. Civ. App. 1975).

[242] 358 S.W.2d 158, 161–62 (Tex. Civ. App. 1962), *aff'd in part, rev'd in part*, 367 S.W.2d 307 (Tex. 1963).

completion . . . was arbitrary."[243] This was because the jury had found that the contract was substantially completed—which appears to have been supported by very strong evidence, such as the fact that the "water lines constituting the water system as then contracted for had been laid, tested, filled with water, and were then being used to serve the customers of the District."[244] The Engineer's own testimony appears to have supported a finding of substantial completion.[245] In other words, the answer appears to have been starkly obvious and inescapable—truly a gross error.

Ultimately, the cases offered by JAR undermine its own arguments, because they underscore the contrast of this situation with those cases. Having paid close attention to the testimony and evidence in this situation, and comparing that with the situations presented in the "gross error" cases, they are light years apart. With the exception of the very egregious cases such as those surveyed above, the body of case law affirms the deference required by the Gross Error Standard. Despite all of the Trustee's invitations to water down the Gross Error Standard, the Court will not ignore the contractual language or the body of case law to do so.

As an aside, it appears to the Court that this dispute reflects the wisdom of these contracts' deference to engineering professionals. There are numerous judgment calls that cannot be easily made by a fact-finder and are far better addressed by an expert on the spot. Further, relatedly, many of the relevant decisions have to be made on the ground based on information available at the time. Inexpert fact-finders second-guessing them long after the fact through litigation would not be ideal, to say the least. Thankfully, this Contract spares the Court that task.

### 2. There were ample grounds for default for late performance.

By the time of default, the time for completing the entire Project was long past, yet the work was less than 50% complete.[246] The Engineer had extended the deadline pursuant to several change orders to July 21, 2022, but no further.[247] JAR repeatedly pressed for more time but, when the Engineer requested more information to support those requests, in the proper contractual form, JAR failed to supply it over

---

[243] *Id*. at 162.

[244] *Id*. at 161.

[245] *Id*.

[246] 2nd Stage Hr'g Tr. 58:2–5.

[247] *See* Ex. P-133; 2nd Stage Hr'g Tr. 14–16, 24:11–25:1. This date is actually generous because it includes some unsigned change orders. The change orders were unsigned because JAR believed that more time was warranted—but it never provided information to support that argument. 2nd Stage Hr'g Tr. 227:10–21.

the course of months.[248] This failure to provide support for JAR's requested delays is fatal to the Trustee's argument.

JAR's overall perspective on this case, and primary defense to the argument that it had failed to perform timely, is that Camino Real failed to clear rights of way and various conflicts for the entire Project area, which obstructed, or even barred, JAR's ability to complete, or even make meaningful progress toward completing, the Project. And it does appear that there were various incursions into the right of way of the project, mostly coming from cable boxes, telephone poles, and other utility-related features, as well as a wall on a neighboring property. JAR claims that it kept the Engineer and Camino apprised of these problems and that accordingly, the Notice of Intent to Default on this basis was illegitimate. But JAR's argument suffers from both procedural and substantive problems.

Procedurally, the method through which JAR should have pursued delays and cost increases due to right-of-way problems was by seeking appropriate dispensation from the Engineer. JAR did not do so, as innumerable points in the transcript and exhibits show.[249] Contrary to the Trustee's assertions, the record shows that additional contract time for actual and potential impact on schedules could be awarded even before the entire impact of the problem was known; time was in fact awarded on this Project on that basis, *when appropriate paperwork was submitted to the Engineer*.[250] To seek to remedy this after the fact in litigation is contrary to the contractual scheme that JAR itself agreed to. The whole framework relies on requests with support being *presented to, and determined by, the Engineer*. JAR was repeatedly instructed to provide such support in the proper form and did not do so, over the course of months. This failure is likely dispositive on its own, in the sense that, if these problems were valid reasons to extend time or funding, they should

---

[248] There are many potential citations. *See, e.g.*, 2nd Stage Hr'g Tr. 21:21–24:7, 227:7–23 (items left open but JAR never provided support for additional time).

[249] There was extended and credible testimony on this by Mr. Fino and Mr. Ordonez. *See, e.g.*, 2nd Stage Hr'g Tr. 21:21–24:7; 31:3–32:10, 47:6–48:9, 58:17–59:15, 227:7–23. The agendas and notes from month after month of partnering sessions provide a valuable repository showing JAR's failure to provide the justification for its requests. *See, e.g.*, Ex. P-21 at 4 (partnering session agenda from October 11, 2022, showing numerous pending requests for JAR to submit proposed change orders, time impact analyses, and other documentation, most of which appear to have been pending since June).

[250] Mr. Fino's testimony was very clear and credible on this important point. 2nd Stage Hr'g Tr. 103:10–104:18. Mr. Rosales eventually admitted it on cross-examination. 2nd Stage Hr'g Tr. 487:14–490:5.

have been timely raised for the Engineer's consideration, and because they were not, they cannot be valid grounds, now, on which to argue the default was wrongful.

The Court finds completely unconvincing the notion that JAR could submit schedules showing lengthening delays but not follow the instructions to submit documentation via the TIA and change order process, essentially holding the Project hostage, preventing Camino from calling a default until JAR deemed that the impacts of the various problems were fully solved and thus decided it would submit the final paperwork. This is directly contrary to the contractual scheme. These are *core* issues on which the Engineer is entitled to deference *under the Contract that JAR signed*. The Court has no power to get JAR out of an agreement that it now regrets. The Engineer's reasonable instructions—including his documentation requests/requirements—should have been followed. They were not. There is not much more that needs to be said.

Mr. Fino and Mr. Ordonez were completely clear and convincing on these points. They were open to JAR being awarded more time—but only if it submitted the appropriate analyses and backed them up for the Engineer's consideration.[251] Because that documentation was absent, the completion deadline was never extended. The Court simply cannot conceive how the Trustee could expect this Court or any factfinder to second guess the credible testimony of Mr. Fino and Mr. Ordonez on this point, given the clarity of the testimony and evidence.

Assuming any further analysis is even necessary, JAR's argument is not convincing on the substance either. Mr. Rosales testified that the obstructions were pervasive, and that in terms of his workflow as a contractor, the interruptions and inconveniences required to move equipment around obstructions can be considerable. But this testimony cannot carry the weight that JAR wants it to.

The Court heard credible testimony and saw evidence that JAR could have made progress on numerous parts of the Project despite the right-of-way issues. No doubt, obstructions affect the pacing and cost of the Project. But absent more specific and concrete evidence, the Court simply cannot find that they had such a drastic impact as to explain the very extreme delays on this Project. The affected areas do not appear nearly as pervasive or substantial as the Trustee has sought to convey. As both maps and video evidence made plain, the vast majority of the project area was not affected by right-of-way issues—and yet those areas were left incomplete. After all, this is not a situation where Camino Real is splitting hairs about every foot of a

---

[251] Again, there are many possible citations. *See, e.g.*, 2nd Stage Hr'g Tr.47:6–48:9, 227:7–23.

project. The Project was not even half-completed, and JAR's last projection bumped its proposed completion back to February 2024.[252] This might be a very different case if JAR had been making substantial progress everywhere except the right-of-way areas. But that is not what was happening.

Maybe the Court is wrong on this substantive point, because of course, its consideration relies only on the evidence it has heard and been able to consider and its non-specialist understanding of construction. But that possibility again returns to the procedural issue: JAR should have timely filed all appropriate paperwork and put the matter squarely *before the Engineer for his consideration* in a contractually appropriate fashion, if it was such a problem. It should be mentioned that the evidence suggests that JAR had pervasive financial, staffing, and operational problems, which the credible testimony of Mr. Fino and Mr. Ordonez portrayed as unusual in their experience—cycling through project managers and superintendents, struggling to pay subcontractors on time, failing to obtain necessary materials including rebar and cement, missing documentation requirements for payment and project management, and inadequately staffing the Project.[253] The record also suggests that Camino and Atkins took extraordinary steps to "hand hold" JAR and try to complete the Project, but to no avail.[254] These general facts, which do not seem subject to any reasonable dispute, provide important context relevant to much of the analysis here as well as in the following sections, as the Court analyzes the various attempts of the Trustee to amplify Camino and the Engineer's perceived failings while ignoring those of JAR. For the moment, the Court merely notes that both the substantive and procedural problems discussed above seem likely to stem from these underlying problems at JAR.

---

[252] 2nd Stage Hr'g Tr. 71:8–15.

[253] *See, e.g.*, 2nd Stage Hr'g Tr. 27:4–17 (numerous superintendents and project managers); 41:14–44:8 (JAR operating "paycheck to paycheck," inability to obtain rebar or cement, inadequate staffing, lack of payment documentation), 52:8–55:3 (documentation issues), 58:17–62:20 (lack of staffing, failures to submit required documentation, need for extra support), 243:4–247:14 (staffing and documentation problems), 249:14–251:13 (subcontractors calling, Atkins putting in extra effort not required on any other project in Ordonez's experience).

[254] *See, e.g.*, 2nd Stage Hr'g Tr. 58:17–62:20, 243:4–247:14, 249:14–251:13.

### 3. There were ample grounds for default for failure to perform work in accordance with contractual requirements.

#### a. JAR consistently failed to provide concrete up to the contractual standards.

The Contract incorporated TxDOT specifications requiring concrete installed on the Project to meet certain standards for strength. Specifically, it required the concrete to be at 3,200 psi after 7 days, and 4,000 psi after 28 days.[255] Testing performed by Atkins' subcontractor showed that JAR's concrete was generally failing to meet that standard.[256] The concrete sampling and testing summary shows that many samples failed one or both of the tests.[257] When that was the case, rather than simply give up, the Engineer took the unusual step[258] of letting testing continue, to ascertain whether the concrete would *ever* reach the required 4,000 psi. Several samples continued to fail even at 90 days. The failures appeared to be particularly pronounced in mid- to late-2022, the last six or seven months before default. Of the nine samples in June and August of that year, only *one* attained 4,000 psi at 28 days as required by the Contract.[259]

The Trustee argues that because most of the concrete on the Project apparently, eventually, obtained the required strength, and because the Engineer did not actually require JAR to remove concrete, this cannot be a default.

The Court disagrees. The fact that the Engineer continued to test after the required time frame had passed and ultimately did not require JAR to remove any concrete does not excuse JAR's failure to meet the agreed-upon standards. The Engineer was entitled to demand removal, but his not doing so does not absolve JAR of its failure to perform. Removal would have placed this Project even further behind, and one can understand his reluctance to demand this step.[260] But his deciding that it was best for the Project to leave the existing concrete in place does

---

[255] Ex. P-129, Item 360. This provision was incorporated into the Contract by the Technical Specifications at 5. *See generally* 2nd Stage Hr'g Tr. 256:2–258:12.

[256] *See generally* 2nd Stage Hr'g Tr. 38:1–39:9.

[257] Ex. P-128.

[258] Mr. Fino testified: "[I]t's not common practice to test after 28 days. I mean, I've never seen it the whole time I was with—the 31 years I was with TXDOT . . . ." 2nd Stage Hr'g Tr. 39:17–19.

[259] Ex. P-128 at 5–6.

[260] The Engineer testified that while the Contract permitted him to demand removal, "we were working with them to get the concrete passed and move the project along. So, yeah, we did not want to make that decision in regards to moving the concrete." 2nd Stage Hr'g Tr. 46:1–3.

not change the facts: The evidence clearly shows that JAR's concrete was systematically failing to achieve the contractual requirements—perhaps even more so as time went on.

JAR also argued that its inability to progress on supplying sufficient concrete had to do with a broader shortage of cement (a crucial ingredient in concrete). The connection between this alleged shortage of supply and the lack of *strength* of JAR's concrete was not entirely clear, but it appears possible that JAR was using insufficient cement because of the alleged shortage, and so affecting the concrete's strength.[261]

In any case, JAR's evidence of an alleged nationwide concrete shortage was insufficient.[262] Instead, it appears that the shortage was particular to JAR, probably due to its business model: Because the principal of JAR also owned a materials supply company, Del Norte Materials, which effectively competed with other suppliers in the area, it seems likely that those competitors were understandably reluctant to help JAR out.[263] These particularities of JAR's position in the market do not excuse contractual non-performance. In light of JAR's failure to provide evidence of an actual shortage, and the testimony of Mr. Fino and Mr. Ordonez that they did not believe there was a shortage, the Court finds that no such shortage can be taken into account to excuse any aspect of JAR's non-performance.

### b. JAR failed to procure a required water enclosure.

There is no doubt that JAR failed to procure a water master meter enclosure that it was instructed to.[264] Again, for whatever reason, JAR simply appears to have been unable to prosecute this Project, as the Engineer determined, including in this respect.

### 4. The "cure items" in the Notice of Intent to Default were properly selected and the proper standard was applied to assess compliance with them.

The Trustee argues that there is no way the cure items contemplated in the Notice of Intent to Default could have been accomplished in the time provided. This

---

[261] *See, e.g.*, 2nd Stage Hr'g Tr. 38:1–39:9 (noting closeness in time between apparent weakening on concrete and lack of cement supply).

[262] 2nd Stage Hr'g Tr. 32:23–33:23, 42:3–20.

[263] *See, e.g.*, 1st Stage Hr'g Tr. 213:12–14; 2nd Stage Hr'g Tr. 390:22–391:25 (mentioning multiple competitors on the supply business side).

[264] 2nd Stage Hr'g Tr. 36:16–37:21; 44:9–45:1. *See* Ex. P-21 (partnering meeting agenda showing master meter enclosure apparently on the agenda in at least August, September, and October).

argument has numerous dimensions—as with other aspects of this case, the Trustee has thrown up argument after argument, but none of them are convincing. The Court analyzes the Trustee's arguments below, beginning with whether it is legally relevant whether or not the cure items could have been accomplished in the given period.

### a. JAR was not entitled to cure items accomplishable by a reasonable contractor in the time given.

As a reminder, Section 8L.7.1 of the Contract, "Declaration of Default," provides for numerous grounds for default, including "fail[ing] to begin the work within the number of days specified"; "fail[ing] to prosecute the work to assure completion within the number of days specified"; "[being] uncooperative, disruptive or threatening"; "fail[ing] to conduct the work in an acceptable manner"; and "commit[ting] fraud or other unfixable conduct as determined by the Owner."

After listing these grounds for default, the Contract states: "If any of these conditions occur, the Engineer will give notice in writing to the Contractor and the Surety of the intent to declare the Contractor in default. If the Contractor does not proceed as directed within 10 days after the notice, the Owner will provide written notice to the Contractor and the Surety to declare the Contractor to be in default of the Contract."

The Trustee, and perhaps even both parties, appear to assume that the language above, and particularly the last sentence, means that the Contractor has to be given "another chance," and maybe "another fair chance," before being defaulted; the Engineer has to "direct[]" the Contractor to do only such tasks as are reasonably accomplishable within 10 days. Call this a "right to reasonable cure." Much time and energy was spent in this case producing evidence and arguments speaking to whether such a right was honored here.

But the Court does not believe that the Contract in fact includes a "right to reasonable cure." The more likely reading is simply that the Engineer can provide directions as he wishes, whether to take particular reasonable steps to show good faith—or simply to cure whatever defects he specifies, up to and including curing *all* outstanding stated defaults. The Court sees no requirement that he pick and choose only a narrow range of those defects, all of which must be correctable within ten days.

A right to reasonable cure, in addition to apparently lacking support in the text of the Contract, seems illogical in its implications. Imagine a contractor that is

nine months behind when the Engineer finally runs out of patience. A notice of intent to default is issued, with the stated grounds for default being failure to prosecute the work to assure completion within the number of days specified. How many days of catch-up can the Engineer instruct the Contractor to complete within the ten-day cure period? 10? Perhaps 15 or even 20? Surely nothing more than that would meet the alleged "right to reasonable cure." But under this logic, if the Contractor proceeds as directed, at the end of the cure period, the Contractor will still be more than eight months behind. Does the Engineer have to issue *another* notice of intent? And another, and another, and another, until the Contractor finally catches all the way up? If not totally unworkable, this seems a surprising and inefficient system at best. The Court believes the more natural reading of the Contract would permit the Engineer to direct such a Contractor to "catch up to the schedule entirely" within the ten-day period or face default. An Engineer could, of course, direct a shorter time if he wished, but he would be within his rights to direct *full compliance* with the Contract by the end of the cure period—even if that was not reasonably possible because of just how far the Contractor had fallen behind.

Another argument against the right to reasonable cure: Some stated grounds for default are not curable at all. For example, "commit[ting] fraud or other unfixable conduct as determined by the Owner." This ground for default alone undermines a "right to reasonable cure," since it expressly contemplates "unfixable conduct." When faced with such conduct, presumably the Engineer will not have much "direction" to offer to the Contractor (aside, perhaps, from such steps as "show us that you did not in fact commit fraud or the other unfixable conduct specified herein"). It is difficult to square this ground of default with any implied "right to reasonable cure," which is another reason for the Court's skepticism with respect to such a right.

It is possible that the parties are aware of other contractual provisions or legal principles that undermine the analysis above. Indeed, Mr. Aldo Madrid of TxDOT may have believed that the right to reasonable cure existed. In his e-mail correspondence with Camino Real and Atkins staff, he pressed them to "ensure that [cure items] are achievable and defendable based on production rates without any outside impacts such as material availability and weather."[265] He also commented that "Several of the corrective actions may not be achievable within a ten (10) calendar day period. The work activities may be too stringent based on the Contractor production rates, current weather conditions, and unknown material

---

[265] Ex. P-61 at 1.

availability. Placing CRCP in the winter may be difficult for the Contractor."[266] The import of these comments is somewhat unclear; it is possible Mr. Madrid did not believe that Atkins/Camino had to honor any *right* to reasonable cure but just that he was encouraging them to follow general *practices* that TxDOT prefers to adhere to on its projects, in order to get projects done and avoid litigation (such as this very case). The Court cannot speculate further, and Mr. Madrid did not testify.

If there is no right to reasonable cure, as the Court believes, then most of the following analysis may not be necessary. But because of the possibility that there *is* a right to reasonable cure, the Court proceeds to analyze whether Camino Real's default was wrongful—that is, whether it honored such a right.

**b. Assuming JAR *was* entitled to such consideration, the cure items were appropriately chosen and doable within ten days by a reasonably competent contractor.**

The Trustee has objected to the cure items included in the Engineer's Notice of Intent to Default on several different grounds. He claims that at least some of the cure items were "immaterial," which apparently means either so trivial as to be easily addressed "in a matter of hours,"[267] or not likely to lead to "meaningful progress" because there was so much else that remained to be done.[268] The Trustee also protests that the rebar was "impossible for JAR to complete within the cure period."[269] There is some irony in the Trustee complaining that the tasks did not go to the heart of the Project but at the same time that they could not be accomplished in the time given—in other words, in a sense the Trustee complains both that the jobs were too small and that they were too large. One wonders how the Trustee thinks the Engineer and Owner could have threaded this particular needle. But it does not matter, because the Trustee's arguments completely distort the actual Contract that JAR actually entered into (as has already been seen in numerous respects).

First, the Court notes that the Trustee seems to misunderstand the reasons for default and the purpose of the cure notice. The initial grounds for default in the Notice of Intent to Default were plainly valid—namely, being far behind on the

---

[266] Ex. P-58 at 5.
[267] Tr.'s Reply at 11.
[268] Tr.'s Reply at 16.
[269] Tr.'s Reply at 16. The Trustee states the rebar cure item is "immaterial" for that reason, but the Court cannot follow its logic.

Project and not performing up to obligations. And as explained already, they are substantial and are obviously sufficient.[270]

By contrast, the cure items were, in this case, directions that the Engineer and Owner were willing to impose in order to permit JAR to continue with the Project *despite* the grounds for default (which even full performance of the cure items would not have fully cured, of course). The Contract does not prescribe a particular form for cure items; it plainly leaves them to the wide discretion of the Engineer. Accordingly, such cure items can be substantial, or they can be relatively minor, intended simply to restore faith in the Contractor's ability and willingness to proceed. In this case, as Mr. Fino put it, the purpose of the cure items was to assess: "Can they do the work? Can they ramp up and do the work that we're asking them to complete?"[271]

The rebar was (contrary to the Trustee's assertions) an important aspect of the core of the Project—moving the roadway toward completion. The water barriers were also an important safety feature, but ensuring that they were full might be considered less a way of advancing the central purpose of the Project and more ensuring that the Contractor could and would take care of important ancillary matters with proper attention to detail as required by the Contract.

The Court notes that the cure items were the product of extensive, careful, and thoughtful discussion among the Engineer and other Atkins staff, Camino Real, and TxDOT authorities. The Notice of Intent to Default went through a remarkably thorough and careful editing process.[272] One of the primary goals of that process was to ensure that the cure items could in fact be accomplished by a reasonable contractor in the ten days allotted. While the Trustee quibbles with the nature of the Engineer's analysis and decision-making, the Court respectfully disagrees. The Engineer and Mr. Ordonez testified confidently and credibly, in light of their extensive knowledge and experience, that the cure items could in fact be accomplished in ten days by a reasonable contractor.[273] JAR appears to have had neither the personnel nor the materials available to do the work, but its lack of preparedness—particularly

---

[270] To the extent that Camino took a position slightly inconsistent with this in Ex. P-26, the Court would simply state that it disagrees with both parties in how to interpret the Contract in various respects. But the Court would also note that this characterization of the default and intent to default does nothing to change the result here, or to alter the facts on the ground.

[271] 2nd Stage Hr'g Tr. 173.

[272] *See, e.g.*, Exs. P-54 through P-62.

[273] *See, e.g.*, 2nd Stage Hr'g Tr. 13:6–16; 68:10–18, 160:24–161:11, 203:12–204:25; 265:22–266:4.

remarkable in light of the fact that the rebar had been noted as a "priority" item in "Partnering Meetings" since October[274]—does not mean the requirements were unreasonable.

The Trustee argues that the rebar cure item was impossible, apparently because there were a few areas—such as around a manhole that JAR allegedly built up twice, but which failed (due to causes unknown) and that JAR had refused to build up a third time.[275] There were some rights of way and utility conflicts (such as Verizon utility boxes), areas where there was not yet asphalt, and areas where dirt and other matter obstructed the roadway. Among other things, however, the Trustee failed to prove that the utility conflicts were nearly as pervasive or obstructive as it would like the Court to believe. The evidence at trial—including drone videos, pictures, and maps, in addition to testimony—in fact suggested that most of the conflicts were not particularly substantial and could be dealt with while still making much more progress on the Project than JAR was making. (What is more, JAR's initial claim for wrongful default focused not on rights of way but on drainage, which further limits the credibility of its current claims related to utilities and rights of way.[276]) Although the Trustee made much of the areas that were not fully ready for rebar, the Court found Camino's arguments and evidence (including the very credible testimony of Mr. Fino and Mr. Ordonez) more persuasive and finds that JAR could have completed a much more substantial amount of the area than it did. There is a rule of reason at work here. As Mr. Fino testified, JAR could simply have inquired about the problem areas, and Mr. Fino would have clarified that he (obviously) did not intend to require rebar over all of these small but impossible areas, since that could not be accomplished in ten days. Or if JAR had simply completed all that *was* possible, then of course, defaulting it on the basis of the few areas that were not reasonably possible might well have been gross error. But again, as Mr. Fino credibly testified, he would not have recommended default under those circumstances.

In the end, these hypotheticals do not matter, because JAR got nowhere close to installing the rebar on the prescribed areas—installing rebar only over about 19% of the prescribed area, by Mr. Rosales' own estimate.[277] The Court does not intend

---

[274] Ex. P-62 at 24.

[275] *See, e.g.*, 2nd Stage Hr'g Tr. 302:10–24, 541:8–545:3.

[276] *See* Ex. TR-25 at 1 (not mentioning utilities or rights of way and claiming that "JAR placed rebar at all locations where it was possible"), 3 (with pictures and notations emphasizing drainage issues, mentioning rights of way only with respect to the construction of an inlet).

[277] 2nd Stage Hr'g Tr. 557:9–10; 199:15–200:24 (noting that all this work should have been ready

to completely disregard the other testimony of Mr. Rosales, who generally insisted that the conflicts were so pervasive across the entire Project that there was no reasonable way to make progress. But the Court is persuaded that the failure to complete anything like the entire prescribed area with rebar has more to do with JAR's supply issues and personnel unavailability than drainage or rights of way or dirt onsite or any other field conditions. Perhaps, too, Mr. Rosales genuinely believed that this was a misplaced priority, and that his team's energy would be best directed elsewhere. Perhaps he was correct about that; but under the Contract, unfortunately, the decision was not his to make, it was the Engineer's.

In any case, for whatever reasons that the Court will not speculate on, there is ample evidence that JAR was simply unable to function at the level necessary to make progress on this Project, and that fact remained consistent during the cure period as well. The Court does not doubt that right of way and other issue impacted JAR's performance, but as discussed above, JAR failed to do what it needed in order to obtain additional time as a result of those issues. The evidence before the Court on this point just could not change the basic facts: Placing rebar was a known and explicit "priority" well *before* the Notice of Intent to Default, and it can be no surprise that JAR's inability to place even a majority of the directed rebar drove Camino to default it.

In sum, taken as a whole, the evidence solidly shows that the cure items were appropriate and could be accomplished within ten days.

### c. JAR did not perform as directed in the Notice of Intent to Default, either by laying rebar, purchasing the water meter enclosure, or correcting traffic control problems.

The Trustee next insists that JAR *did* comply with the directions in the Notice of Intent to Default. This is not supported by the facts. The Court finds that in at least three respects, JAR did not proceed as directed: It failed to purchase the required water meter enclosure, it did not install rebar over the required area, and it did not complete the required traffic control measures. Because these three were unquestionably not performed, and because any one of the three would be sufficient to support the default, the Court focuses on them. This should not be taken as an implicit finding that JAR otherwise complied with the other directions. The Court simply declines to rule on the remaining issues given how clear each of these is.

---

to perform for months and was identified a "priority" item as of the late-October partnering meeting where the surety was present).

The Notice of Intent to Default laid out a concrete set of directions. It included these two: "place CRCP reinforcing steel between STA 131+00 and 151+50" and "provide evidence of order placement for the water master meter enclosure."[278] It also required JAR to "implement and maintain the traffic control (TCP) as shown on the plans to be in compliance with the specification requirements of the corresponding contract terms."[279] JAR asked for clarification of the third item and received it by e-mail on Monday, December 12. Among the other items specified was this instruction: "Water barriers: Fill with water and replace if damaged."[280] JAR failed with respect to the CRCP reinforcing steel (rebar), the water meter enclosure, and the traffic control, specifically the water barriers.

First, as already discussed, JAR failed to properly place rebar in the stated area, which was a little more than 2,000 feet of the Project roadway. The Court has already found that this direction was reasonable despite some parts of the stated area where rebar could not be laid.

The Trustee argues that the Notice of Intent to Default was unclear: "The letter does not explicitly state that JAR has to complete the referenced items within ten days."[281] It also suggests that JAR's progress was sufficient to show its intent or commitment to the Project, as adequate assurance. None of this is credible. The Notice of Intent to Default is clear in its instructions—not to *begin placing* the rebar, but to *place* the rebar, over this area.

As noted—and as would have been obvious to all—a few sections of the area might not have been able to be completed for various reasons, but a simple question to the Engineer could have cleared up any doubt about those minor exceptions. And the Contract does not require, in response to a notice of intent to default, showing an intent to eventually "proceed as directed." Rather, the Contract requires the Contractor to "proceed as directed." JAR placed less than 20% of the directed rebar. There can be no reasonable doubt that JAR failed to do so.

The Court notes as well the credible testimony that JAR failed to supply proper required certifications for the rebar that was installed.[282] Because this fell

---

[278] Ex. P-22.

[279] Ex. P-22.

[280] Ex. P-20. Mr. Ordonez testified that this email was duplicative of what had been regularly discussed concerning traffic control deficiencies. 2nd Stage Hr'g Tr. 266:17–267:8.

[281] Tr.'s 2nd Stage Proposed Findings and Conclusions at 11, 14.

[282] *See e.g.*, 2nd Stage Hr'g Tr. 84:9–14, 86:13–14. This was consistent with the Engineer's

short of the contractual specifications, it would be another grounds on which the rebar placement could not be deemed to conform to the instructions in the Notice of Intent to Default.

Second, JAR failed to purchase the water meter enclosure which, as discussed above, it was supposed to have purchased—and according to credible testimony, *claimed* to have purchased—months before.[283] At the end of the cure period, it produced only an unexecuted purchase order, which on its face was not valid or binding because it was not signed.[284]

Third, JAR did not fill the water barriers as directed. This was confirmed by the testimony and evidence of Mr. Ordonez, who performed an inspection of the barriers at the end of the cure period.[285] He found that eighty-eight barriers were not adequately filled. Some barriers had trash in them and appeared to have been empty for quite a while. Again, the direction was very clear in the e-mail sent as a follow-up on the Notice of Intent to Default. Just as clearly, JAR failed to perform as directed.

In sum, the clear evidence is that JAR failed to perform as directed in at least these three ways. Any one of these three failures to comply with the directions in the Notice of Intent to Default would have been sufficient, under the Contract, for Camino Real to default JAR from the Contract.

### d. Ten calendar days was a contractually permitted cure period, and even if it wasn't, the error was harmless.

The Trustee argues that JAR should have been given ten working days rather than calendar days to complete the cure items. This argument appears to rely on two lines of reasoning: the Notice of Intent to Default stated that the work had to be performed in "10 days" and not "10 calendar days," and because the Contract also provides for "10 days" under such circumstances.

---

observations before the cure period. *See* 2nd Stage Hr'g Tr. 185:8–18. Mr. Rosales denied this but in the Court's opinion did not credibly rebut it. 2nd Stage Hr'g Tr. 557:21–23.

[283] 2nd Stage Hr'g Tr. 36:16–37:21, 44:9–45:1.

[284] 2nd Stage Hr'g Tr. 70:9–71:2; Ex. P-23 at 4–11. The Trustee's proposed findings are plainly incorrect when it states to the contrary. *See* Tr.'s 2nd Stage Proposed Findings and Conclusions at 19 ("On December 19, 2022, JAR provided its written response to the cure notice. That letter confirmed . . . provided the cure documentation requested by CRRMA, i.e. . . . proof of water meter order . . . .").

[285] *See e.g.*, Ex. P-39; 2nd Stage Hr'g Tr. 268:19–270:11.

The Notice of Intent to Default states as follows: "Pursuant to Article 8L.7 of the Standard Specifications contained in the Contract, if Contractor does not perform the above-described corrective actions as directed within 10 days after receipt of this notice to the satisfaction of the CRRMA, the CRRMA intends to provide written notice to Contractor and the Surety declaring Contractor to be in default of the Contract."[286] The Contract requires that when receiving a notice of intent to default, the Contractor must "proceed as directed within 10 days after the notice," on penalty of default.[287]

The Contract favors Camino Real's interpretation. Admittedly, the Technical Specifications portion of the Contract are not explicit on the point, in that they sometimes use the term "calendar days," sometimes "working days," sometimes "business days," and sometimes just "days." That said, "calendar days" is only specified 24 times, whereas "working days" is used 64 times, and nearly always in contexts that reflect the full contractual meaning of that term, which serves important financial and technical purposes in delimiting the rights and responsibilities of the parties. The Court has reviewed every single use of the word "days" in the Contract and believes that the particular use of "10 days" in the default provision Article 8L.7 should be interpreted to mean calendar days.

If so, then the Notice of Intent to Default, which matches the contractual language in providing "10 days," should be interpreted to follow that meaning. Notably, this is how Mr. Rosales of JAR appears to have interpreted it at least initially, as he sent his response to Camino on December 19,[288] exactly ten calendar days after he received the Notice of Intent to Default.[289]

The Court also notes that while Camino Real sent the notice of default on December 22,[290] it was not received until December 27.[291] Wrongful default might be a closer issue if JAR had completed the steps, or come anywhere near doing so, before receiving the notice. But it did not.

---

[286] Ex. P-22 at 1–2.

[287] Tech. Specs., Sec. 8L.7.1.

[288] Ex. P-23.

[289] Notably, it appears that according to the Contract, the Notice of Intent to Default could have started the "clock" on December 7, the date the letter was sent. *See* Tech. Specs., Sec. 1L3.157 ("The date of the letter will serve as the beginning day of notice."). But instead, Camino provided that letter would be effective upon receipt. Ex. P-22 at 1–2 ("10 days after receipt of this notice").

[290] Ex. P-24.

[291] Ex. P-64.

Finally, if this is error, and the Trustee should have been entitled to ten working days, it is a harmless and immaterial one. As noted, JAR was not close to performing, particularly with respect to the rebar. And given that it appears that JAR's own principal thought that December 19 was the deadline, and yet had not taken care of straightforward matters such as the water barriers, the Court cannot imagine finding the default was wrongful on this basis. This is at most a minor "foot fault" and not an independent ground to overturn a well-considered and merited default decision.

**E.    Camino Real would prevail even if the Court applied a reasonableness or even a preponderance of the evidence standard instead of the Gross Error standard.**

The governing standard in this case is Gross Error. The Court is comfortable in that holding and the contract interpretations required to reach it.

Yet because the evidence is so convincing, the Court feels bound to add an alternative holding: Even if Gross Error were not the standard, the Court would still uphold the default because a preponderance of the evidence favors Camino Real. That is, the Court finds that Camino Real has shown not just that the decisions were all reasonable but that it was correct by a preponderance of the evidence that JAR was in default for all of the reasons stated above, that the cure items were appropriately chosen, that compliance with them was correctly assessed, and that the default was not wrongful.

**F.    The Trustee's remaining arguments are meritless.**

**1.  There was no waiver of the right to default JAR for late performance.**

The Trustee argues that Camino Real waived its right to default JAR for late performance by allowing 139 calendar days to pass between the contracted deadline of July 21, 2022, and the Notice of Intent to Default dated December 7, 2022. This argument borders on frivolous (if not crossing the line into it).

The Trustee cherry-picks language and facts from a body of law developed in the context of federal contract and procurement law. Sometimes known as the "waiver of delivery date doctrine," the relevant doctrine has been summarized as follows: "The essence of this doctrine is that where action or inaction by the Government following a contractually-established delivery date induces a contractor to continue performance in the face of default, the Government is estopped from

enforcing the specified delivery date."[292] The Trustee argues that the principle means that because Camino had not called JAR's default for the many months it had exceeded the specified completion date, Camino had waived the right to do so.

One problem for the Trustee's argument is that this doctrine has been largely rejected in the context of construction contracts like this one. A "long line of cases" finds that the sort of estoppel argument underlying the waiver of delivery date doctrine "is not normally applicable where the contract contains the usual provisions applicable to construction contracts entitling the contractor to payment for work performed subsequent to the specified completion date but also entitling the Government to recover liquidated damages for late completion."[293] In other words, the principle is "not normally applicable" here. In addition, assessing liquidated damages from the original deadline has been held to successfully preserve the government from waiver.[294] That too obviously applies to this situation. This body of law, when studied with any seriousness, is much less helpful than the Trustee portrays it to be.

Texas law is the law that governs here, in any case. One helpful case applying Texas law is the Fifth Circuit case of *Dallas-Ft. Worth Regional Airport Board v. Combustion Equipment Associates, Inc.*[295] This case emerged from a failed solid waste disposal project at DFW Airport. After numerous lengthy delays, the airport terminated the contract. One of the contractor's arguments was that because the airport had waived its initial completion deadline, the airport was required to provide notice and set a new deadline before termination. The Fifth Circuit held, to the contrary, that when a project has been beset by particularly lengthy or unreasonable delays, no explicit notice or new deadline need be set, because "passage of time alone might eventually give notice that the contract requirements should have been

---

[292] *Tarzan Const., Inc.*, ENGBCA No. 5552, 91-2 BCA ¶ 23887 (citing *De Vito v. United States*, 413 F.2d 1147 (1969)).

[293] *Darwin Const. Co., Inc.*, GSBCA No. 10193, 91-1 BCA ¶ 23419 (quoting *Brent L. Sellick*, ASBCA No. 21869, 78–2 BCA ¶ 13,510); *Nagy Enters.*, ASBCA No. 48815, 98-1 BCA ¶ 29695 (discussing same); *Timberland Paving and Const. Co. v. U.S.*, 18 Cl. Ct. 129, 147 (1989) ("While the *DeVito* rule is applicable outside the supply contract context, the rule 'has only been applied when exceptional or rare circumstances are presented in a construction contract case.'" (quoting *Indem. Ins. Co. of N. Am. v. U.S.*, 14 Cl. Ct. 219, 224 (1988)).

[294] "Much as the Government can waive its rights under a contract, it can also preserve them, such that forbearance would not permit reliance by the defaulting party. The Government can retain its rights by expressly indicating as much to the other party *or by assessing liquidated damages.*" *Abcon Assocs., Inc. v. U.S.*, 44 Fed. Cl. 625, 629 (1999) (emphasis added and internal citations omitted).

[295] 623 F.2d 1032 (5th Cir. 1980).

met."[296] The rule is one of reasonableness. In the case before it, the Fifth Circuit analyzes reasonableness as follows:

> [T]he record reveals that for eighteen months the Board tolerated CEA's redundant but unfulfilled promises of prompt completion. According to the evidence, neither the incinerator nor any of its component parts was ever satisfactorily operational at the site, even at the date of final eviction. . . . [The] circumstances indicate the Board's patient and helpful attitude toward CEA's prolonged efforts to create the functioning system they had promised. The Board's resignation to the inevitable failure of CEA's system was not unreasonable in that situation.[297]

Termination without notice was therefore acceptable.

Waiver requires a highly fact-specific inquiry.[298] The facts here most certainly do not favor a finding that Camino had waived its right to default JAR. The only fact that "favors" the Trustee's position is that by the time Camino finally defaulted it, JAR had already been in default as to the time of performance a very long time, and Camino had continued to work with JAR and encourage progress on the Project.

The problem for the Trustee is that throughout this lengthy time, Camino by no means accepted the delay or agreed to extend JAR's deadlines. It is absurd to suggest otherwise. Very much to the contrary, Camino consistently prodded JAR to submit appropriate paperwork if there were reasons to extend the deadline per the terms of the Contract, and in the meantime, it assessed liquidated damages[299] and pressured JAR to get back on schedule, making clear that it considered the contractual deadlines (as extended by the contractual means) to still be in place and enforceable even if they had not yet called a default.

Evidence shows that at the regular "partnering meetings" held with JAR— which increased in frequency in mid- to late 2023 due to JAR's failure to

---

[296] *Id.* at 1036.

[297] *Id.* at 1037.

[298] *See, e.g., Lewis v. Smith*, 198 S.W.2d 598, 601 (Tex. Civ. App. 1946).

[299] The Contract provides for liquidated damages to be assessed in section 8L.6 and then in the next section 8L.7.1 also provides for default to be available on grounds that the contractor "fails to prosecute the work to assure completion within the number of days specified." Under the contractual scheme, the accrual of liquidated damages by no means serves as some sort of waiver.

progress[300]—Camino consistently reiterated the contractual deadline (which was never later than July 21, 2022) and showed openness to a "goal" date only of January 31, 2023,[301] while indicating the need for appropriate paperwork to support *any* further extension (which remained lacking). The surety was even invited to one of the "partnering meetings," again showing heightened urgency.[302]

Further, JAR was by no means prosecuting the work so as to "assure completion" by even the "goal" date of January 31, 2023. Thus, even if there had been "waiver" of the original contract date from July 2022 to January 31, 2023 (which the evidence does not support), a default based on JAR's failure to progress at anywhere near even the "goal" deadline would be appropriate. In fact, the evidence shows that JAR's progress if anything seems to have slowed down in the months prior to default. From July to December, the overall completion of the project appears to have progressed only from 47% to 50%,[303] with many items specifically discussed (and *even designated as "priority items"* in prior meetings[304]) not completed. This is obviously not reasonable progress to any sort of reasonable goal. Even if Camino Real had waived JAR's earlier failures to be anywhere near its contractual obligations earlier, these latter failures would easily suffice to support default. In fact, JAR's proposed timelines kept extending and extending, while it failed to produce the documentation required to support any extensions. As the Fifth Circuit observed in the *DFW Airport* case, Camino's "resignation to the inevitable failure of [JAR] was not unreasonable in that situation."[305]

The Trustee offers the Texas appellate court decision of *Baker Marine Corp. v. Weatherby Engineering Co.*[306] to support his argument. In *Baker Marine*, the owner sent a notice of default on February 1, 1983, giving the contractor five days "take positive steps to remedy this problem or [the owner] will be forced to take positive steps to complete the project by other means."[307] The contractor responded

---

[300] 1st Stage Hr'g Tr. 68:2–10; 2nd Stage Hr'g Tr. 521:1–13. Mr. Fino explained that the level of detail he was forced to get into with JAR was unusual in his experience but was caused by the numerous issues JAR was having progressing on the project. *See* 1st Stage Hr'g Tr. 71:19–73:14.

[301] 2nd Stage Hr'g Tr. 34:19–36:12 (explanation of "goal" date and fact that it did not change contractual end date).

[302] 2nd Stage Hr'g Tr. 562:1–3 (Mr. Rosales agreeing that when the surety became involved, the "heat's definitely been turned up a notch").

[303] Ex. P-52 shows 47% as of October. 2nd Stage Hr'g Tr. 57:21–58:5; 71:1–6, 184:23–25.

[304] Ex. P-62 at 24 (prioritizing rebar in area that was not completed by time of default).

[305] 623 F.2d at 1037.

[306] 710 S.W.2d 690 (Tex. App. 1986).

[307] *Id.* at 691.

the next day, "outlining the steps that it was implementing in order to 'remedy [the] problem.'"[308] The owner then worked closely with the contractor for four months, including by negotiating and agreeing on change orders and accepting and agreeing to percentage completion reports.[309] "Although [the owner] did continue to complain to [the contractor] about delays, no other written notice of default was given" before the owner sent a notice of termination on May 1.[310] These facts were held to be sufficient to uphold a jury verdict of waiver in favor of the contractor.

*Baker Marine* is not factually similar. Here, unlike *Baker Marine*, there was no notice of default giving a short timeline for cure followed by a lengthy period of cooperation, such that the contractor could have been taken by surprise. To the contrary, as discussed, Camino gave very ample warnings of serious problems to JAR, before it sent the Notice of Intent to Default, which it promptly enforced. Further, as the Court has already found, Camino laid out a way for JAR to preserve the Contract in the Notice of Intent to Default. JAR was unable to perform the corrective steps in part because it had failed to order supplies for items that were specifically noted as "priority" items in recent partnering meetings.

In sum, the Court finds that Camino Real by no means and in no way waived its right to default JAR for late performance. To the contrary, JAR was repeatedly and clearly put on notice that its delays were not acceptable and that all of the contractual consequences of that failure were on the table. The default was by no means unequitable.

## 2. Even if Camino Real did not obtain TxDOT'S "concurrence" that JAR was in default, which is by no means certain, that would not affect the dispute between Camino Real and the Trustee.

The Trustee has argued that default in wrongful because Camino Real failed to follow certain requirements contained in TxDOT's Local Government Project Management Guide.[311] Namely, section 9.2.18 of the Guide provides among other regulations that "[p]rior to termination of a federal aid contract for which TxDOT concurred in the award, the LG shall consult with and receive the concurrence of

---

[308] *Id.* at 693.

[309] *Id.*

[310] *Id.*

[311] *See* Tr.'s Mot. for Reconsideration at 4–5; Tr.'s 1st Stage Proposed Findings and Conclusions at 27–28.

TxDOT."[312] The Trustee claims that because Camino did not obtain this "concurrence," the default was wrongful.

First, it is by no means clear that TxDOT did not concur in the default process. The record reflects the involvement of TxDOT at both the Notice of Intent to Default stage at the Notice of Default stage. Camino and Atkins staff were in touch with Mr. Aldo Madrid, Director of Construction of TxDOT's El Paso District, who reviewed both letters to JAR prior to their being sent.

Most tellingly, after receiving a draft Notice of Default on December 20, 2022—in other words, very shortly before the Contract was terminated for default— Mr. Madrid wrote as follows to Mr. Telles of Camino:

> TxDOT has no comments on the draft letter you provided for our review. As with any "Default" on any construction project, make sure this is the path the that [sic] "Owner" needs to take; other measures were taken along the way with no success and this is the last resort.
>
> Feel free to contact me if you have any questions or if you need any assistance.[313]

This certainly looks like "concurrence." Mr. Madrid had "no comments," provided only advice he considered applicable to "any 'Default' on any construction project," raised no objections, and seems to have contemplated no further correspondence before termination. And this e-mail was sent "prior to termination," as required by the Local Government Project Management Guide. There is no basis on which to claim the Local Government Project Management Guide was not complied with, given this evidence.

The Trustee's motivation for urging this argument is presumably the correspondence that preceded the Notice of Intent to Default, in which Mr. Madrid provided some specific criticism, some of which Camino took to heart and some which it did not.[314] First, the Court reiterates that on the plain text of the Local Government Project Management Guide, it sees no requirement that TxDOT's

---

[312] Ex. TR-75.

[313] Ex. P-64.

[314] See, e.g., Exs. P-59 through P-62. See also 1st Stage Hr'g Tr. 87:22–88:1. The testimony at trial was somewhat ambiguous on the concurrence point. 1st Stage Hr'g Tr. 112:19–113:13; 2nd Stage Hr'g Tr., 171:4–9, but the Court finds Mr. Fino's testimony on redirect to be compelling and to represent the more accurate testimony. 1st Stage Hr'g Tr. 128:2–15; 2nd Stage Hr'g Tr. 198:9–199:14.

concurrence be obtained prior to sending a Notice of Intent to Default. Perhaps it is prudent to obtain input at this stage, since the actual default appears to require approval; but there appears to be no such legal requirement. Second, this correspondence too likely establishes concurrence. As was stated at trial, it does appear that TxDOT "acquiesced."[315] Whether or not it had reservations or suggestions, it certainly took no step to stop the Notice of Intent to Default despite having the opportunity to do so.

Third and most importantly, even if the local government guidelines applied not just to the actual termination but to the Notice of Intent to Default, and even if TxDOT did not concur (both very big "ifs"), there is absolutely nothing that indicates that violation should benefit JAR—that if Camino Real did not follow TxDOT guidelines, it is some sort of defense to contractual default that can be raised by JAR and adjudicated by this Court. It seems to the Court that this regulation is a matter of internal state governance—a regulation protecting TxDOT and helping it control local authorities. It looks at most like a violation of internal regulations, a matter to be settled between Texas and its governmental unit, Camino Real—not one that would provide any sort of cause of action or legal defense to a third party like JAR or the Trustee.

For these reasons, this argument has no merit.

## Conclusion

The Court came into this trial unclear on what the evidence would show. In their briefing in earlier stages of the case and leading up to trial, the parties had painted very, very different pictures of the evidence. Ultimately, the evidence itself left a very clear impression: Camino's story was the one that was supported by the overwhelming weight of the evidence.

The big picture is very simple. This is not a close case. Unfortunately, for whatever reasons, JAR was unable to perform its contractual obligations on this Project. It was far behind time, it had not complied with its paperwork responsibilities under the Contract, and it had failed to perform according to the Contract. It also failed to take the steps required by the Notice of Intent to Default.

---

[315]  1st Stage Hr'g Tr. 128:2–15.

The Trustee has sought to shift the blame to Camino Real, making the most of various alleged mistakes. But the Trustee's numerous arguments don't add up to much at all.

Camino Real put on extensive and credible testimony from the Engineer concerning all important aspects of this case. The Engineer also credibly testified that the obstacles faced by JAR, such as the right-of-way issues, did not represent the massive barriers to progress that the Trustee has portrayed them as. And perhaps more importantly: if they were so substantial, JAR failed to assert them and gain time through the appropriate means as directed by the Engineer.

The Court casts no aspersions on JAR or its principals, and it recognizes their contributions to El Paso and to this region and state over the years. The Court realizes the potential impact of this ruling on both the bankruptcy estate and on Mr. Rosales and his family. But the Court is bound to follow the law. And after long and careful consideration of the evidence and the governing law, the very clear conclusion here is that Camino Real properly defaulted JAR under the Contract. That is the Court's holding.

# # #